# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SIERRA CLUB, CITIZENS ACTION
COALITION OF INDIANA,
HOOSIER ENVIRONMENTAL
COUNCIL, and ENVIRONMENTAL
LAW AND POLICY CENTER,

           Petitioners,

           v.

U.S. DEPARTMENT OF ENERGY,
and CHRIS WRIGHT, in his official
capacity as Secretary of Energy,

           Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 26-1057

## PETITION FOR REVIEW

Sierra Club, Citizens Action Coalition of Indiana, Hoosier Environmental

Council, and Environmental Law and Policy Center (collectively, "Public Interest

Organizations") petition the Court for review of the Department of Energy and

Secretary of Energy Christopher Wright's (collectively, "DOE") Order No. 202-25-

13, dated December 23, 2025 (the "Order," Exhibit A); DOE's Notice of Denial of

Rehearing by Operation of Law and Providing Further Consideration, Order No.

202-25-13A, dated February 23, 2026 ("Rehearing Denial Order," Exhibit B); and

any amendment or modification of the Order or the Rehearing Denial Order. Public Interest Organizations petition under Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*(b), and Section 502 of the DOE Organization Act of 1977, 42 U.S.C. § 7192(a), along with Federal Rule of Appellate Procedure 15(a) and D.C. Circuit Rule 15(a).

The prerequisites for judicial review of this petition have been met. On January 22, 2026, Public Interest Organizations timely moved to intervene and sought rehearing of the Order (Exhibit C). DOE has denied Public Interest Organizations' request for rehearing. *See* Rehearing Denial Order. Public Interest Organizations' petition is filed within sixty days after the denial of rehearing. 16 U.S.C. § 825*l*(b). This Court has subject matter jurisdiction, Public Interest Organizations are parties aggrieved by the Order, and venue is proper. *Id.* § 825*l*(a)–(b).

Dated: March 16, 2026

Respectfully Submitted,

[continued for signatures]

/s/ Jennifer Yun[1]
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
1250 I St. NW, Fourth Floor
Washington, DC 20005
(202) 745-5210
jyun@earthjustice.org
mlenoff@earthjustice.org

Sameer Doshi (DC Cir. 64549)
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 800-8332
sdoshi@earthjustice.org

*Counsel for Citizens Action Coalition
of Indiana, and Hoosier
Environmental Council*

/s/ Gregory E. Wannier
Gregory E. Wannier (DC Cir. 55920)
Tony Mendoza
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
tony.mendoza@sierraclub.org

Jonah Baskin (DC Cir. 66682)
Sierra Club Environmental Law Program
50 F Street NW, Eighth Floor
Washington, DC 20001
(202) 556-3917
jonah.baskin@sierraclub.org

*Counsel for Sierra Club*

/s/ Bradley Klein
Bradley Klein
Nicholas Wallace
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
(312) 673-6500
bklein@elpc.org
nwallace@elpc.org

*Counsel for Environmental Law &
Policy Center*

---

[1] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

# RULE 26.1 DISCLOSURE STATEMENTS

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment. Sierra Club has no parent companies and no publicly held company has a 10% or greater ownership interest in Sierra Club.

Citizens Action Coalition of Indiana is a non-profit organization, organized and existing under the laws of the State of Indiana. Citizens Action Coalition of Indiana does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Hoosier Environmental Council is a non-profit organization, organized and existing under the laws of the State of Indiana. Hoosier Environmental Council does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Environmental Law & Policy Center states that it is a non-profit environmental organization, organized and existing under the laws of the State of Illinois. Petitioner Environmental Law & Policy Center does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

*/s/ Jennifer Yun*[2]
Jennifer Yun (DC Cir. 66550)
Michael Lenoff (DC Cir. 66374)
1250 I St. NW, Fourth Floor
Washington, DC 20005
(202) 745-5210
jyun@earthjustice.org
mlenoff@earthjustice.org

Sameer Doshi (DC Cir. 64549)
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 800-8332
sdoshi@earthjustice.org

*Counsel for Citizens Action Coalition
of Indiana, and Hoosier
Environmental Council*


*/s/ Bradley Klein*
Bradley Klein
Nicholas Wallace
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
(312) 673-6500
bklein@elpc.org
nwallace@elpc.org

*Counsel for Environmental Law &
Policy Center*

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Tony Mendoza
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
tony.mendoza@sierraclub.org

Jonah Baskin (DC Cir. 66682)
Sierra Club Environmental Law Program
50 F Street NW, Eighth Floor
Washington, DC 20001
(202) 556-3917
jonah.baskin@sierraclub.org

*Counsel for Sierra Club*

---

[2] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

# CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statements** and all attachments with the Clerk of the Court using the Court's CM/ECF system.

I further certify that I have on this 16th day of March, 2026, caused copies of the foregoing to be served via certified priority mail, return receipt requested, on:

Chris Wright
Secretary, U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585

Pamela Bondi
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Jeffrey Novak
Acting General Counsel
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

I also caused copies to be sent via electronic mail to AskCR@hq.doe.gov and The.Secretary@hq.doe.gov.

I have also served a copy of the foregoing on all parties to the proceeding before the DOE via electronic mail.

Dana Nessel,
  Michigan Attorney General
Lucas Wollenzien
Michael E. Moody
  Assistant Attorney General
Special Litigation Division
525 W. Ottawa St.
P.O. Box 30755
Lansing, MI 48909
WollenzienL@michigan.gov
MoodyM2@michigan.gov


Robert Funk
Christine F. Ericson
Special Assistant Attorneys General
Illinois Commerce Commission
Office of the General Counsel
160 N. LaSalle St., Suite C-800
Chicago, IL 60601
(312) 793-2877
Robert.Funk@Illinois.gov
Christine.Ericson@Illinois.gov

Keith Ellison,
  Attorney General of Minnesota
Peter Surdo
Cat Rios-Keating
Alyssa Bixby-Lawson
  Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
Peter.Surdo@ag.state.mn.us


Kwame Raoul,
  Attorney General of the State of Illinois
Samuel C. Lukens,
  Assistant Attorney General
Office of the Illinois Attorney General
115 South LaSalle St., 25th Floor
Chicago, IL 60603
Samuel.Lukens@ilag.gov
jason.james@ilag.gov


Tricia DeBleekere
  Executive Director
Brad Pope
  Legal and Regulatory Director
Organization of MISO States
811 E. Washington Ave., Suite 400
Madison, WI 53703
tricia@misostates.org
brad@misostates.org

Dated: March 16, 2026

Respectfully submitted,

*/s/Jennifer Yun*
Jennifer Yun

# EXHIBIT A



# Department of Energy
Washington, DC 20585

### Order No. 202-25-13

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA),[1] and section 301(b) of the Department of Energy Organization Act,[2] and for the reasons set forth below, I hereby determine that an emergency exists in portions of the Midwest region of the United States due to a shortage of electric energy, a shortage of facilities for the generation of electricity, and other causes. Issuance of this Order will meet the emergency and serve the public interest.

### *BACKGROUND*

The F.B. Culley Generating Station (Culley) is an electric generating facility in Warrick County, Indiana. Culley is owned and operated by CenterPoint Energy and consists of two coal-fired generation units, Unit 2 (103.7 MW) and Unit 3 (265.2 MW), with a combined name plate capacity of 368.9 MW. Unit 2 and Unit 3 began operations in 1966 and 1973, respectively. Unit 2 is slated to cease operations in December 2025.[3]

### *EMERGENCY SITUATION*

Midcontinent Independent System Operator, Inc.'s (MISO) year-round resource adequacy concerns are well documented. In 2022, MISO requested Federal Energy Regulatory Commission (FERC) approval of its filing to revise its resource adequacy construct (including the Planning Resource Auction or PRA) to establish capacity requirements for each of the four seasons of the year rather than on an annual basis determined by peak summer demand.[4] MISO justified this revision by explaining that "Reliability risks associated with Resource Adequacy have shifted from 'Summer only' to a year-round concern."[5] MISO noted that over 60% of all "MaxGen" events (events when MISO initiates emergency procedures because of concerns over the adequacy of available generation) occurred outside of the summer season.[6]

In December of 2023, MISO released an "Attributes Roadmap," in which it presented "an in-depth look at the challenges of operating a reliable bulk electric system in a rapidly

---

[1] 16 U.S.C. § 824a(c).

[2] 42 U.S.C. § 7151(b).

[3] As a coal-fired facility, it would be difficult for Culley Unit 2 to resume operations once it has been retired. Specifically, any stop and start of operation creates heating and cooling cycles that could cause an immediate failure that could take 30-60 days to repair if a unit comes offline. In addition, other practical issues, such as employment, contracts, and permits may greatly increase the timeline for resumption of operations. Further, if Culley were to begin disassembling the plant or other related facilities, the associated challenges would be greatly exacerbated. Thus, continuous operation is required in such cases so long as the Secretary determines a shortage exists and is likely to persist.

[4] *Midcontinent Independent System Operator, Inc.,* FERC Docket No. ER22-495-000 (Nov. 30, 2021). This request was approved by FERC on August 31, 2022. *See Midcontinent Independent System Operator, Inc.*, 180 FERC ¶ 61,141 (2022).

[5] MISO Transmittal Letter at 3, FERC Docket No. ER22-495-000 (Nov. 30, 2021).

[6] *Id.* at 3-4.

transforming energy landscape."[7]  Among other things, this report described changes in the time of year during which the risk of the loss of load was greatest.  For the 2023/24 Planning Year, the greatest risk of loss of load was in the summer, but it is expected that by the summer of 2027, there will be an equal loss of load risk in both the summer and fall seasons.  MISO also projected that the risk of loss of load in the winter and spring seasons, although not as high as in the summer or fall, will nevertheless increase over time.[8]

More recently, MISO affirmed the resource adequacy problems occurring outside of its summer season in its 2024 report entitled, "*MISO's Response to the Reliability Imperative.*"[9]  In a section of that report entitled "Risks in Non-Summer Seasons," MISO again stressed that it has resource reliability concerns outside of the summer season:

> Widespread retirements of dispatchable resources, lower reserve margins, more frequent and severe weather events and increased reliance on weather-dependent renewables and emergency-only resources have altered the region's highest historic risk profile, creating risks in non-summer months that rarely posed challenges in the past.[10]

These MISO studies indicate that the emergency conditions caused by the loss of generation capacity in MISO extend past the summer season.  The evidence indicates that there is also a potential longer term resource adequacy emergency in MISO.

In its 2024 Long-Term Reliability Assessment (LTRA), the North American Electric Reliability Corporation (NERC) notes that the MISO assessment area is at an elevated risk "because probabilistic assessments indicate above-normal generator outages during extreme weather can result in unserved energy or load loss.  With uncertainty around new resource additions and existing generator retirements, MISO is also at risk of falling below [Reference Margin Levels] within the next five years."[11]

When MISO reported the results of its PRA for the 2025-26 Planning Year, it noted that "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources" in the northern and central zones, which include Indiana.[12]

On June 6, 2025, the Organization of MISO States (OMS) and MISO issued the results of their survey, which has been conducted annually for many years to determine the degree to

---

[7] MISO, *Attributes Roadmap*, at 3 (Dec. 2023), https://cdn.misoenergy.org/2023%20Attributes%20Roadmap631174.pdf.

[8] *Id.* at 11.

[9] MISO, *MISO's Response to the Reliability Imperative* (Updated Feb. 2024), https://cdn.misoenergy.org/2024+Reliability+Imperative+report+Feb.+21+Final504018.pdf.

[10] *Id.* at 12.

[11] *NERC 2024 Long-Term Reliability Assessment*, at 13 (December 2024, corrected July 11, 2025), https://www.nerc.com/globalassets/our-work/assessments/2024-ltra_corrected_july_2025.pdf.

[12] MISO, *Planning Resource Auction: Results for Planning Year 2025-26*, at 13 (April 2025), https://cdn.misoenergy.org/2025%20PRA%20Results%20Posting%2020250529_Corrections694160.pdf.

which expected capacity resources satisfy planning reserve margin requirements.[13]  The 2025 Survey presented projections of resource adequacy for the summer of 2026 and subsequent years.  Although the survey projected a potential capacity surplus for the summer of 2026, it also projected that at least 3.1 GW of additional generation capacity beyond currently committed generation capacity must be added to meet the projected planning reserve margin.[14]  The survey also projected that there would be insufficient capacity to meet the peak demand for electricity in each of the following four summers, increasing from a deficit of 1.4 GW in 2027 to 8.2 GW in 2030.[15]  Similar results were projected for MISO's winter seasons, with a small surplus of generation capacity in 2026, followed by increasing deficits the following four years.[16]

The primary reasons for these projected deficits also are shown on the OMS-MISO survey.  Large quantities of existing generation capacity are projected to be retired each year while, at the same time, the demand for electricity is projected to increase at an accelerating pace.[17]  Although the OMS-MISO survey projects generation capacity to continue to increase in the coming years with the addition of new potential generation assets, the increase in capacity is largely offset by the projected retirements, and does not keep up with the growth in demand.[18]

MISO has been taking steps to address these projected deficits, but the solution is years away.  For example, on June 6, 2025, MISO submitted a proposal to FERC to establish an Expedited Resource Addition Study (ERAS) process to provide a framework for the expedited study of interconnection requests to address urgent resource adequacy and reliability needs in the near term.  This proposal was approved by FERC on July 21, 2025.[19]  The ERAS process should help expedite the construction of needed new capacity.  However, resources studied under the ERAS will have commercial operation dates that are at least three years away, and are provided an additional three-year grace period to commence commercial operations.[20]  In addition, supply chain constraints impeding the acquisition of critical grid components, including large natural gas turbines and transformers, are likely to further hinder rapid construction and exacerbate reliability concerns.[21]  Consequently, it is not at all clear that the new ERAS process will result in the addition of new capacity in the next few years.

---

[13] OMS and MISO, *OMS-MISO Survey Results* (Updated June 6, 2025), https://cdn.misoenergy.org/20250606%20O MS%20MISO%20Survey%20Results%20Workshop%20Presentation702311.pdf.

[14] *Id.* at 2.

[15] *Id.* at 7.

[16] *Id.* at 9.

[17] *Id.* at 7, 9.

[18] *Id.*

[19] *Midcontinent Independent System Operator, Inc.,* 192 FERC ¶ 61,064 (2025).

[20] *Id.* P 84.

[21] *See generally*, S&P Global, *US Gas-Fired Turbine Wait Times as Much as Seven Years; Costs Up Sharply*, (May 2025), ("With demand for natural gas-fired turbines in the US rapidly accelerating amid power demand growth forecasts driven by AI, manufacturing, and electrification, wait times for turbines are anywhere between one and seven years depending on the model, and costs have increased considerably, experts told Platts."), https://www.spglobal.com/commodity-insights/en/news-research/latest-news/electric-power/052025-us-gas-fired-turbine-wait-times-as-much-as-seven-years-costs-up-sharply.

More broadly, executive orders issued by President Donald J. Trump on January 20, 2025, and April 8, 2025, underscore the dire energy challenges facing the Nation due to growing resource adequacy concerns.  President Trump likewise declared a national energy emergency in Executive Order 14156, "Declaring a National Energy Emergency," that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[22]  The Executive Order adds: "Hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."[23]  In a subsequent Executive Order 14262, "Strengthening the Reliability and Security of the United States Electric Grid," President Trump emphasized that "the United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and increase in domestic manufacturing."[24]

Further, the Department detailed the myriad challenges affecting the Nation's energy systems in its July 2025 "Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid," issued pursuant to the President's directive in Executive Order 14262.  The Department concluded that "[a]bsent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation."[25]

## *ORDER*

FPA section 202(c)(1) provides that whenever the Secretary of Energy determines "that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy," then the Secretary has the authority "to require by order . . . . such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest."[26]  This statutory language constitutes a specific grant of authority to the Secretary to require the continued operation of Culley Unit 2 when the Secretary has determined that such continued operation will best meet an emergency caused by a sudden increase in the demand for electric energy or a shortage of generation capacity.

---

[22] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (*Declaring a National Energy Emergency*), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[23] *Id*.

[24] Executive Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025) (*Strengthening the Reliability and Security of the United States Electric Grid*), https://www.federalregister.gov/documents/2025/04/14/2025-06381/strengthening-the-reliability-and-security-of-the-united-states-electric-grid.

[25] U.S. Department of Energy, *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid*, at 1 (July 2025), https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf.

[26] Although the text of FPA section 202(c) grants this authority to "the Commission," section 301(b) of the Department of Energy Organization Act transferred this authority to the Secretary of Energy. *See* 42 U.S.C. § 7151(b).

Such is the case here.  As described above, the emergency conditions resulting from increasing demand and shortage from accelerated retirement of generation facilities will continue in the near term and are also likely to continue in subsequent years.  This could lead to the loss of power to homes and businesses in the areas that may be affected by curtailments or power outages, presenting a risk to public health and safety.  Given the responsibility of MISO to identify and dispatch generation necessary to meet load requirements, I have determined that, under the conditions specified below, continued additional dispatch of Culley Unit 2 is necessary to best meet the emergency arising from increased demand, determined shortage, and other causes, and serve the public interest under FPA section 202(c).

To ensure Culley Unit 2 will be available if needed to address emergency conditions, Culley Unit 2 shall remain in operation until March 23, 2026.

Based on my determination of an emergency set forth above, I hereby order:

A.  From December 23, 2025, MISO and CenterPoint Energy shall take all measures necessary to ensure that Culley Unit 2 is available to operate.  For the duration of this Order, MISO is directed to take every step to employ economic dispatch of Culley Unit 2 to minimize cost to ratepayers.  Following the conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices.  CenterPoint Energy is directed to comply with all orders from MISO related to the availability and dispatch of Culley Unit 2.

B.  To minimize adverse environmental impacts, this Order limits operation of dispatched units to the times and within the parameters as determined by MISO, pursuant to paragraph A.  MISO shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether Culley Unit 2 has operated in compliance with the allowances contained in this Order.

C.  All operations of Culley Unit 2 must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions.  This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D.  By January 13, 2026, MISO is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of Culley Unit 2 consistent with this Order.  MISO and CenterPoint Energy shall also provide such additional information regarding the environmental impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E.  CenterPoint Energy is directed to file with the Federal Energy Regulatory Commission tariff revisions or waivers to effectuate this Order.  Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F.  This Order shall not preclude the need for Culley Unit 2 to comply with applicable state, local, or Federal laws or regulations following the expiration of this Order.

G.  Because this Order is predicated on the shortage of facilities for generation of electric energy and other causes, Culley Unit 2 shall not be considered a capacity resource.

H.  This Order shall be effective from 11:59 PM Eastern Standard Time (EST) on December 23, 2025, and shall expire at 11:59 PM Eastern Daylight Time (EDT) on March 23, 2026, with the exception of applicable compliance obligations in paragraph D.

Issued in Denver, Colorado at 6:39 PM EST on this 23rd day of December 2025.


_Chris Wright_

Chris Wright
Secretary of Energy


cc:  **FERC Commissioners**
    Chairman Laura V. Swett
    Commissioner David Rosner
    Commissioner Lindsay S. See
    Commissioner Judy W. Chang
    Commissioner David A. LaCerte

    **Indiana Utility Regulatory Commission**
    Chairman Jim Huston
    Commissioner David Veleta
    Commissioner David Ziegner

# EXHIBIT B

# UNITED STATES OF AMERICA
## Department of Energy
Washington, DC 20585

Midcontinent Independent System Operator, Inc.                    Order No. 202-25-13A
and CenterPoint Energy, Inc. Regarding the
F.B. Culley Generating Station

## NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION
(February 23, 2026)

Rehearing has been timely requested of the Department of Energy's order issued on December 23, 2025, in the above-captioned matter.[1]  Thirty (30) days having passed from the date on which rehearing requests were filed, the requests for rehearing are deemed denied by operation of law.[2]

As provided in 16 U.S.C. § 825*l*(a) and 16 U.S.C. § 824a(c), the requests for rehearing of the above-cited order may be addressed in a future order.[3]

Chris Wright
Secretary of Energy

---

[1] *Midcontinent Indep. Sys. Operator, Inc. and CenterPoint Energy, Inc.*, Order No. 202-25-13 (2025) (regarding the F.B. Culley Generating Station).

[2] 16 U.S.C. § 825*l*(a).

[3] 16 U.S.C. § 825*l*(a) (DOE may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper); 16 U.S.C. § 824a(c) (DOE may issue a supplemental order).

# EXHIBIT C

BEFORE THE UNITED STATES DEPARTMENT OF ENERGY

| | | |
|---|---|---|
| Federal Power Act Section 202(c) Emergency Order: Midcontinent Independent System Operator (MISO) and Northern Indiana Public Service Company LLC | ) ) ) ) ) ) | Order No. 202-25-12 |
| Federal Power Act Section 202(c) Emergency Order: Midcontinent Independent System Operator (MISO) and CenterPoint Energy Indiana South | ) ) ) ) ) ) | Order No. 202-25-13 |

Motion to Intervene and Request for Rehearing and Stay of
Sierra Club, Citizens Action Coalition of Indiana, Just Transition Northwest
Indiana, Hoosier Environmental Council, Environmental Law and Policy Center,
and Public Citizen (collectively, "Public Interest Organizations" or "PIOs")

**I. INTRODUCTION** ........................................................................................... 3

**II. STATEMENT OF ISSUES AND SPECIFICATION OF ERROR** .................. 5

**III. INTERVENORS' INTERESTS** ...................................................................... 7

**IV. BACKGROUND** ........................................................................................... 10

    A. *The Primary Actors in the Electric Industry Already Protect Resource Adequacy Without Intrusion from the Department.* ......................................... 10

        1. The Federal Energy Regulatory Commission Regulates Wholesale Electricity Markets and Mechanisms that Acquire Adequate Resources. 10

        2. MISO Protects Reliability and Resource Adequacy Through FERC-Regulated Reserve Margin Requirements, a Residual Capacity Auction, and Retirement Approvals. ...................................................................... 12

        3. MISO Also Continuously Monitors the Grid to Balance Supply and Demand, and to Prevent Blackouts Using an Escalating Sequence of Real-Time Alerts that Activate Reserve Resources in a Specific, Predetermined Order. ............................................................................................... 16

        4. Indiana Evaluates Resource Adequacy Through Integrated Resource Planning and Annual Capacity Procurement Requirements. ................... 19

1

5.   NERC Protects Reliability via Standards and Regular Assessments. ....... 21

B.  *The Evidence Shows No Reliability or Resource Adequacy Crisis in MISO for Winter 2025–2026, Spring 2026, or Thereafter.* .............................................. 23

1.   There Is No Evidence of a Resource Adequacy Crisis in the current Winter or upcoming Spring Seasons. ..................................................... 23

2.   There Is No Evidence of a Resource Adequacy Crisis After Spring 2026.  26

C.  *Schahfer and Culley Should Retire As Soon As Possible.* .............................. 30

1.   Schahfer and Culley Were Built Four to Six Decades Ago. ...................... 30

2.   The Owners of Schahfer and Culley 2 Are Investor-Owned Utilities Subject to Extensive Regulation. .................................................. 31

3.   Schahfer and Culley 2 Are Old, Unreliable, Inflexible, Dirty, and Expensive. ............................................................... 32

4.   Schahfer's Retirement Has Been Carefully Planned and Well Executed to Ensure Resource Adequacy. ...................................................... 39

5.   Culley 2's Retirement Has Been Carefully Planned and Well Executed, and Overseen by the Indiana Commission to Ensure Resource Adequacy… ............................................................... 43

**V. REQUEST FOR REHEARING** ......................................................... **45**

A.  *The Orders Address Circumstances Beyond the Lawful Scope of an Emergency Under Section 202(c), and Fail to Provide Evidence or Reasoned Decision-Making Substantiating the Existence of an Emergency that Can Come Within Section 202(c).* ...................................................... 48

1.   Legal Framework: Section 202(c) Empowers the Department to Respond Only to Imminent, Certain, and Unexpected Shortfalls in Electricity Supply. ................................................................. 48

2.   The Orders' Primary Focus is Long-Term Bulk-System Reliability, Which Is Not a Basis to Mandate Generation Under Section 202(c). ................... 56

3.   The Orders Do Not, and Could Not, Provide any Valid Evidence or Reasoned Decision-Making to Support Their Stated Near-Term Resource Adequacy Concerns. ............................................................ 65

B.  *The Orders Are Not Based on Reasoned Decision-Making and Substantial Evidence in Imposing Requirements to Best Meet the Claimed Emergency and Serve the Public Interest.* ...................................................... 71

1.   Legal Framework: Section 202(c)(1) Authorizes the Department to Require Only Generation that Best Meets the Emergency and Serves the Public Interest. ................................................................. 71

2.  The Orders do not address the generators' unreliability or explain how, in light of that unreliability, the generators could meet the claimed emergency. ............................................................... 73

3. The Orders Do Not Address the Plants' Continued Demonstration of Their Technical Inability to Meet the Claimed Emergency.................................78

4. The Orders Do Not Address or Reflect Consideration of Alternatives. ....... 80

C. *The Orders Exceed Other Limits on the Department's Statutory Jurisdiction...* ..................................................................................................................... *81*

1. The Department Lacks Jurisdiction to Impose the Availability Requirements.................................................................................. 81

2. The Department Lacks Jurisdiction to Disallow Treatment of Schahfer or Culley 2 as a Capacity Resource. ............................................. 84

D. *The Orders Fail to Provide the Conditions Required Under Section 202(c) to Lessen Conflicts with Environmental Standards and Minimize Environmental Harm.*.................................................................................... *87*

1. Legal Framework: Section 202(c) Further Limits the Department's Authority and Mandates Affirmative Steps to Maximize Environmental Compliance and Minimize Environmental Harm Where the Order "May Result in a Conflict" with a Federal, State, or Local Environmental Law or Regulation. ........................................................................................... 87

2. The Orders May Result in a Conflict with a Federal, State, or Local Environmental Law or Regulation. ........................................................ 88

**VI. REQUEST FOR STAY**.........................................................................................**94**

A. *Intervenors Will Suffer Irreparable Harm Without a Stay of the Orders.* ...... *94*

B. *A Stay Would Not Result in Harm to Any Other Interested Parties.* .............. *95*

C. *A Stay Is in the Public Interest Given the Significant Evidence Demonstrating There is No Factual or Legal Support for These Orders, and Given the Harm they Produce to the Broader Public.* ............................................................. *95*

**VII. CONCLUSION** .................................................................................................**96**

## I. INTRODUCTION

Both Units 17 and 18 of the R.M. Schahfer Generating Station ("Schahfer") and Unit 2 of the F.B. Culley Generating Station ("Culley 2") in Indiana (collectively, the "Plants") are very expensive and very toxic to operate. For example, operating Schahfer beyond 2025 would require *more than one billion dollars* in expenditures, according to its owner, Northern Indiana Public Service Company LLC ("NIPSCO"). Ex. 4 at 13 (Powers January Declaration).

NIPSCO and Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South ("CenterPoint Indiana"), which owns Culley 2, determined pursuant to years-long, state-mandated integrated resource planning ("IRP") processes that the Plants are no longer needed to serve customer demand past 2025. Accordingly, NIPSCO and CenterPoint Indiana long ago resolved to close the Plants in December 2025.

That long-anticipated transition was disrupted last month when the Department of Energy ("Department") issued two 90-day orders under Section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c). See Order No. 202-25-12 (Exhibit 1, the "December Schahfer Order") and Order No. 202-25-13 (Exhibit 2, the "December Culley Order") (collectively, the "Orders"). The Department justifies these intrusive orders by alleging concerns about resource adequacy and reliability, but its concerns are based on selective quotations of some documents, elementary misunderstandings or mischaracterizations of additional documents, and disregard of governing law to engage in a forbidden effort to usurp others' authority. Moreover, the concerns expressed in the Orders are not primarily focused on the actual 90-day period at issue (*i.e.*, the period starting on December 23, 2025 and extending to late March of 2026). The evidence shows there is every reason to believe that the actors with authority over resource adequacy and reliability— FERC, NERC, MISO, Indiana regulators, the electric utility owners, and others— have provided for adequate resources and reliability in the Winter 2025–26 and Spring 2026 seasons, in all arguably relevant geographies, and will continue doing so going forward.

The Department is acting pursuant to a new and unprecedented policy to exceed its carefully constrained emergency authority under Section 202(c) in order to prevent coal plant retirements. The policy is unlawful because Section 202(c) applies only to imminent, unexpected shortfalls, not to the Department's preference for specific types of energy generation.

The Orders will cause significant harm. The significant cost of running the Plants, hundreds of thousands of dollars a day, are likely to be borne by households and families in the area. *See infra* sec. IV.C.3; Ex. 5 (Synapse Report).

And there are other more deadly costs as well. Schahfer and Culley 2 are dirty, old plants that spew pollution into the air and into the Kankakee and Ohio Rivers. *See infra* sec. IV.C.3. Operation of all these units leads to premature deaths and deepens the harms to communities already injured by decades of environmental pollution. *See id.*

4

Public Interest Organizations thus respectfully request that the Department grant intervention; stay the Orders; grant rehearing and rescind the Orders (and any renewals of the Orders); and allow the two Indiana Plants at issue—Schahfer and Culley 2—to retire as planned.[1]

## II. STATEMENT OF ISSUES AND SPECIFICATION OF ERROR

The undersigned Public Interest Organizations move to intervene and request rehearing and a stay of both Orders pursuant to Section 313(a) of the Federal Power Act, 16 U.S.C. § 825*l*(a), and the applicable rules of practice and procedure, 18 C.F.R. §§ 385.203, .212, .214, .713; *see* Ex. 8 (Cooke Email to Alle-Murphy) (recommending that "a party seeking rehearing can look for procedural guidance to [Federal Energy Regulatory Commission's ("FERC")] Rules of Practice and Procedure, 18 CFR Part 385.").[2] Public Interest Organizations' motion and requests are based upon the following errors and issues:

    A. The Department has not demonstrated that an emergency exists in any portion of MISO as required by Section 202(c) of the Federal Power Act; nor has the Department demonstrated that an emergency exists as defined in the

---

[1] Because the two Orders employ nearly identical language and reasoning and are both addressed to power generating plants in the Indiana zone of the MISO transmission grid, Public Interest Organizations are here submitting a single Request for Rehearing applicable to each of the Orders.

[2] Until sometime after June 18, 2025, the Department maintained a webpage with procedures for intervention and rehearing requests. U.S. Dep't of Energy, *DOE 202(c) Order Rehearing Procedures* (visited June 18, 2025), https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures (attached as Ex. 30) [hereinafter "DOE Rehearing Procedures"]. The Department maintains another website which currently states, "All public comments and requests related to FPA section 202(c) should be sent via email to AskCR@hq.doe.gov. . . . Additional information about 202(c) procedures, if necessary, will be announced on this page. The provision of this process for submission of correspondence or comments on any pending application is for purposes of ensuring the receipt by the appropriate office and personnel within the Department. Establishment of this email address does not establish a 'docket,' and those submitting correspondence do not constitute parties or intervenors to any proceeding." U.S. Dep't of Energy, *DOE's Use of Federal Power Act Emergency Authority* (last visited Jan. 22, 2025), https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority (attached as Ex. 74) [hereinafter "DOE 202(c) Webpage"]. Public Interest Organizations' instant motion and requests are also pursuant to the DOE 202(c) Webpage and the DOE Rehearing Procedures.

implementing regulations for Section 202(c). *See, e.g.,* 16 U.S.C §§ 824(a)–(b), 824a(a)–(c); 10 C.F.R. §§ 205.371–.375; *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39,984 (Aug. 6, 1981); *Hughes v. Talen Energy Mktg., LLC,* 578 U.S. 150 (2016); *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000); *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303 (1961); *Citizens Action Coal. v. FERC,* 125 F.4th 229 (D.C. Cir. 2025); *Conn. Dep't of Pub. Util. Control v. FERC,* 569 F.3d 477 (D.C. Cir. 2009); *Alcoa Inc. v. FERC,* 564 F.3d 1342 (D.C. Cir. 2009); *Cal. Indep. Sys. Op. Corp. v. FERC,* 372 F.3d 395 (D.C. Cir. 2004); *Otter Tail Power Co. v. Federal Power Commission,* 429 F.2d 232 (8th Cir. 1970); *Richmond Power & Light v. FERC,* 574 F.2d 610, 615 (D.C. Cir. 1978); *Duke Power Co. v. Fed. Power Com.,* 401 F.2d 930, 938 (D.C. Cir. 1968).

B.  Even if the emergency described by the Orders did exist—it does not—the Department has not demonstrated a reasoned basis for its determination that additional dispatch of Schahfer and Culley 2 is necessary to "best meet the emergency and serve the public interest." See, e.g., 16 U.S.C. § 824a(c); 10 C.F.R. § 205.373; Dep't of Homeland Sec. v. Regents of the Univ. of Calif., 591 U.S. 1 (2020); Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208 (2009); *Allentown Mack Sales & Service, Inc. v. NLRB,* 522 U.S. 359 (1998); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983); *NAACP v. Fed. Power Comm'n,* 425 U.S. 662 (1976); *Gulf States Utils. Co. v. Fed. Power Comm'n,* 411 U.S. 747 (1973); *Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973); *California v. Fed. Power Comm'n,* 369 U.S. 482 (1962); *Pa. Water & Power Co. v. Fed. Power Comm'n,* 343 U.S. 414 (1952); *Nat'l Shooting Sports Found., Inc. v. Jones,* 716 F.3d 200 (D.C. Cir. 2013); *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n,* 412 F.3d 133 (D.C. Cir. 2005); *Sierra Club v. Env't. Prot. Agency,* 353 F.3d 976, 980 (D.C. Cir. 2004); *Wabash Valley Power Ass'n, Inc. v. FERC,* 268 F.3d 1105 (D.C. Cir. 2001).

C.  The Orders' availability requirements and the Orders' override of Schahfer and Culley 2's tariff-defined capacity treatment each exceed the Department's authority and are unreasoned. *See, e.g.,* 16 U.S.C. §§ 824(a)–(b), 824a(b)–(c); *Gallardo v. Marstiller,* 596 U.S. 420 (2022); *Hughes v. Talen Energy Mktg., LLC,* 578 U.S. 150 (2016); *FERC v. Elec. Power Supply Ass'n,* 577 U.S. 260 (2016); *Gomez-Perez v. Potter,* 553 U.S. 474 (2008); *Fed. Power Comm'n v. Fla. Power & Light Co.,* 404 U.S. 453 (1972); *Conn. Light & Power v. Fed. Power Comm'n,* 324 U.S. 515 (1945); *Conn. Dep't of Pub. Util. Control v. FERC,* 569 F.3d 477 (D.C. Cir. 2009).

6

D.  The Department has unlawfully failed to ensure that the Orders compel generation only during hours necessary to meet the emergency and serve the public interest, that operations are consistent with any applicable environmental laws to the maximum extent practicable, and that any adverse environmental impacts are minimized. *See, e.g.*, 16 U.S.C. § 824a(c)(2); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016); *Fla. Power & Light Co. v. FERC*, 88 F.3d 1239 (D.C. Cir. 1996); *City of New Orleans v. FERC*, 67 F.3d 947 (D.C. Cir. 1995); Ex. 9 (DOE Order No. 202-22-4); Ex. 6 (DOE Order No. 202-17-4 Summary of Findings); Ex. 110 (DOE Order No. 202-24-1).

## III. INTERVENORS' INTERESTS

As further discussed below, each of the Public Interest Organizations has interests that may be directly and substantially affected by the outcome of these proceedings. Each party may therefore intervene in these proceedings. 18 C.F.R. § 385.214; *see* Ex. 30 (DOE Rehearing Procedures); Ex. 74 (DOE 202(c) Webpage); Ex. 8 (Cooke Email to Alle-Murphy).

The Public Interest Organizations also demonstrate concrete injuries arising from the Orders that are redressable by a favorable outcome. Each organization is therefore aggrieved by the Department's Orders and may properly apply for rehearing. *See* Federal Power Act, § 313(a), 16 U.S.C. § 825*l*(a); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1112 (D.C. Cir. 2001); 18 C.F.R. §§ 385.203, 385.713; Ex. 30 (DOE Rehearing Procedures); Ex. 74 (DOE 202(c) Webpage); Ex. 8 (Cooke Email to Alle-Murphy).

### A.  Sierra Club

As of December 2025, over 8,000 Sierra Club members reside in Indiana. Sierra Club members are harmed by pollution produced by operating the Culley and Schahfer coal units. Sierra Club has over 900 members in Jasper County, Indiana, where Schahfer is located, and the adjoining counties. Sierra Club has approximately 300 members in Warrick County, Indiana, where Culley is located, and the adjoining counties. The Orders to operate these Plants beyond their planned retirement date will subject Sierra Club members to additional air and water pollution in the areas where they live, work, and recreate. In addition, Sierra Club members include people who pay for electricity from CenterPoint Indiana and NIPSCO.

Sierra Club has demonstrated an organizational commitment to the interests of reducing pollution from these coal-burning power plants. Sierra Club's Beyond Coal Campaign seeks to reduce the pollution currently being produced by coal-burning

power plants such as Culley and Schahfer, and to reduce energy bills by ensuring that ratepayers do not fund the cost of continuing to operate uneconomic coal plants like Culley and Schahfer. To those ends, Sierra Club has advocated for the retirement of the Culley plant in multiple regulatory proceedings, including CenterPoint Indiana's 2016, 2020, 2023, and 2025 Integrated Resource Plan stakeholder processes, a fuel adjustment clause docket related to forced outages at the Culley plant, and electric rate cases. Sierra Club has also submitted comments to the Indiana Department of Environmental Management on draft air and water permits for the Culley plant, advocating for more stringent pollution requirements. Sierra Club has advocated for the retirement of Schahfer in several regulatory proceedings, including a certificate of public necessity proceeding for retrofits at the Schahfer plant in 2017, and NIPSCO's 2014, 2016, and 2018 Integrated Resource Plan stakeholder processes. In 2019, Sierra Club signed a multi-party settlement in NIPSCO's electric rate case that adjusted the depreciation schedule for the Schahfer plant to align with a 2023 retirement and that provided that electric customers were to receive a bill credit upon the plant's retirement.

Sierra Club has invested staff and volunteer time, as well as significant financial resources to hire experts, to advocate for the retirement of Culley and Schahfer. Sierra Club has submitted hundreds of individual comments to the utilities and Indiana Commission advocating for the retirement of these coal units. By denying these and other benefits of the Culley 2 and Schahfer Plants' retirements, the Orders harm Sierra Club and its members.

### B. Citizens Action Coalition of Indiana

Citizens Action Coalition of Indiana, Inc. ("CAC") is Indiana's oldest and largest consumer and environmental advocacy organization. Since 1974, CAC has helped Hoosiers save more than $10 billion in excess utility charges. CAC advocates on behalf of Hoosiers on issues regarding energy policy, utility reform, health care, pollution prevention, and family farms. CAC's activities include research, public education, organizing citizens, lobbying, intervening in utility cases before the Indiana Utility Regulatory Commission ("IURC"), and litigating when necessary. CAC engages in rate cases, cost recovery proceedings, certificates of public convenience and necessity proceedings, demand side management proceedings, and numerous other matters impacting the cost or reliability of Hoosiers' energy services, including numerous proceedings associated with the planned retirements of Schahfer and Culley 2. CAC also participates in the rigorous Integrated Resource Plan stakeholder processes required for Indiana's jurisdictional electric utilities

submitting integrated resource plans every three years according to Indiana Code § 8-1-8.5-3(e)(2).

### C. Just Transition Northwest Indiana

Just Transition Northwest Indiana ("JTNWI"), a nonprofit corporation chartered under the laws of Indiana, is a grassroots environmental justice organization serving the Northwest Indiana region, primarily Lake, Porter, LaPorte, and Jasper Counties, that centers on organizing and base-building activities. JTNWI's mission is to educate and organize Northwest Indiana communities and workers, give voice to our shared stories, and support a just transition to a regenerative economy that protects the environment, climate, and future generations. Since the organization's formation in 2020, JTNWI has worked tirelessly on issues related to utility affordability, pollution response and accountability, and industrial decarbonization within the NIPSCO service territory, including Wheatfield and Jasper County, Indiana, where the R.M. Schahfer Generating Station is located, communities JTNWI serves whose health and livelihoods will be adversely impacted by the 202(c) emergency order. JTNWI works across the local, state, and federal levels, including advocating for coal ash waste clean closures, plant retirements, and just transition planning in fossil fuel-impacted communities in the region, and is actively involved in public comment periods and interventions in NIPSCO electric rate cases before the Indiana Utility Regulatory Commission and in environmental permits with the Indiana Department of Environmental Management and the United States Environmental Protection Agency.

### D. Hoosier Environmental Council

Hoosier Environmental Council, Inc. ("HEC") is a 501(c)(3), non-profit, public interest environmental policy and advocacy organization chartered under the laws of Indiana. Since its formation in 1983, HEC has been and continues to be committed to protecting Indiana's air, land, waterways and wildlife habitat through initiatives in education, research, technical assistance, public policy advocacy, and legal action including the enforcement of federal and state laws that protect Indiana's natural resources. To further its mission, HEC actively seeks federal and state agency implementation and enforcement of environmental laws and regulations, and when necessary initiates enforcement actions on behalf of HEC and its members. For more than 40 years, HEC has advocated for measures to reduce the harm that coal-fired power does to land, air, water, and human health. HEC has been active regarding the Schahfer and Culley 2 sites, as well as many current and former coal-fired power plants, advocating on behalf of its members for safe closure of coal-fired power stations and proper closure of coal combustion

9

residual waste ponds and landfills. HEC's interest is in protection of air, water and land quality at and around these sites.

### E.  Public Citizen

Established in 1971, Public Citizen is a national research and advocacy organization representing the interests of household consumers. Public Citizen has members and supporters in every state, including those who pay electric utility bills in Indiana and the Midwest. Public Citizen is active before the Federal Energy Regulatory Commission promoting just and reasonable rates, and in supporting efforts for utilities to be accountable to the public. Financial details about the organization are on its website. Public Citizen, Annual Reports, www.citizen.org/about/annualreport/.

### F.  Environmental Law and Policy Center

Environmental Law and Policy Center ("ELPC") is a not-for-profit environmental organization headquartered in Chicago with members and contributors throughout the Midwest, including in Indiana. Among other things, ELPC advocates before the Indiana Utility Regulatory Commission and the Federal Energy Regulatory Commission for clean, reliable energy generation in order to reduce ratepayer costs and improve environmental outcomes. ELPC has participated in IURC cases and matters involving NIPSCO and other Indiana utilities. See, *e.g.*, IURC Cause No. 44688 (NIPSCO 2015 Rate Case); IURC Cause No. 45378 (Vectren Distributed Generation Rider); Duke Energy Indiana 2024 IRP.

## IV. BACKGROUND

### A.  The Primary Actors in the Electric Industry Already Protect Resource Adequacy Without Intrusion from the Department.

#### 1.  The Federal Energy Regulatory Commission Regulates Wholesale Electricity Markets and Mechanisms that Acquire Adequate Resources.

FERC regulates wholesale sales and transmissions of electric energy in interstate commerce. 16 U.S.C. § 824(b)(1). Federal authority over the electric grid dates back at least to 1935, when the Federal Power Act became law and the Federal Power Commission administered the Act.

The Federal Power Act did not give the federal agency plenary authority over the electric grid. Instead, Congress provided that federal regulation shall "extend only to those matters which are not subject to regulation by the States" and provided that "[t]he Commission" does not have jurisdiction, "except as specifically

10

provided in [the Federal Power Act], over facilities used for the generation of electric energy." *Id.* at § 824(a)–(b)(1). As such, authority over generation facilities belongs to the states. *See id.*

In 1977, through the Department of Energy Organization Act, Congress reorganized the agencies that administer the Federal Power Act. Congress created the Department of Energy and FERC. 42 U.S.C. §§ 7131, 7171(a). Congress also transferred certain functions of "the Commission" in the Federal Power Act to the Department and other functions to FERC, thereby abolishing the Federal Power Commission. *See id.* §§ 7151(b), 7172(a)(1). FERC retained authority over rates and charges for the transmission of electric energy or sale of electric energy at wholesale (in both cases, in interstate commerce), and the non-emergency interconnection of facilities for the generation, transmission, and sale of electric energy. *Id.* § 7172(a)(1)(B); 16 U.S.C. § 824(a). The Department's authority over functions of "the Commission" in the Federal Power Act include functions under some subsections of Section 202 of the Act. *See* 42 U.S.C. § 7151(b). The 1977 reorganization did not expand the role of the "the Commission" at the expense of state authority or shrink states' authority over generation facilities. *See, e.g.*, *id.* § 7113 ("Nothing in this chapter shall affect the authority of any State over matters exclusively within its jurisdiction.").

As part of its regulatory oversight, FERC has promoted the role of nonprofit entities, known as Independent System Operators or Regional Transmission Organizations, in bulk power system operations and planning. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016); *Regional Transm. Orgs.*, Order No. 2000, 65 Fed. Reg. 810, 811 (Jan. 6, 2000); *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transm. Servs. by Pub. Utils. and Recovery of Stranded Costs by Pub. Utils. and Transm. Utils.*, Order No. 888, 61 Fed. Reg. 21,540, 21,542 (May 10, 1996). FERC generally regulates these entities pursuant to its authority over rates and charges for wholesale sales and transmissions of electric energy. *See, e.g.*, Order No. 2000, 65 Fed. Reg. at 811. These entities, referred to here as ISOs or RTOs, perform a variety of functions, including:

- Ensuring the electric grid operates reliably in a defined geographic footprint;
- Balancing supply and demand instantaneously and maintaining sufficient operating reserves;
- Dispatching system resources as economically as possible;
- Coordinating system dispatch with neighboring balancing authority areas ("BAAs");

11

- Planning for transmission in its footprint;
- Coordinating system development with neighboring systems and participating in regional planning efforts; and
- Providing non-discriminatory transmission access.

Ex. 46 at 53 (FERC Energy Primer). Some ISOs "also operate capacity markets, which, along with underlying resource adequacy rules, ensure sufficient capacity is available." *Id.* at 68.

Independent System Operators now span much of the country, excluding portions of the Southeast, Southwest, and Northwest regions of the country. *See id.* at 37. The map below depicts the geographic footprint of the various ISOs.



Source: Ex. 46 at 67 (FERC Energy Primer).

2. *MISO Protects Reliability and Resource Adequacy Through FERC-Regulated Reserve Margin Requirements, a Residual Capacity Auction, and Retirement Approvals.*

MISO is an Independent System Operator and the grid operator for territory stretching roughly from North Dakota to Michigan and down to Louisiana. This territory is organized into zones numbered 1 through 10, as shown in MISO's FERC-approved tariff and reproduced below.



Source: Ex. 75 (MISO Tariff Zonal Map).

MISO implements resource adequacy standards across its territory to ensure it achieves a level of grid reliability meeting both industry standards and those of the North American Electric Reliability Corporation ("NERC"). To meet its resource adequacy requirements, MISO utilizes a series of interrelated mechanisms that both measure current and future system needs and help the utilities in its region secure the resources that best meet those needs at least cost. *See generally* Ex. 46 at 66–75, 87–90 (FERC Energy Primer); Ex. 3 at 8–9 (EFG Report).

### i. *Reserve Margin Requirements.*

The foundation of MISO's resource adequacy implementation process is its Loss of Load Expectation ("LOLE") study, which measures whether available generation capacity is capable of meeting load demand under various conditions, including low probability but high impact events (such as extreme weather). *See generally* Ex. 38 (MISO LOLE Presentation). MISO runs its LOLE study every year, based on the latest available data. It utilizes a systemic model, taking inputs from the past thirty years of weather data as well as resource performance characteristics from a broad range of operating conditions. Using this wealth of information, MISO then runs thousands of simulations looking to future years. Each of the simulations examines the system at every individual hour of each year being studied. These simulations identify circumstances that could most stress the system, while also predicting how the system's fleet of resources will perform. *See* Ex. 58 (MISO Tariff Module E-1); Ex. 38 (MISO LOLE Presentation); Ex. 81 at 47-54 (Joundi Testimony). MISO runs this model annually, based on the latest available data.

MISO uses its LOLE study results in conjunction with its system-wide peak demand forecast, which it develops from projections provided by each of the load-serving entities within its territory. It combines these inputs to determine how much generating capacity is required to meet MISO's industry-standard goal of expecting no more than one day with a loss of load event every ten years. *See* Ex. 10 at 2–5 (Grid Strategies June Report). The result of this calculation is a reasonable buffer of extra capacity to account for potential emergencies and other conditions, which is known as the regional Planning Reserve Margin ("Reserve Margin"). The Reserve Margin, stated as a percentage, reflects the amount of generating capacity that must be procured in each season to meet resource adequacy standards across the region. MISO develops a separate Reserve Margin for each season of the year. An illustrative calculation of a Reserve Margin is below.

**Illustrative Reserve Margin Calculation**

| | |
|---|---|
| Expected Peak Demand | 100,000 MW |
| Extra Buffer | 7,000 MW |
| **Reserve Margin** | **7%** |

After developing the system-wide Reserve Margin, MISO uses it to convert the peak demand projection for each zone into a capacity requirement (in accredited megawatts, or "MW") that each zone must meet for each season. The requirement for each zone is known as that zone's Planning Reserve Margin Requirement ("Reserve Margin Requirement"), which is the amount of megawatts of capacity that must be procured for each zone. These megawatts can come from inside or outside the zone, so long as they are deliverable to the zone. *See* Ex. 3 at 8–9 (EFG Report).

As with the zonal calculation, MISO also converts each individual load-serving entity's projected peak demand into a capacity requirement using the system-wide Reserve Margin. A load-serving entity is, like NIPSCO and CenterPoint Indiana, an entity that "has undertaken an obligation to serve [l]oad for end-use customers by statute, franchise, regulatory requirement or contract." *See* MISO's FERC-Approved Tariff at Module A (as currently effective), *available at* https://etariff.ferc.gov/TariffBrowser.aspx?tid=1162 (defining "Load Serving Entity"). And the Reserve Margin Requirement for each zone is, roughly speaking, the sum of all load-serving entities' obligations in that zone.

Finally, MISO assigns to each individual resource a capacity value based on MISO's conservative estimate of how likely that generator is to be able to provide energy during peak net demand conditions. The purpose of this estimate is to determine a percentage of resources' maximum capacity (their "accredited capacity") that can be used by load-serving entities or in the Planning Resource Auction to achieve Reserve Margin Requirements, and it reflects that resources cannot always ensure that they will operate at their maximum possible capacity. Generally

14

speaking, MISO's approach combines probabilistic modeling with historic and unit-specific performance. Through the capacity accreditation process, MISO fully accounts for the limitations of each resource's ability to contribute to MISO's resource adequacy during peak demand conditions or during times of overall system stress (*e.g.*, when extreme weather affects unit performance). And MISO's capacity accreditation rules are regulated and overseen by FERC. *See, e.g.*, *Midcontinent Indep. Sys. Op., Inc.*, 180 FERC ¶ 61,141, at P 1 (2022) (approving MISO's seasonal resource adequacy construct); *see also Midcontinent Indep. Sys. Op., Inc.*, 189 FERC ¶ 61,065, at P 1 (2024) (approving new methodology applicable to 2028–2029 delivery year).

Once MISO (1) establishes the regional Reserve Margin, (2) converts it to a Reserve Margin Requirement for each zone using peak demand projections, (3) apportions each zone's Reserve Margin Requirement among load-serving entities, and (4) determines all eligible resources' accredited capacity, the load-serving entities must meet their capacity obligations. *See* Ex. 3 at 8–9 (EFG Report).

Load-serving entities have a few options for procuring capacity. First, they can use generating capacity they already own. Second, they can contract with another entity that owns generating capacity to promise to sell energy in the future when called upon by MISO to do so. Third, as a final fallback option they can obtain capacity through a residual capacity market run by MISO known as the Planning Resource Auction ("Planning Auction" or "PRA"). *See id.*

### ii. *MISO's Residual Capacity Market.*

MISO conducts the Planning Auction every year. The Planning Auction is actually four separate simultaneous seasonal auctions. In each auction, MISO solicits operational commitments for each season from a suite of generation resources that will ensure resource adequacy. Many resources provide an "offer" identifying what price they would need to be paid to keep operational (*i.e.*, remain capable of delivering power upon command) all or part of the resource's accredited capacity for each of the four seasons. Other resources, including those already committed to operate via outside contracts, are self-scheduled into the auction process, meaning that MISO treats them as price takers or $0 offers. MISO then stacks each of these resources in ascending cost order, forming a supply curve.

The supply curve crosses a preset sloped demand curve, known as the Reliability Based Demand Curve. The sloped demand curve is designed by MISO to procure a certain amount of capacity at each price point; although it is tethered around MISO's goal of experiencing no more than one loss of load event per decade, it will obtain more capacity if it is cheaper and less if it is more expensive. This is

consistent with the general principle that grid operators must always balance the tradeoff between resource adequacy and cost. *See* Ex. 10 at 2–3 (Grid Strategies June Report); Ex. 3 at 8–9 (EFG Report); Ex. 31 at 4 (MISO 2025–26 Auction Results).

The point where the supply and demand curves intersect is called the capacity market clearing price. All resources on the supply curve with offers at or below that amount are then committed to remain operational and be available for the respective season(s) in which they cleared, with the owners of those resources' capacity rights receiving the clearing price. Ex. 58 (MISO Tariff Module E-1).

### iii. MISO's Approvals of Generator Retirements.

Pursuant to MISO's FERC-approved tariff, a utility within MISO seeking to suspend the operation of a generating unit must provide an "Attachment Y" notice to MISO. Ex. 60 at 1 (MISO Tariff Sec. 38.2.7); Ex. 61 (MISO Tariff Attachment Y). The purpose of the notice is to enable MISO to evaluate the potential local grid reliability impacts of such suspension. If retirement would cause unacceptable reliability impacts, MISO may offer compensation to keep the resource active as a System Support Resource. *See* Ex. 60 at PDF p. 5 (MISO Tariff Sec. 38.2.7).

3. *MISO Also Continuously Monitors the Grid to Balance Supply and Demand, and to Prevent Blackouts Using an Escalating Sequence of Real-Time Alerts that Activate Reserve Resources in a Specific, Predetermined Order.*

In addition to annually securing the set of resources it has determined will meet its regional reliability standard, MISO also operates the grid on a daily and hourly basis to match the resources it has available with load (*i.e.*, demand) over the course of each day. During normal operational periods, MISO uses its energy markets to receive information from every potential resource in the region (generators, batteries, etc.) about how much power they believe they can provide and at what price, and then issues instructions to the set of resources it needs to meet projected demand at least cost to the system. *See generally Elec. Power Supply Ass'n*, 577 U.S. at 268 ("Each administers a portion of the grid, providing generators with access to transmission lines and ensuring that the network conducts electricity reliably. And still more important for present purposes, each operator conducts a competitive auction to set wholesale prices for electricity. These wholesale auctions serve to balance supply and demand on a continuous basis, producing prices for electricity that reflect its value at given locations and times throughout each day." (internal citation omitted)).

On occasion, the total electric generation that is freely offered in MISO's day-ahead market is less than the MISO region's projected demand. That mismatch

16

between projected demand and voluntary supply does not, however, of itself produce any disruption to the grid. In these instances, MISO implements a well-defined process to identify additional resources until the projected shortfall is addressed.

MISO has enshrined its process for securing extra resources to address projected shortfalls, which it deems "Max Gen Emergencies," in its operational tariff. Ex. 33 at §§ 4.2–4.3 (MISO Market Capacity Emergency) (describing Max Gen Emergency Event procedures). As described there, MISO often can address any shortfall simply by issuing a capacity advisory to double check its numbers, followed by a so-called "max-gen" alert to facility operators to suspend any optional maintenance or other activities that might be interfering with resources' power output (*i.e.*, to achieve maximum generation from all available resources). *Id.* at §§ 4.1, 4.2.2. MISO can then issue a warning of a potential shortfall and start curtailing exports and coordinating with its neighbors to bring in imports from adjacent regions. *Id.* at § 4.2.3. If these preliminary measures don't address the shortfall, MISO will then proceed step by step through a series of five steps with subparts (labeled "1a" through "5") of increasingly stringent mitigation measures to increase generation or reduce usage of electricity during the period at issue. Only on the final step (step "5") does any involuntary load shedding (*i.e.*, a blackout) occur; Steps "1a" through "4b" describe an escalating sequence of mitigation measures MISO will employ, including requesting power transfers from neighboring regions, turning on backup generators, utilizing contracted demand response resources, and asking the public for voluntary reductions. *See* Ex. 33 (MISO Market Capacity Emergency); Ex. 3 at 7 (EFG Report). The following table, prepared by MISO, describes these steps (without delineating between "step 1a," "step 1b," etc.).[3]

---

[3] The following is a partial explanation of acronyms in the table: MPs means Market Participants; LBAs means Load Balancing Authorities; AME means Available Maximum Emergency; EEA means Energy Emergency Alert; LMM means Load Management Measures; LMRs means Load Modifying Resources; EDR means Emergency Demand Response; LMPs means Locational Marginal Prices; MCPs means Market Clearing Prices; and VOLL means Value of Lost Load. Ex. 33 (MISO Market Capacity Emergency) at 2, 3, 8, 13, 19, 34.

**Attachment 8 — Summary of Market Capacity Emergency Procedure Steps**

| Market Capacity Emergency Procedure Steps | | |
|---|---|---|
| **Normal Operations** | | Normal Pricing |
| **Capacity Advisory** | Advance notice of forecasted capacity shortage, MPs update offer and market data, Update STR and STR RPE values, Declare Conservative System Operations if conditions warrant. | Normal Pricing |
| **Alert** | Request MPs/LBAs ensure accuracy of LMM/LMR availability and Self-Scheduled values, Send LBAs LMM survey, Commit available economic Resources, Coordinate reconfiguration with RCs/TOPs. | Emergency Pricing - Tier 0 |
| **Warning** | Suspend CTS, Schedule in External/Internal Module E Resources, Evaluate TEC/Inadvertent Payback, Curtail Export Schedules, Request waivers, Implement reconfiguration options. | Emergency Pricing - Tier I |
| **Event Step 1** | Commit AME Resources, Declare EEA1, Activate Emergency Limits. | Emergency Pricing - Tier I |
| **Event Step 2** | Declare EEA2, Implement LMRs and LMM – Stage 1, Commit EDR Resources, Emergency Energy Purchases, Public Appeals. | Emergency Pricing - Tier II |
| **Event Step 3** | Implement waivers, Utilize operating reserves, Implement LMM – Stage 2. | Emergency Pricing - Tier II |
| **Event Step 4** | Implement CRSG Reserve Call, Emergency reserve purchases. | Emergency Pricing - Tier II |
| **Event Step 5** | Declare EEA3, Firm Load Shed, Set LMPs and MCPs to VOLL Pricing, OE-417 reporting. | Value of Lost Load (VOLL) Pricing |
| **Termination** | Terminate Max Gen and possibly Capacity Advisory. | Normal Pricing |

Source: Ex. 33 at 43 (MISO Market Capacity Emergency).

Through a combination of responsible grid management and capacity retention policies, MISO has avoided the need to utilize the full five steps of its emergency process in recent years. MISO has not faced a Market Footprint Maximum Generation Emergency Event Step of 3 or higher since 2009, according to the most recent summation available (through June 2024)—and highest Max Gen event reached only Step 1b in the Summer 2025 season that recently concluded. *See* Ex. 32 at 4–27 (MISO Emergency Declarations); Ex. 68 at 3–4 (Grid Strategies Sept. Report). For the Fall 2025 season that recently concluded, PIOs are not aware of any EEA alert having been issued. Moreover, MISO Staff's December 2025 presentation to MISO's Board of Directors indicated that "No reliability actions were needed this fall" and showed on a granular daily level that no alerts, warnings, or reliability actions or events occurred in the Fall 2025 season. Ex. 138 at 11 (MISO Fall 2025 Operations Report).

4. *Indiana Evaluates Resource Adequacy Through Integrated Resource Planning and Annual Capacity Procurement Requirements.*

Electric utilities in Indiana are required, pursuant to legislation enacted over a decade ago, to submit to the Indiana Utility Regulatory Commission (the "Indiana Commission") an "integrated resource plan that assesses a variety of demand side management and supply side resources to meet future customer electricity service needs in a cost effective and reliable manner." Ind. Code § 8-1-8.5-3(e)(2). By rule, the Indiana Commission requires utilities—including NIPSCO and CenterPoint Indiana—to submit their IRP for review every three years. 170 IAC 4-7-2(a). Following submission of the IRP, customers and interested parties may submit comments to the Indiana Commission; this is followed by a draft report issued by the Indiana Commission's designated director, another round of stakeholder comment, and then a final report from the Indiana Commission's designated director. The director's report is to comment on the IRP's compliance with requirements for its contents. 170 IAC 4-7-2.2(a)–(g).

And those required contents are extensive. A utility's integrated resource plan must include the following, among other requirements:[4]

(1) At least a twenty-year future period for predicted or forecasted analyses;

(2) An analysis of historical and forecasted levels of peak demand and energy usage, including historical load shapes, actual and weather-normalized energy and demand levels; assumptions as to demographic, economic, and technological changes;

(3) At least three alternative forecasts of peak demand and energy usage;

(4) A description of the utility's existing resources, including expected retirements, deratings, life extensions, repowerings, and refurbishments; fuel price forecasts by generating unit; and analysis of the transmission system's effects on power supply;

(5) A description of the utility's process for selecting possible alternative future resources for meeting future demand, including a cost-benefit analysis, if performed;

---

[4] The following partial description of requirements is condensed slightly from the language used in Indiana's regulatory code.

19

(6) A description of the possible alternative future resources for meeting future demand, including demand-side, supply-side, and transmission resources;

(7) . . .

(8) A description of candidate resource portfolios and the process for developing those portfolios, including how the candidate portfolios performed across a wide range of scenarios, and the cost of each portfolio;

(9) A description of the utility's preferred resource portfolio, including a description of how the preferred resource portfolio balances cost effectiveness, reliability, and portfolio risk and uncertainty;

(10) A short-term action plan for the next three-year period to implement the utility's preferred resource portfolio and its workable strategy, including an implementation schedule and budget;

(11) A discussion of inputs, methods, and definitions used in the IRP;

(12) Appendices of data sets and sources used in the IRP;

(13) A description of the utility's effort to develop and maintain a database of electricity consumption patterns, disaggregated by several classes of users;

(14) . . .

(15) A proposed schedule for industrial, commercial, and residential customer surveys;

(16) A discussion of the use of advanced metering infrastructure for enhancing usage data and improving load forecasts, DSM programs, and other aspects of planning;

(17) . . .

(18) A discussion of distributed generation and its effect on planning;

(19) . . .

(20) A discussion of how the utility's fuel inventory and procurement planning practices have been taken into account;

(21) . . .

(22) A description of the generation expansion planning criteria;

20

(23) A discussion of how compliance costs for existing or reasonably anticipated air, land, or water environmental regulations impacting generation assets have been taken into account;

(24) A discussion of how the utilities balanced resource planning objectives including cost effectiveness, rate impacts, risks, and uncertainty;

(25) A description of the base case scenario;

(26) A description and analysis of alternative scenarios;

(27) A brief description of transmission modeling in the Indiana system;

(29) An explanation of the avoided cost calculation for demand side resources;

(30) A summary of the utility's most recent public advisory process.

170 IAC 4-7-4 to 4-7-9; *see also* Ex. 3 at 1 (EFG Report).

While the Indiana Commission does not directly approve or reject the utility's integrated resource plan (beyond the director's reports described above), any action an Indiana utility takes that impacts its generation mix, including applying for a Certificate of Public Convenience and Necessity for a generating resource, must be consistent with its most recently submitted IRP, unless differences between the most recent IRP and the resource action are fully explained and justified with supporting evidence. Ind. Code § 8-1-8.5-5(b)(2)(B); 170 IAC 4-7-2.5(b). Thus, IRPs are stable and consequential utility planning documents that are given considerable scrutiny by the Indiana Commission.

In addition to submitting IRP analyses, electric utilities located within Indiana's MISO transmission area are required to pass on to the Indiana Commission their annual planning reserve margin report submitted to MISO. Utilities are also required to submit their annual resource adequacy assessment to the Indiana Commission within twenty-five days of submitting the report to MISO. 170 IAC 4-7-2.3(a). Additionally, an electric utility in Indiana is required to demonstrate annually to the Indiana Commission that for both the Summer and Winter seasons, no more than 15% of its allocated capacity requirement will be acquired from the relevant RTO capacity auction. In other words, each utility must demonstrate that it either owns or has under contract 85% of its capacity requirement. Ind. Code § 8-1-8.5-13.

### 5. *NERC Protects Reliability via Standards and Regular Assessments.*

NERC is the "Electric Reliability Organization" under Section 215 of the Federal Power Act. *N. Am. Elec. Reliab. Corp.*, 116 FERC ¶ 61,062, at P 3, *order on reh'g &*

21

*compliance*, 117 FERC ¶ 61,126 (2006); *see* 16 U.S.C. § 824o(a)(2). This role dates back to 2005, after Congress added Section 215 to the Act and FERC certified NERC as the Electric Reliability Organization. Energy Policy Act of 2005, Pub. L. No 109-58, Title XII, Subtitle A, section 1211(a), 119 Stat. 594, 941 (2005), 16 U.S.C. § 824o (2000 & Supp. V 2005); 116 FERC ¶ 61,062, at P 16.

As the Electric Reliability Organization, NERC is responsible for establishing and enforcing reliability standards for the Bulk-Power System. 16 U.S.C. § 824o(a)(2); 18 C.F.R.§ 39.1. NERC's reliability standards are subject to FERC's review and approval. 16 U.S.C. § 824o(d); Ex. 10 at 7 (Grid Strategies June Report).

The NERC-developed and FERC-approved reliability standards apply to all users, owners, and operators of the Bulk-Power System within the continental United States. 16 U.S.C. § 824o(b)(1); 18 C.F.R. §§ 39.2, 40.1(a), 40.2(a); *see* 18 C.F.R. § 39.1 (defining "Bulk-Power System"). Each reliability standard identifies the types of entities that must comply with the standard, such as generator owners, transmission owners, or transmission operators. *Reliability Standard Compliance and Enforcement in Regions with Regional Transm. Orgs. or Indep. Sys. Ops.*, 122 FERC ¶ 61,247, at P 4 (2008); *e.g.,* Ex. 130 (NERC Emergency Ops., EOP-011-4) (stating requirements applicable to, *inter alia*, balancing authorities, reliability coordinators, and transmission operators for the purpose of "address[ing] the effects of operating Emergencies by ensuring each Transmission Operator and Balancing Authority has developed plan(s) to mitigate operating Emergencies and that those plans are implemented and coordinated within the Reliability Coordinator Area as specified within the requirements"). Independent System Operators like MISO must comply with applicable NERC standards, and they are subject to penalties for noncompliance. 122 FERC ¶ 61,247, at PP 1, 5, 16; *see also* MISO Tariff Schedule 34 (setting forth allocation costs associated with monetary penalties assessed against MISO for violation of NERC standards).

NERC performs other functions in addition to development and enforcement of reliability standards. For instance, NERC annually assesses seasonal and long-term reliability of the bulk power system and monitors system performance. *See* 18 C.F.R. § 39.11. As part of these assessments, an "elevated risk" designation does not constitute an emergency because it does not indicate the possibility of imminent shortfalls; indeed, it is only the second of three risk levels offered by NERC. NERC typically provides specific context and details associated with its determination. Since it began providing standardized "risk" assessments by region in the summer of 2021, NERC has adhered to a three-tiered assessment of risk: areas facing the least risk are "low" or "normal" risk regions, areas facing the most risk are "high" risk regions, and areas in between are "elevated" risk regions. *See* Ex. 42 at PDF pp. 75, 124, 170, 218 (2019–24 NERC Summer Reliability Assessments). NERC's

22

determination of "elevated" risk often indicates only that there is a "[p]otential for insufficient operating reserves in above-normal conditions." Ex. 41 at 6 (NERC 2025 Summer Reliability Assessment). Planning Reserve Margins *do generally* meet Reference Margin Levels in "elevated" risk regions. *Id.* at 10, 41.

| Table 2: Seasonal Risk Assessment Summary | |
|---|---|
| **Category** | **Criteria[1]** |
| **High** — Potential for insufficient operating reserves in normal peak conditions | • Planning Reserve Margins do not meet Reference Margin Levels (RML); or<br>• Probabilistic indices exceed benchmarks, e.g., loss of load hours (LOLH) of 2.4 hours over the season; or<br>• Analysis of the risk hour(s) indicates resources will not be sufficient to meet operating reserves under **normal peak-day demand and outage scenarios**[2] |
| **Elevated** — Potential for insufficient operating reserves in above-normal conditions | • Probabilistic indices are low but not negligible (e.g., LOLH above 0.1 hours over the season); or<br>• Analysis of the risk hour(s) indicates resources will not be sufficient to meet operating reserves under **extreme peak-day demand with normal resource scenarios** (i.e., typical or expected outage and derate scenarios for conditions);[2] or<br>• Analysis of the risk hour(s) indicates resources will not be sufficient to meet operating reserves under **normal peak-day demand with reduced resources** (i.e., extreme outage and derate scenarios)[3] |
| **Normal** — Sufficient operating reserves expected | • Probabilistic indices are negligible<br>• Analysis of the risk hour(s) indicates resources will be sufficient to meet operating reserves under normal and extreme peak-day demand and outage scenarios[4] |
| Table Notes:<br>[1]The table provides general criteria. Other factors may influence a higher or lower risk assessment.<br>[2]**Normal resource scenarios** include planned and typical forced outages as well as outages and derates that are closely correlated to the extreme peak demand.<br>[3]**Reduced resource scenarios** include planned and typical forced outages and low-likelihood resource scenarios, such as extreme low-wind scenarios, low-hydro scenarios during drought years, or high thermal outages when such a scenario is warranted.<br>[4]Even in normal risk assessment areas, extreme demand and extreme outage scenarios that are not closely linked may indicate risk of operating reserve shortfall. | |

Source: Ex. 143 at 11 (NERC 2025–2026 Winter Reliability Assessment).

B. *The Evidence Shows No Reliability or Resource Adequacy Crisis in MISO for Winter 2025–2026, Spring 2026, or Thereafter.*

1. *There Is No Evidence of a Resource Adequacy Crisis in the current Winter or upcoming Spring Seasons.*

MISO conducted its annual four-season capacity auction (the Planning Auction, discussed above in sec. IV.A.2) as scheduled in the spring of 2025. The 2025–2026 Planning Auction procured adequate supplies for MISO as a whole and for Local

Resource Zone 6 (which includes the MISO portion of Indiana[5]) for both the Winter 2025–2026 and Spring 2026 seasons.[6] Notably, the 2025–2026 auction did not include Schahfer or Culley 2 as capacity resources for the Winter 2025–2026 and Spring 2026 seasons.  Ex. 11 at PDF p. 4 (NIPSCO 2025 Planning Reserve Margin Report); Ex. 12 at 4 (CenterPoint 2025 Planning Reserve Margin Report). For the Winter 2025–2026 period, cleared offers from Zone 6 totaled 14,331.5 megawatts, which exceeded the Zone 6 Local Clearing Requirement by nearly *30 percent*.  The Planning Auction, accounting for inter-zonal transfer capability, calculated that surplus capacity from other areas of MISO could provide adequate imports— specifically, 4,354.1 megawatts—to meet the total Reserve Margin Requirement for Zone 6. Ex. 31 at 20 (MISO 2025–2026 Planning Auction Results); Ex. 3 at 7 (EFG Report). For Spring 2026, cleared offers from Zone 6 totaled 15,181.0 megawatts, which exceeded the Zone 6 Local Clearing Requirement by over *46 percent*. Similar to the Winter results, the Planning Auction calculated that surplus capacity could provide adequate imports—2,985.6 megawatts—towards meeting Zone 6's Reserve Margin Requirement for Spring. Ex. 31 at 21 (MISO 2025–2026 Planning Auction Results); Ex. 3 at 7 (EFG Report).

In addition to Zone 6 fully meeting its capacity requirements, every other Local Resource Zone in MISO successfully met its capacity requirements within the 2025– 2026 Planning Auction, resulting in MISO finding that there were no capacity deficits in the region during the planning year. *See* Ex. 31 at 12 (MISO 2025–26 Auction Results) ("The 2025 PRA demonstrated sufficient capacity at the regional, subregional and zonal levels"); Ex. 34 at 9 (Ramey MISO Comments) (testifying just after the 2025–2026 Planning Auction that no capacity deficits for the period beginning in 2025 materialized).

As required by Indiana law, both NIPSCO and CenterPoint Indiana completed their triennial IRP analysis within the past fourteen months: NIPSCO in December 2024 and CenterPoint Indiana in December 2025. Ex. 100 (NIPSCO 2024 IRP); Ex. 21 (CenterPoint Indiana 2025 IRP). NIPSCO's 2024 IRP assumed that Schahfer Units 17 and 18 would retire at the end of 2025, with reliability maintained through previously approved transmission upgrades and approximately 2,100 MW of replacement resources (renewables plus a new 400-MW gas peaker) entering

---

[5] MISO Local Resource Zone 6 includes most of Indiana, including the CenterPoint Indiana and NIPSCO service territories, and a portion of Kentucky. *See* Ex. 75 (MISO Tariff Zonal Map).

[6] MISO defines the Winter season for its Planning Auction as December through February, and defines the Spring season as March through May.

service. Ex. 100 at 6-7 (NIPSCO 2024 IRP); Ex. 3 at 3–4 (EFG Report). NIPSCO's resource planning analysis indicated no sign of a Summer reliability shortfall in 2026, and the retirement of Schahfer would not create a capacity deficiency under the current rules. Ex. 100 at 26 (NIPSCO 2024 IRP); Ex. 3 at 4–5 (EFG Report). NIPSCO's analysis also showed that for the Winter 2025–2026 season, total accredited capacity is well above the Planning Reserve Margin, including because of higher winter accreditation for wind resources and generally lower winter peak loads. Ex. 100 at 26 (NIPSCO 2024 IRP); Ex. 3 at 5 (EFG Report). Thus, the IRP record supports the conclusion that continued operation of Schahfer 17 and 18 is not required for resource adequacy in early 2026. Ex. 3 at 5–6 (EFG Report). NIPSCO also submitted a Planning Reserve Margin Annual Report to the Indiana Commission last year to demonstrate how it meets the 85% threshold for each season of 2025–2026 pursuant to Ind. Code § 8-1-8.5-13(*l*), as discussed above in section IV.A.4. Ex. 11 at 3–4 (NIPSCO Planning Reserve Margin 2025 Report).

Similarly, CenterPoint Indiana's most recent IRP, filed just last month, assumes Culley Unit 2 would retire at the end of 2025 as part of its Reference Case. Ex. 21 at 151 (CenterPoint Indiana 2025 IRP). CenterPoint Indiana's analysis and projections show no capacity shortage in Winter 2026 or in subsequent years. *Id.* at 152; Ex. 3 at 5 (EFG Report). Specifically, for the Winter 2025–2026 season, CenterPoint Indiana projected a capacity surplus of 161 MW. Additionally, CenterPoint Indiana submitted its Planning Reserve Margin Annual Report to the Indiana Commission in May 2025, again pursuant to Ind. Code § 8-1-8.5-13(*l*). The report showed that CenterPoint Indiana more than meets its minimum 85% requirement of owned or contracted resources, with 100% of the utility's allocated Reserve Margin Requirement in Winter 2025–2026 being owned or contracted for and 99% of its allocated Reserve Margin Requirement for Spring 2026 owned or contracted for. Ex. 12 at 4 (CenterPoint 2025 Planning Reserve Margin Report).

At the IURC's 2025 Winter Reliability Forum last month, both NIPSCO and CenterPoint Indiana presented data on their resource adequacy for the Winter 2025–2026 season, in line with state law requirements. NIPSCO described how it entered the 2025–2026 MISO Planning Auction with "295 MW of capacity requirement for winter season and surplus capacity of 192 MW in the spring season." Ex. 59 at 12 (NIPSCO 2025 Winter Reliability Presentation). Notably, 295 MW is just over 10% of NIPSCO's allocated Reserve Margin Requirement of 2,897 MW for Winter 2025–26, meaning that NIPSCO achieved well over its mandated target of 85% owned or bilaterally contracted capacity. Ex. 11 at 4 (NIPSCO 2025 Planning Reserve Margin Report). NIPSCO emphasized that "[n]o extraordinary measures are needed to operate wind and solar facilities during extreme cold weather events" because "wind turbines have cold weather packages that operate normally in ambient temperatures down to -22°F." NIPSCO also highlighted that

25

the utility's solar assets are "designed to operate in [a] sub-freezing temperature environment" and "primarily consist of bi-facial modules which are significantly more efficient at shedding snow than mono-facial modules." Ex. 59 at 8 (NIPSCO 2025 Winter Reliability Presentation).

CenterPoint Indiana also reported that it had "procured sufficient capacity to meet customer demand and MISO planning reserve margin requirements [] for the winter season" at the Winter Reliability Forum. CenterPoint Indiana attained its allocated Reserve Margin Requirement of 1,031 megawatts, which significantly exceeds the utility's projected peak demand of 863 megawatts. Ex. 67 at 23 (CenterPoint Indiana 2025 Winter Reliability Presentation).

*2. There Is No Evidence of a Resource Adequacy Crisis After Spring 2026.*

The MISO system is also positioned to operate reliably for years beyond the 90-day timeframe of the Orders. There is ample evidence demonstrating that this is true for the remainder of the 2025–2026 planning year; for the next couple years after that; and even out through the 2030 time horizon that the Department identifies as a long-term source of concern.

First and most directly, MISO has secured the stability of its grid through at least the end of May 2026 by operation of its 2025–2026 Planning Auction. The auction secures in April of each year the resources necessary to ensure grid reliability individually for each of the four subsequent seasons. *See supra* sec. IV.A.2.ii. The 2025–2026 Planning Auction exceeded its target Reserve Margin Requirements for the Spring season by 1.5%, meaning that (as it did for the Summer, Fall, and Winter seasons) MISO will enter the Spring season with *more* resources than its own analysis has indicated are actually needed to ensure grid reliability. Ex. 31 at 5 (MISO 2025–26 Auction Results). Furthermore, MISO's modeling in conjunction with its shift to a seasonal resource adequacy construct indicated that the loss of load risk in Spring (as with Fall 2025 and Winter 2025–2026) is very low. Ex. 81 at 49:15–17 (Joundi Testimony); *see also* Ex. 82 at 33 (MISO 2024–25 LOLE Study Report); Ex. 83 at 34 (MISO 2025–26 LOLE Study Report). Thus, there is no basis for any resource adequacy concern for the Spring season.

Second, although MISO has not yet conducted its 2026–2027 Planning Auction (or the auctions for subsequent years), MISO is not projecting any possibility of a regional resource adequacy shortfall through May 2027. MISO's joint annual survey with the Organization of MISO States ("OMS"), which forecasts generation capacity supply and system load (the "OMS-MISO Survey"), evaluates a range of potential outcomes years into the future, using a set of assumptions ranging from extremely

26

conservative to a match of utility projections. *See supra* sec. IV.A.2. The most recent edition of that survey, completed June 2025, predicts a *surplus* of between 1.4 and 6.1 gigawatts ("GW") for Planning Year 2026–2027 (*i.e.*, June 2026–May 2027), and its projection range for Planning Year 2027–2028 ranges from a surplus of 6.4 GWs to a small deficit of 1.4 GWs. Ex. 89 at 7 (2025 OMS-MISO Survey). In other words, the survey provides no basis for any concern about MISO's ability to meet resource adequacy needs through at least May 2027. And a series of unlikely events would have to occur for the region to see even a minor (1–2 GW) deficit through May 2028, as further explained below. MISO's system is robust, and even before its new approach to generator interconnection (also discussed below), it was on track as of early June 2025 to ensure that its grid remains robust for approximately the next three years.

The evidence also confirms sufficient resources in the months and years after Spring 2026 in the utility territories of both NIPSCO and CenterPoint Indiana, where the subject generating Plants are located. CenterPoint Indiana's Planning Reserve Margin Report submitted to the Indiana Commission last year shows that it has secured accredited resources totaling over 100% of its allocated Reserve Margin Requirement in each season of planning year 2026–2027 and 2027–2028. Ex. 12 at PDF pp. 5–6 (CenterPoint 2025 Planning Reserve Margin Report).  And NIPSCO's IRP "indicates no sign of a summer reliability shortfall in 2026 or even in 2027." Ex. 3 at 5 (EFG Report).

To the extent there are capacity gaps in the NIPSCO and CenterPoint Indiana IRPs in years 2028 and beyond, such gaps are not predictions of the shortage of capacity needed to meet demand. Rather, consistent with the planning purpose of IRPs, both NIPSCO and CenterPoint Indiana's IRPs calculate the amount of accredited capacity needed to meet demand plus, maintain a Reserve Margin as determined by MISO. Ex. 21 at 81 (CenterPoint Indiana 2025 IRP); Ex. 100 at 24 (NIPSCO 2024 IRP). Any "surplus" or "shortfall" shows whether the utility has more or fewer resources than are needed to achieve MISO's Reserve Margin given expected future load and utility-owned generation and capacity purchases.

For Summer 2028 and Summer 2029, CenterPoint Indiana shows a capacity shortfall of 115 MW and 114 MW respectively. Ex. 21 at 152 (CenterPoint Indiana 2025 IRP). NIPSCO shows a shortfall starting in Summer 2028. Ex. 100 at 26 (NIPSCO 2024 IRP). But these projected capacity deficits are not a basis on which to declare an imminent shortfall or an emergency. They are a planning signal to guide medium- and long-term utility planning. And they are being treated as such by CenterPoint Indiana and NIPSCO. CenterPoint Indiana does not have a projected shortfall in 2028 because it is unable to procure or interconnect enough capacity. Rather, the utility has not decided on whether to purchase capacity from

27

the MISO market or construct a battery using Culley 2's interconnection rights and is conducting an RFP to see which would be more cost-effective for its customers. *See* Ex. 21 at 190 (CenterPoint Indiana 2025 IRP); Ex. 3 at 3 (EFG Report). Likewise, NIPSCO's existing capacity projection showing a shortfall starting in 2028 should be understood as a "foundational starting point" upon which "NIPSCO developed six different portfolio concepts around accreditation and emission intensity through least cost portfolio optimization analysis." Ex. 100 at 26 (NIPSCO 2024 IRP); s*ee also* Ex. 100 at 1 (describing NIPSCO's selected solution of "add[ing] between 900 and 1,150 MW of new storage capacity and 350 MW of short-term thermal PPAs by 2028-2029. . . . NIPSCO will continue to track accreditation trends as the rule is implemented and adjust its storage procurement plan accordingly.") (NIPSCO 2024 IRP). The capacity supply-demand balance graphs in NIPSCO's IRP "are NIPSCO's going-in position to its 2024 IRP (including existing and planned resources) and do not contemplate unidentified, additional resources that NIPSCO would plan to acquire as a result of its IRP to fill gaps in need in 2028 and beyond." Ex. 3 at 5 (EFG Report) (referring to Ex. 100 at 26 (NIPSCO 2024 IRP)).

Third, although MISO has spoken publicly about its long-term resource adequacy concerns heading into Summer 2028 and beyond, those concerns can be addressed through traditional, non-emergency, policy measures and other strategies to ensure no shortfall actually occurs. And MISO is not standing still in this regard; as MISO has explained,

"State regulators along with utilities have the responsibility of ensuring resource adequacy. MISO remains focused on reliably operating the grid using the resources our members provide, while working closely with stakeholders and regulatory partners, providing visibility into system needs and sending market signals to inform long-term resource planning."

Ex. 117 at PDF p. 4 (RTO Insider Article).

Generally speaking, from FERC down to stakeholders, everyone working regularly in the energy regulatory world recognizes that the industry is dynamic, and everyone is engaging to ensure there are adequate resources going forward. At the end of May 2025, FERC hosted a technical conference where MISO, the MISO Independent Market Monitor, and other contributors highlighted that the system is in good shape today, and outlined plans to ensure that remains the case down the road. *See, e.g.*, Ex. 35 at 1 (Patton MISO Comments) ("The resource adequacy challenges and risks in MISO are not nearly daunting as portrayed by MISO planning reports or the NERC 2024 Long-Term Reliability Assessment."); *see also* Ex. 62 at 13 (FERC Technical Conference Notice).

In fact, MISO has already taken tangible steps to address what it perceived to be a potential for resource adequacy shortfalls down the road: it developed, and secured FERC approval for, an Expedited Resource Addition Study (ERAS) pathway for generator interconnection. *See generally* Ex. 90 (MISO ERAS Transmittal Letter); Ex. 91 at P 1 (MISO ERAS Decision). The ERAS proceeding demonstrates that in response to somewhat conjectural resource adequacy shortfall projections, MISO launched an entirely new interconnection process that is currently underway. ERAS has already accepted, in its first two cycles, twenty-five projects totaling around 11,400 megawatts of new capacity, most of which will be provided by gas plants. *See* Ex. 140 at PDF p. 2 (MISO ERAS December Release); *See also* Ex. 48 at PDF p. 2 (Utility Dive, MISO begins reviewing 6.1 GW — 70% of it gas — in fast-track interconnection study). These projects will receive fast-tracked interconnection studies, with projected in-service dates no later than three years from now. Including the twenty-five projects already accepted in the first two cycles, projects totaling nearly 30,000 megawatts have been accepted or are pending validation into the ERAS study program. Ex. 140 at PDF p. 2 (MISO ERAS December Release). Of the first ten projects in the program, accepted in September of last year, at least three have already executed interconnection agreements and the remainder were expected to complete agreements last month. Ex. 140 at PDF p. 2 (MISO ERAS December Release). That approximately 30 GW of nameplate capacity by itself would more than cover the OMS-MISO Survey's maximum projected needs under the most conservative assumptions.[7] The OMS-MISO Survey did not account for ERAS projects because it predated FERC's approval of ERAS. Thus, MISO does not simply have a plan to address the possibility of shortfalls three-plus years down the road; actually, a key pillar of its plan is already underway.

---

[7] While the 30 GW of capacity is nameplate capacity, not accredited capacity, the accredited capacity of the produced resources will almost certainly exceed the 1.4 GW capacity gap identified in the OMS-MISO survey. For combined cycle turbines, accredited capacity is, on average, between 84.7% and 91.4% of the generator's nameplate capacity. *See* Ex. 47 (MISO Schedule 53 Class Averages). Gas generation is 70% by size of the current ERAS queue. Ex. 48 (Utility Dive, MISO begins reviewing 6.1 GW — 70% of it gas — in fast-track interconnection study).

C. *Schahfer and Culley Should Retire As Soon As Possible.*

    1. *Schahfer and Culley Were Built Four to Six Decades Ago.*

       i. *Schahfer Units 17 and 18 Are Electric Generating Units in Indiana Originally Built in the Mid-1980s.*

The R.M. Schahfer Generating Station is a coal and gas-burning power plant in Wheatfield, Indiana, owned and operated by NIPSCO, the retail electric utility that serves portions of northwest Indiana. Four coal-burning units were commissioned at the Schahfer site between 1976 and 1986: Units 14, 15, 17, and 18. Coal is delivered to Schahfer by rail. Two smaller gas combustion turbines, Units 16A and 16B, were commissioned in 1979. The Indiana Commission has approved NIPSCO's plan to install new combustion turbine gas units at the site upon the retirement of Units 17 and 18, using the retiring units' interconnection rights. *See* Ex. 20 (IURC Schahfer Gas Plant Order); Ex. 132 (NIPSCO Rate Case Discovery Responses).

NIPSCO is a member of MISO and offers the output of the Schahfer coal units in the MISO energy markets. In its 2018 IRP, NIPSCO determined that retiring and replacing all four Schahfer units would reduce costs for its customers. Ex. 71 at 6-7 (NIPSCO 2018 IRP). The two largest of the four original Schafer units were retired in 2021. Ex. 72 at 9 (NIPSCO 2021 IRP). The remaining Schahfer coal units, Units 17 and 18, were slated to retire in December 2025. Ex. 102 (MISO Attachment Y Response to NIPSCO).

The Schahfer coal units are no longer competitive in the MISO energy market and have exhibited a long-term decline in generation over the last two decades. *See infra* sec. IV.C.3. Due to their lack of economic competitiveness, NIPSCO has planned and executed a decade-long process to replace these aging coal units with modern generation units.

      *ii. Culley Unit 2 Is an Electric Generating Unit in Indiana Built in 1966.*

The F.B. Culley Generating Station is a coal-burning power plant located in Warrick County, Indiana, near Newburgh. It is owned and operated by CenterPoint Energy Indiana South (formerly Southern Indiana Gas & Electric Company) and sits on the north bank of the Ohio River. CenterPoint Energy Indiana South is the retail electric utility that serves southwest Indiana. Three coal-burning units were built at the Culley facility between 1955 and 1973: Units 1, 2, and 3. Unit 1 has retired.

### 2. The Owners of Schahfer and Culley 2 Are Investor-Owned Utilities Subject to Extensive Regulation.

#### i. R.M. Schahfer Generating Station Is Owned by Northern Indiana Public Service Company LLC.

NIPSCO has owned the Schahfer plant since it was built in the 1980s. NIPSCO is a subsidiary of NiSource Inc., a publicly traded corporation based in Indiana with subsidiary utilities in five other states. Ex. 78 at 15, 19, 23 (NiSource 2024 Annual Report). NIPSCO qualifies as a "public utility" under Indiana law, rendering it subject to extensive regulation of its operations by the Indiana Commission: *see, e.g.,* Ind. Code § 8-1-2-1(a), ch. 8-1-2, ch. 8-1-8.5. NIPSCO owns several generating plants in Indiana, including the Michigan City Unit 12 coal generating plant with a capacity of 455 megawatts, the Sugar Creek Generating Station combined-cycle gas plant with a capacity of 563 megawatts, and numerous wind and solar generating facilities around the state of Indiana (plus one solar facility in Kentucky). Ex. 100 at 7 (NIPSCO 2024 IRP). NIPSCO is also constructing a 400 MW gas combustion turbine facility at the site of Schahfer Units 17 and 18, as discussed below in section IV.C.4.i. NIPSCO is subject to the Indiana Commission's triennial integrated resource planning requirement and submitted its most-recent IRP to the Indiana Commission in December 2024. 170 IAC 4-7-2(a)(3)(C); Ex. 100 (NIPSCO 2024 IRP).

#### ii. Culley Unit 2 Is Owned by CenterPoint Energy Indiana South.

The F.B. Culley Generating Station is owned by CenterPoint Energy Indiana South (CenterPoint Indiana), which is a subsidiary of CenterPoint Energy, Inc., a publicly traded corporation based in Houston, Texas with subsidiary electric and gas utilities in four states including Indiana. Ex. 79 at 19-20 (CenterPoint 2024 Annual Report). Like NIPSCO, CenterPoint Indiana qualifies as a "public utility" under Indiana Code § 8-1-2-1, rendering it subject to the state's comprehensive utility regulatory scheme. CenterPoint Indiana owns or controls several generating assets in Indiana, including the two Culley coal units totaling 360 MW; gas turbines totaling 620 MW at A.B. Brown; and hundreds of megawatts worth of owned or contracted wind and solar generating assets. Ex. 80 at 13 (CenterPoint 2025 IRP Summary). Culley Unit 2 is the only CenterPoint Indiana coal unit that lacks post-combustion pollution controls for nitrogen oxides. Ex. 115 at 162-163 (Vectren[8] 2020 IRP). CenterPoint Indiana is also subject to the Indiana Commission's triennial integrated resource planning requirement and submitted its most-recent IRP to the

---

[8] CenterPoint Energy Indiana South was formerly known by the trade name Vectren South or Vectren.

31

Indiana Commission in December 2025. 170 IAC 4-7-2(a)(3)(C); Ex. 21 (CenterPoint Indiana 2025 IRP).

> 3. *Schahfer and Culley 2 Are Old, Unreliable, Inflexible, Dirty, and Expensive.*
>
> > i. *Schahfer Exemplifies these Unwanted Attributes.*
> >
> > > a. <u>*Schahfer Is Old and Unreliable.*</u>

Schahfer Units 17 and 18 are 43 and 40 years old, respectively, beyond the typical economic design life of 40 years for a coal unit, and approaching the end of the typical operational life of coal units (40 to 50 years). Ex. 4 at 7 (Powers January Decl.) (citing Ex. 63 (Palgrave Handbook) and Ex. 64 (IEA Report)). Both units have experienced long and recurrent outages in recent years that reflect aged, worn components that are expensive and may be difficult to repair or replace. *Id.* at 7–8; Ex. 132 at PDF p. 16 (NIPSCO Rate Case Discovery Responses) ("NIPSCO calculates that operating Schahfer Units 17 and 18 beyond 2025 would require more than $1 billion of additional investment through 2027."). In the tables below, and with further context in his declaration, PIOs' expert engineer Bill Powers identifies the duration and reasons for the units' longest outages in the past two years based on NIPSCO's filings with the Indiana Commission. Ex. 4 at 7–8 (Powers January Decl.). For reference, there are 8,760 hours in a year.

**Longest 2025 Outages by Type**

| Unit | Outage Description | Total Duration (hours) |
|---|---|---|
| 17 | • Boiler tube leaks (5 outages) | 1,044 |
| 18 | • Boiler tube leak (1 outage)<br>• Steam turbine bearing vibration / failure<br>• High turbine bearing vibration | 150<br>2,980<br>1,996 |

The numbers above are rounded to the nearest hour.

**Longest 2024 Outages by Type**

| Unit | Outage Description | Total Duration (hours) |
|------|--------------------|------------------------|
| 17 | • Boiler tube leaks (2 outages) | 1,645 |
| 18 | • ESP problems (1 outage)<br>• Boiler tube leaks (3 outages)<br>• Pulverizer mill trip, extensive damage | 147<br>159<br>614 |

The numbers above are rounded to the nearest hour.

Ex. 4 at 6 (Powers January Declaration) (citing NIPSCO public filings including Exs. 14-16 (Saffran Q1, Q2, Q3 2025 Outage Testimony)).

These outages demonstrate Schahfer's increasing inability to consistently perform even under normal conditions, let alone to meet an emergency. Both units have been unexpectedly unable to produce power during significant portions of recent years. This unexpected downtime is known as a "forced outage" with the "forced outage rate" being the percent of hours in which a unit was in forced outage. The Schahfer units experienced the following forced outage rates over the past two years, which were well above the national coal unit forced outage average rate of 12.0%.

| Unit | Forced Outage Rate | |
|------|------|------|
| | **2024** | **2025*** |
| 17 | 18.8% | 15.9% |
| 18 | 13.2% | 78.2% |

*\* through September*

Ex. 4 at 5 (citing NIPSCO public filings including Exs. 14-16 (Saffran Q1, Q2, Q3 2025 Outage Testimony)). Mr. Powers, drawing on his experience of over 40 years in the fields of power plant operations and environmental engineering, opined that these high outage rates "reflect[] the impact of worn and difficult-to-repair or replace coal unit components on operational reliability" and "point to degraded Schahfer 17 and 18 reliability [that] will degrade further if the units are required to run for extended periods of time, are required to stop and start numerous times, or attempt to start up at an accelerated rate in response to extreme demand

33

conditions." Ex. 4 at 1, 6–7 (Powers January Decl.). Mr. Powers noted that the jump in the forced outage rate in 2025 was "likely exacerbated" by underspending on operating and maintenance ("O&M") and capital outlays as the Schahfer units reached their expected end of life. *Id.* at 8. He described how elements of the Schahfer units' air emissions control system—including electrostatic precipitators, the wet limestone scrubber, and ultra-low $NO_x$ burners—need regular maintenance to stave off degradation. *Id.* at 19. He further opined, "It cannot be assumed that the Schahfer 17 and 18 pollution control equipment is in good working order and will operate reliably to control the facility's emissions beyond December 2025." *Id.*

   b. *Schahfer Is Inflexible.*

In addition to its reliability problems outlined above, the Schahfer plant also takes significant time to start up from a cold condition, as shown in the following table:

| Unit 17 | Unit 18 |
| --- | --- |
| 23 hours | 23 hours |

Ex. 4 at 10 (Powers January Decl.) (citing Ex. 19, NIPSCO CPCN Discovery Responses). These startup times are very long, even for coal units. *See* Ex. 118 at PDF p. 3 (RMI Analysis of Coal Plants' Threats to Reliability) (stating that the average coal plant takes 12 hours to reach max capacity from a cold start); Ex. 55 at 26 (IEA Flexibility Report) (similar). Even if Schahfer could provide power reliably—and it cannot—the units' long start times mean the plant is ill-suited to provide peaking power during periods of high demand—precisely the periods the December Schahfer Order appears intended to address. A peak demand event may not become apparent to system operators at MISO until just a few hours before the actual peak. Ex. 4 at 10-11 (Powers January Declaration) (citing Ex. 85 (MISO Attributes Roadmap)). Moreover, bringing the Schahfer units from a cold start condition to full output to meet extreme demand would cost around $300,000 each time. *Id.* at 11 (citing Ex. 54 at 16 (NARUC Coal Report)). The alternative to incurring those costs would be the costly approach of running the units on a "Must Run" or "Self-Scheduled" basis. *Id.*

   c. *Schahfer Is Dirty.*

Schahfer has been a significant source of pollution. Each year when operating, the plant emitted hundreds of thousands of pounds of air toxics, hundreds of thousands of pounds of particulate matter ("PM"), many millions of pounds of nitrogen oxides and sulfur dioxide, and billions of pounds of carbon dioxide. *See* U.S. Envtl. Prot. Agency ("EPA"), ECHO, https://echo.epa.gov/air-pollutant-

34

report?fid=110000493706 (last visited Jan. 6, 2026). In 2023, the plant discharged nearly 29 million pounds of pollution into nearby water bodies, including the Kankakee River, including 23,000 pounds of toxic metals. EPA, ECHO, https://echo.epa.gov/detailed-facility-report?fid=110000493706 (last visited Jan. 6, 2026). PIOs' expert engineer, Mr. Powers, calculated that if Schahfer 17 and 18 operated during the 90-day period of the December Schahfer Order with the same level of production they maintained in January-March 2025, more than 140,000 pounds of $SO_2$, 675,000 pounds of $NO_x$, 535,000 tons of $CO_2$, and 104,000 pounds of PM would be emitted. (As Mr. Powers notes, that analysis ignores that Unit 18 actually needs extensive repairs to become operable, as discussed *infra* in sec. V.B.2.)  Ex. 4 at 14-15 (Powers January Decl.).

Emissions from Schahfer have serious health harms. EPA's Co-Benefits Risk Assessment ("COBRA") tool demonstrates that retiring Schahfer would reduce nationwide mortality by 9.4 to 16 deaths per year due to reductions in $PM_{2.5}$, $SO_2$, and $NO_x$ emissions. Ex. 154 at PDF p. 5 (EPA COBRA Schahfer Retirement Analysis).[9]

Additionally, burning coal at Schahfer creates toxic coal ash. The plant already holds roughly 1 million cubic yards of coal ash in an on-site impoundment. Ex. 88 at 2 (Schahfer Waste Disposal Area Closure Plan). Groundwater monitoring at Schahfer's Waste Disposal Area has consistently, over several years, shown statistically significant levels of lithium, molybdenum, and arsenic at downgradient groundwater monitoring wells. Ex. 147 at 5-7 (Schahfer 2024 Groundwater Monitoring Report).

### d. *Schahfer Is Expensive*.

Schahfer costs significantly more money to run than it can earn in the market. If Units 17 and 18 run at their average capacity factor from 2020 through 2025 (and ignoring for purposes of analysis the fact that Unit 18 is broken), they are expected to lose $9.8 million and $8.9 million, respectively, during the 90-day term of the Order. Ex. 5 at 6 (Synapse Report).

Schahfer has gotten even more expensive to run since 2021. In 2024, the cost of Schahfer's power rose to $80.93 per MWh, a 66% increase over the 2021 cost. Ex. 49

---

[9] PIOs obtained this analysis in the public COBRA portal by entering the annual Schahfer emissions of $PM_{2.5}$, $SO_x$, and $NO_x$, based on data from EPA's CAMPD database, as reductions from the Jasper County and Porter County (Indiana) "Fuel Combustion: Industrial" source.

at PDF p. 2 (2025 Energy Innovation Dataset).  This means the cost of Schahfer's power grew significantly faster than inflation (roughly 16%) over the same period. Ex. 50 at 3 (2025 Energy Innovation Coal Cost Report); *see also* Ex. 51 at 12-13 (2023 Energy Innovation Coal Cost Report) (describing the same methodology used in the 2025 report).

### ii. *Culley Unit 2 Exemplifies These Unwanted Attributes.*

#### a. <u>Culley 2 Is Old and Unreliable</u>.

Culley 2, at sixty years old, is at least ten years beyond the typical operational life of coal units. Ex. 4 at 9 (Powers January Declaration). CenterPoint Indiana has stated that Culley 2 has "run past its useful life" as the basis for its planned retirement in 2025. Ex. 80 at 30 (CenterPoint Indiana 2025 IRP Summary). In the table below, and with further context in his declaration, PIOs' expert engineer Bill Powers identifies how Culley 2's forced outage rate has steadily increased over the past half-decade, based on CenterPoint Indiana's filings with the Indiana Commission.

### Culley 2 Forced Outage Rate, 2020-2024

| Unit | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| Culley 2 | 6.3% | 21.9% | 26.6% | 24.8% | 32.4% |

Ex. 4 at 8 (Powers January Decl.) (citing Ex. 22, CenterPoint 2024 Performance Report). Mr. Powers states that this data "points to degraded Culley 2 reliability." Ex. 4 at 8-9 (Powers January Decl.). Mr. Powers further highlighted CenterPoint's public disclosure that its maintenance expenditure declined about 20% from 2022 to 2023 in account 512 (Maintenance of Boiler Plant). *Id.* at 9 (citing Ex. 152, CenterPoint Rate Case Discovery Responses). Mr. Powers noted that increased maintenance spending (missing recently at Culley 2) "is necessary to minimize the effect of equipment degradation with age and changing operating regimes." *Id.* at 9.

#### b. <u>Culley 2 Is Inflexible</u>.

To gauge the startup time of Culley 2, it is instructive to consider the startup time for another coal generating plant formerly within CenterPoint Indiana's portfolio. The A.B. Brown coal units required 18 to 24 hours for a cold start. Ex. 153 at 30 (Wayne Games 2018 Testimony). And Culley 2 is over a decade older than the two A.B. Brown units. *Id.* at 13. As noted above in section IV.C.3.i.b, the startup time of an average coal unit is 12 hours. A cold start time in this range renders Culley 2 unhelpful for responding in real time to emergency conditions. PIOs' expert Mr. Powers opined that like Schahfer, "Culley 2 would not be able to meet a

previously unanticipated exceptional MISO peak demand unless it was already online." Ex. 4 at 12 (Powers January Decl.). A cold start of Culley 2 would also cost approximately $37,000 each time; and the cost of running Culley 2 on "Must Run" or "Self Scheduled" commitment status to avoid cold starts solely to be prepared for a potential demand peak would be higher. *Id.* at 12.

       *c.*   <u>*Culley 2 Is Dirty*</u>.

Culley 2 has been a significant source of pollution. Each year when operating, the plant emitted tens of thousands of pounds of air toxics, hundreds of thousands of pounds of particulate matter, millions of pounds of nitrogen oxides and sulfur dioxide, and billions of pounds of carbon dioxide. *See* EPA, ECHO, https://echo.epa.gov/air-pollutant-report?fid=110000403723 (last visited Jan. 11, 2026). In 2023, the plant discharged approximately 92.5 million pounds of pollution into the Ohio River, including nearly 2,000 pounds of toxic metals. EPA, ECHO, https://echo.epa.gov/detailed-facility-report?fid=110000403723 (last visited Jan. 11, 2026). In 2024, under the National Emissions Standards for Hazardous Air Pollutants, EPA initiated an administrative penalty action against CenterPoint Indiana for alleged exceedance of Culley 2's 30-boiler-operating-day rolling average emissions limit for mercury. Allegedly, the exceedance began when Unit 3 experienced a catastrophic boiler feed pump turbine failure in June 2022 and remained out of service through mid-March 2023. CenterPoint Indiana agreed to a Consent Agreement and Final Order involving payment of an $81,500 civil penalty. EPA, ECHO, Civil Enforcement Case Report (Docket No. CAA-05-2024-0031), https://echo.epa.gov/enforcement-case-report?activity_id=3603947405.

PIOs' expert engineer, Mr. Powers, calculated that if Culley 2 operated during the 90-day period of the December Culley Order with the same level of production it maintained in January–March 2025, more than 113,000 pounds of $SO_2$, 160,000 pounds of $NO_x$, 60,000 tons of $CO_2$, and 153,000 pounds of PM would be emitted. Ex. 4 at 16–17 (Powers January Decl.). The COBRA tool demonstrates that retiring Culley 2 would reduce nationwide mortality by 2.5 to 3.9 deaths per year due to reductions in $PM_{2.5}$, $SO_2$, and $NO_x$ emissions. Ex. 155 at PDF p. 5 (EPA COBRA Culley Retirement Analysis).[10]

---

[10] PIOs obtained this analysis in the public COBRA portal by entering the annual Culley 2 emissions of $PM_{2.5}$, $SO_x$, and $NO_x$, based on data from EPA's CAMPD database, as reductions from the Warrick County (Indiana) Fuel Combustion: Electric Utility source. Ex. 155 at 4 (Culley COBRA Analysis).

Additionally, burning coal at Culley 2 creates toxic coal ash. The plant already holds roughly 350,000 cubic yards of coal ash in the on-site East Ash Pond, which receives bottom ash sluice water and FGD wastewater from Unit 2. Ex. 98 at 2-2 (Culley East Ash Pond Closure Plan); Ex. 109 at 4-1–4-2 (Culley East Ash Pond Extension Demonstration). Groundwater monitoring data around Culley's East Ash Pond show that releases of the toxic pollutant molybdenum exceed federally set safety levels. Ex. 148 at 2, 4, 7 (Culley 2024 Groundwater Monitoring Report).

### d. *Culley 2 Is Expensive.*

Culley 2 costs significantly more money to run than it can earn in the market. CenterPoint Indiana Vice President of Power Supply Wayne Games testified in 2018 that "[s]ince 2008, the [A.B.] Brown plants and Culley Unit 2 cycle more than any other Vectren South [CenterPoint Indiana] plant because they are not competitive in the MISO energy market." Ex. 153 at 14 (Wayne Games 2018 Testimony). He referred to Culley 2 (together with the A.B. Brown coal plant) as "among the most inefficient units within the State" and "the smallest and more expensive coal units in the MISO stack." *Id.* at 7, 8.

Moreover, if the unit runs at its average capacity factor from 2020 through 2025, the unit is expected to cost $1.8 million during the 90-day term of the December Culley Order. Ex. 5 at 6 (Synapse Report). Looking beyond the near term of the December Culley Order, Culley 2 would need extensive capital upgrades to run over a longer period. As CenterPoint Indiana's executive, Mr. Games, stated in 2018 as the company first explained its retirement plan for Culley 2:

> "[A] minimum of $70 million in additional capital investments are required to continue operating Culley Unit 2 through 2036. In part, this investment is driven because Culley Unit cannot solely rely on Culley Unit 3 for environmental compliance costs. A dry bottom ash system must be installed to comply with CCR and further investments may be required to comply with section 316b of the Clean Water Act (designed to protect fish and other aquatic wildlife at water intake and outfall structures) on the design and operation of the current river intake structure. In addition to these environmental costs, Culley Unit 2's distributed control system ('DCS') is a Honeywell system 1 installed in 2000 and must be updated or replaced because it is obsolete. A few other significant capital investments that would be required to keep Culley Unit 2 operating beyond 2023 include a turbine major overhaul, boiler acid clean, main transformer overhaul/replacement, major boiler component replacement, dry stack ductwork replacement, ID fan

38

> discharge ductwork, coal conveyor gallery replacement, boiler/high energy piping condition assessment, air heater basket replacement, continued overhaul of circulating water pumps and traveling water screens, and replacement of two 480-volt motor control center electrical switchgear."

Ex. 153 at 20-21 (Wayne Games 2018 Testimony). The referenced ash handling system was later approved for construction in 2022, with a capital cost equaling a portion of $19 million. Ex. 125 at 12 (IURC AB Brown CT Order).

***

All of these harms could be avoided by retiring Culley 2 and Schahfer 17 and 18 as planned. As further discussed below, CenterPoint Indiana South and NIPSCO wanted to retire these Plants at the end of 2025. MISO approved the retirements, and the Indiana Commission approved utility actions contemplating both Schahfer and Culley 2 retirements.

### 4. *Schahfer's Retirement Has Been Carefully Planned and Well Executed to Ensure Resource Adequacy.*

NIPSCO has been diligently planning the retirement of Schahfer's coal units since at least 2018. In Indiana, IRPs are rigorous processes that involve sophisticated modeling and scrutiny by diverse stakeholders and regulators. *See* section IV.A.4, above. In its 2018 IRP, NIPSCO announced a preferred resource plan that included the retirement of all four Schahfer coal units by 2023. NIPSCO's short term action plan from the 2018 IRP focused on initiating the retirement process for all four of the Schahfer coal units and acquiring replacement resources to fill the energy and capacity gap resulting from the retirements. NIPSCO's 2018 IRP determined that the retirement of Schahfer coal units provided "significant cost savings versus the status quo and offer[ed] an acceptable outcome for portfolio flexibility and with regard to the impact on employees and the local economy." Ex. 71 at 156 (NIPSCO 2018 IRP).

In its 2021 IRP, published in November of that year, NIPSCO noted that Schahfer Units 14 and 15—the larger coal generating units at the site—had been retired earlier that year, and NIPSCO stated that "Units 17 and 18 are on track to retire by the end of 2023." Ex. 72 at 9 (NIPSCO 2021 IRP). NIPSCO again confirmed that retiring these coal units was economically advantageous. In the 2021 IRP, NIPSCO noted that it continued to make progress on over a dozen Indiana Commission-approved generation projects to replace the retired capacity at Schahfer. Ex. 72 at 9 (NIPSCO 2021 IRP).

In May 2022, NIPSCO announced plans to delay the retirement of Schahfer Units 17 and 18 until 2025 after several solar projects faced delays associated with a United States Department of Commerce anti-dumping investigation. Ex. 73 (NIPSCO May 2022 Investor Call).

NIPSCO's 2024 IRP confirmed that Schahfer Units 17 and 18 "remain on track to retire by the end of 2025." Ex. 100 at 6 (NIPSCO 2024 IRP). To replace the retiring capacity at Schahfer, NIPSCO noted that it continued to make progress on its fourteen Indiana Commission-approved renewable energy projects, including wind, solar, and solar plus battery storage resources, while also gaining regulatory approval for a natural gas peaking resource that will be located at the Schahfer property and use the interconnection rights associated with the retiring Units 17 and 18. Ex. 100 at 1, 6–7 (NIPSCO 2024 IRP); Ex. 20 at 10, 17, 41 (IURC Schahfer Gas Plant Order); Ex. 132 at PDF pp. 14–16 (NIPSCO Rate Case Discovery Responses).

In sum, the retirement of Schahfer Units 17 and 18 results from nearly a decade of planning. In each of these successive resource planning exercises, NIPSCO confirmed that its customers would benefit from the retirement of Schahfer coal units.

   *i. Schahfer's Retirement Was the Product of a Generation Replacement Strategy that Improves Resource Adequacy.*

Over the last decade, NIPSCO has brought forward and the Indiana Commission has approved a suite of generation resources that replace the output of the Schahfer coal units. As NIPSCO is moving from reliance on large single-station generation to a fleet of modern, smaller, more nimble generating units, the replacement of Schahfer is expected to improve reliability and grid resilience. *See* Ex. 132 (NIPSCO Rate Case Discovery Responses).

**Figure 1, excerpt from Ex. 100 at Summary p. 7 (NIPSCO 2024 IRP).**

40



In Cause No. 45947, the Indiana Commission approved ~400 MW of gas peaking capacity to be located at the Schahfer site. Ex. 20 (IURC Schahfer Gas Plant Order). NIPSCO relied on its planned retirement of Schahfer to demonstrate that the gas plant was displacing coal and eligible for construction-work-in-progress financing incentives under Indiana law. *Id.* at 21 ("Partial displacement of retiring coal-fired energy generation with a gas peaking resource has been a component of NIPSCO's IRP modeling and related CPCN regulatory filings since 2021. As such, we find the CT Project is being constructed to displace energy from an existing coal-fired generation facility and is therefore eligible for [construction-work-in-progress financing]."). The IDEM-issued air permit for these new peaking units provides that NIPSCO must retire Schahfer Units 17 and 18 before the combustion turbines begin to operate. Ex. 101 at 34 (Schahfer Title V Permit Modification) ("Upon the commencement of operation of the natural gas-fired simple cycle combustion turbines, identified as 19A, 19B, 19C, and Unit 20, the two (2) dry bottom pulverized coal-fired boilers, identified as Unit 17 and Unit 18, shall be permanently shutdown and subsequently decommissioned from the source.").

Collectively, these projects improve reliability. These projects will allow NIPSCO to continue to meet its resource adequacy requirements. *See* section IV.A.4. The battery and peaking gas units are capable of responding to disturbance on the grid and to changing generation needs much more quickly than the coal units. Ex. 132 (NIPSCO Rate Case Discovery Responses).

41

*ii. MISO and the Indiana Commission Continue to Take Actions in Reliance on Schahfer's Retirement.*

For MISO asset owners like NIPSCO, no generating unit is permitted to retire without first being approved by MISO for retirement through a process that assures transmission system stability and resource adequacy. In January 2023, NIPSCO requested that MISO approve a retirement date of December 31, 2025, for Schahfer Units 17 and 18.  In February 2023, MISO approved the retirement of Schahfer Units 17 and 18, finding no impact on reliability:

> "After being reviewed for power system reliability impacts as provided for under Section 38.2.7 of MISO's Open Access Transmission, Energy, and Operating Reserve Markets Tariff ('Tariff'), the suspension of Schahfer Units 17 and 18 would not result in violations of applicable reliability criteria. Therefore, Schahfer Units 17 and 18 may suspend without the need for the generators to be designated as System Support Resource ('SSR') units as defined in the Tariff."

Ex. 102 at PDF p. 12 (MISO Attachment Y Response to NIPSCO).

The Indiana Commission has also endorsed the retirement of Schahfer Units 17 and 18 in two distinct regulatory processes.

First, in 2019, 2023, and 2025 electric rate case final orders, the Indiana Commission approved depreciation rates and operations and maintenance spending for Schahfer that assumed NIPSCO's expected retirement dates. *See* Ex. 103 at 120 (NIPSCO 2019 Rate Order) (summarizing approved depreciation adjustment and noting NIPSCO's associated plan to retire Schahfer coal units); Ex. 104 at 13-14 (NIPSCO 2023 Rate Order) (approving demolition costs for Schahfer and adjusting depreciation recovery for Schahfer units); Ex. 106 at 23 (NIPSCO 2025 Rate Order) (describing approved settlement's reduction of O&M spending in revenue requirement for Schahfer Units 17 and 18 with their expected retirement in December 2025). While depreciation timelines and adjustments to O&M spending included in base rates do not legally require that a retirement occur on the projected retirement date, in each of these cases a broad coalition of stakeholders, including the Indiana Office of Utility Consumer Counselor (the statutory ratepayer representative), entered into a settlement agreement with NIPSCO that assumed the units would retire as projected by the utility, and agreed to adjust depreciation schedules and O&M spending accordingly. In each of these cases, the Indiana Commission approved the Schahfer depreciation schedule or O&M spending, while noting the utility's intention to retire the units.

Second, the Indiana Commission approved Certificates of Public Convenience and Necessity ("CPCNs") that NIPSCO received for new generation resources from

42

2018 through 2025, that were justified, in part, on a stated need to replace the Schahfer coal units. In approving these projects, the Indiana Commission explicitly noted that the generation was intended to replace Schahfer. The Indiana Commission order approving the 400 MW of gas peaking capacity for the Schahfer site, for example, found that "[Combustion Turbine] Project is designed to reliably cycle in response to the MISO market and will displace the retiring Schahfer coal units with more efficient and controllable load-following capacity." Ex. 20 at 28 (IURC Schahfer Gas Plant Order). Other CPCN orders approving NIPSCO's replacement generation include Indiana Commission Cause Nos. 45818, 45936, 45500, 46028, 45908, and 45887. In other words, the Commission has relied on and not objected to the plan for Schahfer retirements as it has approved NIPSCO's requests to build and charge customers for the cost of projects explicitly designed to replace the Schahfer units.

> 5. *Culley 2's Retirement Has Been Carefully Planned and Well Executed, and Overseen by the Indiana Commission to Ensure Resource Adequacy.*

CenterPoint Indiana has been planning the retirement of Culley 2—its "oldest, smallest (83 MW), and most inefficient coal generating unit"—for over a decade. Ex. 107 at 33 (Vectren 2014 IRP). In its 2014 IRP, CenterPoint Indiana found that retiring Culley 2 in 2020 would save customers money, but deferred making a decision due to load-growth and regulatory uncertainty. *Id.* at 25-26. The 2016 IRP confirmed that retiring Culley 2 in 2024 was part of the preferred plan for serving its customers. Ex. 108 at 44 (Vectren 2016 IRP). CenterPoint Indiana official Wayne Games informed the Indiana Commission two years later that:

> "Investing so heavily in a unit as old and inefficient as Culley Unit 2 is not economic. Vectren South's modeling bore this out. Due to the higher cost to operate, the unit has experienced less overall run time and much more unit cycling. Culley Unit 2 has reached the end of its useful life and should be retired rather than continuing to spend capital keeping the inefficient unit operating."

Ex. 153 at 21 (Wayne Games 2018 Testimony).

> i. *Culley 2's Retirement Was the Product of a Generation Replacement Strategy that Improves Resource Adequacy.*

CenterPoint Indiana's initial plan to replace Culley 2 and the A.B. Brown coal plant with a combined-cycle gas facility at the A.B. Brown site was rejected by the Indiana Commission in 2019. *See* Ex. 114 (IURC 2019 CCGT Order). The Indiana Commission rejected this replacement gas facility because it found that the utility had failed to adequately consider alternatives, including the ability of renewables to

replace some of the retiring coal energy and capacity. *Id*. at 25-28. The Indiana Commission directed CenterPoint Indiana to reevaluate its plan to replace its retiring coal units.

In its 2020 IRP, CenterPoint Indiana announced its revised coal-replacement preferred plan, responding to the Indiana Commission's order in Cause No. 45052. Instead of replacement with a single combined cycle gas facility, the revised plan called for replacement of the majority of CenterPoint Indiana's coal fleet—including A.B. Brown and Culley 2—by the end of 2023 with 700-1,000 MWs of solar, 300 MWs of wind, energy efficiency, and two gas combustion turbines ("CTs") totaling 460 MW. Ex. 115 at 51 (Vectren 2020 IRP). CenterPoint Indiana found that the fast-ramping CTs, combined with the wind and solar resources, enabled the utility "to maintain constant electric supply during potentially extended periods of low output" from renewables. *Id*. at 34-35. CenterPoint Indiana found that the 2020 preferred plan would save its customers $320 million over the study period compared to continued operation of its existing coal generation. *Id*. at 35.

In its 2023 IRP, CenterPoint Indiana observed that the Indiana Commission's approval of five generation projects from its 2020 preferred plan "affirms the direction taken" in replacing its coal units. Ex. 116 at 36 (CenterPoint 2023 IRP). The 2023 IRP modeling again found that a preferred portfolio that included the retirement of Culley 2 in 2025 would save its customers money. *Id*. at 38, 56; *see also id*. at 57 (preferred portfolio "[s]aves customers nearly $80 million over the next 20 years when compared to continued operation of F.B. Culley with coal."). CenterPoint's 2025 IRP again found that retiring Culley 2 in 2025 was a part of the utility's preferred plan. Ex. 80 at 20 (CenterPoint Indiana 2025 IRP Summary).

> ii. *MISO Likely Approved Culley 2's Retirement, and the Indiana Commission has Approved Adjustments to the Culley Depreciation Schedule and Repeatedly Approved Generation Projects Specifically Designed to Allow Culley 2 to Retire.*

CenterPoint Indiana submitted an Attachment Y notice to MISO, as required under MISO's FERC-approved tariff, seeking approval to retire Culley 2 at the end of 2025. Ex. 21 at 52 (CenterPoint Indiana 2025 IRP). While the MISO response to this Attachment Y filing has not been made public, CenterPoint noted that Culley 2 had operated "past its useful life" and remained on track for a 2025 retirement. *Id*. at 30. CenterPoint noted in a recent filing at FERC that "MISO reviewed the Company's suspension request for Culley Unit 2 and found no reliability criteria violations." Ex. 128 at 9 (CenterPoint Cost Allocation Complaint).

The Indiana Commission has supervised CenterPoint's resource planning and endorsed the retirement of Culley 2 in two categories of regulatory proceedings.

Since 2020, the Indiana Commission has approved a series of generating resources that were explicitly premised on replacing Culley 2 and other now-retired coal units. For example, in Cause No. 45564, in approving the construction of 460 MW of gas peaking capacity, the Indiana Commission observed that the "Preferred Portfolio identified through the 2019/2020 IRP called for the retirement or exit of energy provided by coal-burning units at the Brown and Culley generating stations." Ex. 125 at 16 (IURC AB Brown CT Order). The Indiana Commission further observed of this replacement plan:

> "The Preferred Portfolio mapped a shift from a generating fleet of predominantly coal-burning resources to one of intermittent renewable resources supported by gas generation to ensure reliability. One early step in implementing the Preferred Portfolio was the addition of solar generating resources approved by the Commission in Cause Nos. 45501 on October 27, 2021 and 45600 on May 4, 2022. A next step is the addition of the two new CTs requested in this Cause."

*Id*. at 16. Thus, in approving CPCNs for replacement resources, the "steps" in CenterPoint Indiana's replacement plan, the Indiana Commission approved CenterPoint Indiana's plan to retire and replace Culley 2.

Second, in Cause No. 45990, a CenterPoint Indiana electric rate case, the Indiana Commission approved an adjustment in test-year spending associated with the retirement of Culley 2. Ex. 126 at 58 (IURC 2025 CenterPoint Rate Order); *see also* Ex. 127 at 30 (Chrissy Behme Testimony) (rate schedules filing "reflects a pro forma adjustment decrease to test year expense associated with F.B. Culley Unit 2, which is forecasted to retire at the end of the test year."). In other words, the Indiana Commission has already approved a reduction in rate recovery associated with the Culley 2 retirement.

## V. REQUEST FOR REHEARING

The Orders are a manifestation of the Department's overarching policy to systematically misapply Section 202(c) of the Federal Power Act to preserve fossil-fueled power plants, including coal-fired plants, that otherwise would be retired. That policy aims to bolster the fossil energy industry, irrespective of need, expense, and harm. In its zeal to implement its policy through issuance of the Orders, (1) the Department has exceeded the authority Congress gave it, using its "emergency" powers in the absence of any imminent shortfall to impose federal control of basic generation and supply decisions; and (2) the Department has done so without reasoned decision-making and on the basis of purported "facts" that are not supported by any credible evidence. *See Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Rel. Bd.*, 522 U.S. 359, 374 (1998) (explaining agency obligation to undertake

45

reasoned-decision-making); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 429 U.S. 29, 43 (1983) *same); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The agency must make findings that support its decision, and those findings must be supported by substantial evidence."); *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency cannot ignore evidence contradicting its position."); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (explaining that, absent statutory authorization, an agency's action is contrary to law). Numerous examples of the Department's unreasoned and unlawful decision-making are described throughout this section V. The only plausible explanation for these repeated legal errors is that the Department has prioritized implementing its policy over compliance with law.

Congress never conferred on the Department the broad authority over the country's mix of power generation resources that the Department seeks to wield under the pretense of responding to claimed "emergencies." To the contrary Congress explicitly reserved authority over resource adequacy and grid reliability to the states, FERC, and NERC. *See, e.g.*, 16 U.S.C. §§ 824(a)–(b), 824o; *Pac. Gas & Elec.*, 461 U. S. at 205. Both the agency's new policy and the Orders exceed the Department's authority and are therefore contrary to law.

Before tackling the Orders' legal faults and issues*, see infra* sections V.A through V.D, it is useful to understand the broader context of the Department's policy. The Department acknowledges that its Orders are based on a government-wide policy—dictated by Executive Order—of promoting fossil-based energy through the use of any emergency powers executive departments and agencies could try to invoke. The Orders rely upon the Energy Emergency EO, 90 Fed. Reg. 8,433, which directs the heads of all executive departments and agencies to use "emergency authorities" and "other lawful authorities" to facilitate the production, extraction, creation, and generation of coal and other fossil fuels.

The Orders also rely on another executive order, the Grid EO (Ex. 93). The Grid EO was issued at the same time as three other executive actions aimed at supporting the coal industry, and was announced at a White House political event focused on promoting coal. Ex. 94 (NY Times Coal Article). In essence, the Grid EO calls on the Department to assume the authority for resource adequacy and grid reliability decision-making that the Federal Power Act reserves to others, and to "systemize" the issuance of Section 202(c) orders for that improper purpose. *See* Ex. 93, 90 Fed. Reg. at 15,521–22 (Grid EO) (directing the Department to "streamline, systemize and expedite" the issuance of Section 202(c) orders; to develop a "uniform methodology" for assessing reserve margins and a protocol to retain generators the Secretary deems critical to system reliability; and to prevent

46

certain generators from leaving the bulk-power system or converting to a different fuel source).

The Department's words and actions following issuance of the Grid EO reveal its efforts to unlawfully arrogate to itself others' lawful authority through systematic misapplication of Section 202(c) to prop up coal-burning power plants. The Department's initial steps included issuing a Section 202(c) order to prevent the well-planned retirement of the J.H. Campbell Generating Plant in Michigan. *See* Ex. 150 (May Campbell Order). The Department's order was clear on one point— Campbell cannot be allowed to retire—but left vague and unclear almost everything else. *See, e.g., Consumers Energy Co. v. Midcontinent Indep. Sys. Op., Inc.*, 192 FERC ¶ 61,158, at PP 39–40 (2025) (recognizing the variety of interpretations of the Campbell order and settling on "the most reasonable reading of the DOE Order's intended scope"). The Campbell order failed to make clear even where the grid supposedly needed energy from Campbell, selectively quoted sources without examining their context and core findings, and flouted Congress' explicit limitations on the Department's Section 202(c) powers. *See* Motion to Intervene and Request for Rehearing and Stay of Sierra Club et al. at *passim* (June 18, 2025), https://www.energy.gov/sites/default/files/2025-07/PIO%20Request%20for%20Rehearing%20of%20Order%20No.%20202-25-3.pdf.

After preventing Campbell's retirement, the Department has continued to implement its policy. In addition to the Orders on the NIPSCO and CenterPoint Indiana Plants, the Department has issued Section 202(c) orders to prevent fossil-burning plant retirements in Pennsylvania, Order Nos. 202-25-4, 202-25-8, & 202-25-10, in Indiana, Order Nos. 202-25-12 & 202-25-13, and in Colorado, Order No. 202-25-14.

Additionally, on July 7, 2025, the Department published the "methodology" required by the Grid EO, which the Department explained will "guide reliability interventions," including the use of Section 202(c) orders. Ex. 96 at vi (July Resource Adequacy Report); *see also* Ex. 97 at 3–4 (DOE July 7 Press Release) ("The methodology also informs the potential use of DOE's emergency authority under Section 202(c) of the Federal Power Act."). The report identifies no present or imminent emergency; at most, using deeply flawed methodology, it identifies a theoretical shortfall of generation in 2030.

Taken together, the Energy Emergency EO, Grid EO, July Resource Adequacy Report, and the Department's recent Section 202(c) orders reflect a policy to promote the long-term preservation of fossil-fueled electric generation, including coal-fired generation, by using the Department's emergency authority under Section 202(c). To the extent these actions left any room for doubt that the Department has

47

such a policy, Energy Secretary Wright's own words have removed it. In his statement to the press when the Centralia Order issued, Secretary Wright emphasized, "The Trump administration will continue taking action to keep America's coal plants running." Ex. 133 (Department Press Release on Centralia Order); *see also* Ex. 149 at *passim* (New York Times Article on Trump's Coal Plant Policy); Ex. 76 (Secretary Wright's West Virginia Remarks) (reporting Secretary Wright's stated intention to stop the closure of coal plants and claiming authority to do so).

The Department has further reinforced this policy by applying it in the Orders.

A.  *The Orders Address Circumstances Beyond the Lawful Scope of an Emergency Under Section 202(c), and Fail to Provide Evidence or Reasoned Decision-Making Substantiating the Existence of an Emergency that Can Come Within Section 202(c).*

   1.  *Legal Framework: Section 202(c) Empowers the Department to Respond Only to Imminent, Certain, and Unexpected Shortfalls in Electricity Supply.*

The Orders invoke Section 202(c) of the Federal Power Act, which provides:

> "During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation of transmission of electric energy . . . the Commission shall have authority . . . with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, deliver, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest."

16 U.S.C. § 824a(c)(1). That authority was transferred to the Department by the Department of Energy Organization Act. *See* 42 U.S.C. § 7151(b).

Section 202(c)'s text and context establish that an "emergency" enabling the Department to over-ride state and private decision-making must be an event that is imminent, certain, and unexpected. 16 U.S.C. § 824a(c). The constrained scope of Section 202(c)'s emergency authority is confirmed by the broader statutory context—in particular, the separate regime delineating federal authority over bulk-system reliability in Section 215 of the Federal Power Act, *id.* § 824o—as well the Department's regulations, caselaw applying Section 202(c), and the Department's consistent past practice.

### i. *The Text and Context of Section 202(c) Confine an Emergency to Imminent, Certain, and Unexpected Events*

Section 202(c)'s text empowers the Department to require generation only in an "emergency." *Id.* § 824a(c). Both the ordinary meaning of the term (which the statute does not expressly define) and statutory context limit the Department's emergency authority to imminent, unexpected, and certain events. At the time Congress enacted Section 202(c), Webster's New International Dictionary of the English Language (1930) defined "emergency" as, with emphasis added here, a "*sudden* or *unexpected* appearance or occurrence… An *unforeseen* occurrence or combination of circumstances which calls for *immediate* action or remedy; *pressing* necessity; exigency." Contemporary dictionaries similarly define "emergency" as demanding imminence: an emergency is "an *unforeseen* combination of circumstances or the resulting state that calls for *immediate* action." Merriam Webster's Dictionary 407 (11th ed. 2009) (emphasis added); *see* 3 Oxford English Dictionary 119 (1st ed. 1913) (defining emergency similarly as "a state of things *unexpectedly* arising, and urgently demanding *immediate* action" (emphasis added)); *see also* Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 812 n.147 (2025) (noting that dictionaries have given the term "emergency" the "same meaning for many years").

The remainder of Section 202(c) underscores the exigency inherent in the governing term "emergency." The authority granted by Section 202(c) is, in the first instance, a war-time power. 16 U.S.C. § 824a(c) (beginning with "[d]uring the continuance of any war in which the United States is engaged"); *see Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) (noting that statutory terms should be interpreted in the context of nearby parallel terms "in order to avoid the giving of unintended breadth to the Acts of Congress"). An "emergency" under the statute is limited to circumstances of similar urgency: "a *sudden* increase in the demand for electric energy," for example. 16 U.S.C. § 824a(c) (emphasis added); *see Richmond Power & Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) (holding that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances"); S. Rep. No. 74-621, at 49 (1935) (explaining that Section 202(c) provides "temporary power designed to avoid a repetition of the conditions during the last war, when a serious power shortage arose").

The text's use of the present tense accentuates its focus on imminent and certain shortfalls: It empowers the Department to act only where "an emergency *exists*." 16 U.S.C. § 824a(c) (emphasis added). The Section's title and text both emphasize that it provides a "temporary" authority, further emphasizing that its emphasis on immediate—not distant—needs. *Id.* § 824a(c), (c)(1); *see Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (cleaned up) ("The title of a statute and the heading of a

49

section are tools available" to resolve "the meaning of a statute," and "a title is especially valuable where it reinforces what the text's nouns and verbs independently suggest."). That near-term focus precludes use of Section 202(c) to pursue broader or long-term energy-policy goals, such as a "fear of overdependence" on foreign oil supplies, *Richmond Power & Light*, 574 F.2d at 617, or "energy independence," Ex. 96 at 1 (July Resource Adequacy Report); *see also Richmond Power & Light*, 574 F.2d at 614 (Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances, and is aimed at situations in which demand for electricity exceeds supply and not those in which supply is adequate but a means of fueling its production is in disfavor.").

Section 202's overall structure further highlights Section 202(c)'s emphasis on imminent, near-term concerns. The preceding subsections (202(a) and (b)) together define and limit the tools by which the federal government may pursue "abundant" energy supplies in the normal course. 16 U.S.C. § 824a(a) (seeking "abundant supply of electric energy" by directing the federal government to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy"); *id.* § 824a(b) (allowing federal government to order "physical connection . . . to sell energy to or exchange energy" upon application, and after an opportunity for hearing). The resulting statutory "machinery for the promotion of the coordination of electric facilities" comprises the following: in subsection (a), an instruction to establish a general framework meant to facilitate "coordination by voluntary action;" in subsection (b), "limited authority to compel interstate utilities to connect their lines and sell or exchange energy," subject to defined procedural and substantive requirements, when "interconnection cannot be secured by voluntary action;" and in subsection (c), "much broader" but "temporary" authority "to compel the connection of facilities and the generation, delivery, or interchange of energy during times of war or other emergency." S. Rep. No. 74-651 at 49 (1935).

That tiered structure—placing primary emphasis on voluntary resource adequacy planning, 16 U.S.C. § 824a(a), specifying limited authority where that voluntary system fails, *id.* § 824a(b), and allowing for "temporary" central command-and-control only in case of an "emergency," *id.* § 824a(c)—requires that Section 202(c) remain narrowly confined to instances of an immediate and unavoidable "break-down in electric supply," S. Rep. No. 74-651 at 49 (1935), rather than a mere desire for more abundant supply in the future, *cf.* Ex. 1 at 4 (December Schahfer Order); Ex. 2 at 5 (December Culley Order) (emphasis added) (pointing to conditions that "will continue in the near term" and "are also *likely* to continue in *subsequent years*" that "*could* lead to the loss of power . . . in the areas that *may* be affected by curtailments or power outages, presenting a *risk* to public health and safety"). The tiered structure authorizes increasingly intrusive federal intervention,

50

but under increasingly narrow circumstances. Interpreting Section 202(c)'s "emergency" powers to permit the Department to compel generation based on nothing more than the generalized challenges of operating a reliable bulk electric system in a rapidly transforming energy landscape, or concerns over longer term resource adequacy, *see* Ex. 1 at 2 (December Schahfer Order), Ex. 2 at 1, 2 (December Culley Order), would unwind the careful balance of voluntary, market-driven action and federal power set out in Sections 202(a) and 202(b). Such an interpretation cannot be squared with the statutory text and structure. *See Otter Tail Power Co. v. Fed. Power Comm'n*, 429 F.2d 232, 233–34 (8th Cir. 1970) (holding that Section 202(c) "enables the Commission to react to a war or national disaster," while Section 202(b) "applies to a crisis which is likely to develop in the foreseeable future").

### ii. Congress' Enactment of a Specific, Cabined Scheme to Address Reliability Concerns Confirms That Generalized or Long-Term Bulk-Power System Reliability Concerns Are Not an "Emergency" Under Section 202(c).

That the Department's Section 202(c) emergency powers do not extend to general supervision of bulk-power-system reliability is confirmed by Section 215 of the Federal Power Act—which specifically and directly delineates the scope of federal authority to enforce mandatory reliability requirements for the bulk-power system. 16 U.S.C. § 824o. Congress added Section 215 to the Federal Power Act in 2005 precisely because the Act as it then existed—including Section 202—did not give the federal government with the power to enforce measures designed to ensure bulk-system reliability. *See Rules Concerning Certification of the Elec. Reliab. Org.; and Procedures for the Establishment, Approval, and Enforcement of Elec. Reliab. Standards*, 70 Fed. Reg. 53,117, 53,118 (Sept. 7, 2005) ("In 2001, President Bush proposed making electric Reliability Standards mandatory and enforceable," leading to enactment of Section 215 in 2005); Ex. 139 at 7-6 (*Report of the Nat'l Energy Pol'y Dev. Grp.*) (noting that "[r]egional shortages of generating capacity and transmission constraints combine to reduce the overall reliability of electric supply in the country" and that "one factor limiting reliability is the lack of enforceable reliability standards" because "the reliability of the U.S. transmission grid has depended entirely on *voluntary* compliance," and then recommending "legislation providing for enforcement" of reliability standards (emphasis added)); S. Rep. No. 109-78 at 48 (2005) (stating that Section 215 "changes our current voluntary rules system" for bulk-system reliability "to a mandatory rules system"); *see also Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009) (noting that prior to the Energy Policy Act of 2005, "the reliability of the nation's bulk-power system depended on participants' voluntary compliance with industry standards").

51

By enacting Section 215, Congress provided a comprehensive and carefully circumscribed scheme to empower the federal government to enforce bulk-system reliability requirements. That statutory scheme strikes a careful balance between state and federal authority, and between private, market-driven decisions and top-down control. Reliability standards are devised by NERC independent "of the users and owners and operators of the bulk-power system" but with "fair stakeholder representation." 16 U.S.C. § 824o(c)–(d); *see also id.* § 824o(a)(3) (defining reliability standards as "a requirement . . . to provide for reliable operation of the bulk-power system"). FERC may approve or remand those standards (but not replace them with its own) and is required to "give due weight" to NERC's "technical expertise" while independently assessing effects on "competition." *Id.* § 824o(d)(2)–(4). Section 215 provides specified enforcement mechanisms and procedures for reliability standards—which mechanisms conspicuously exclude the power to command specific generation resources to remain operational. *Id.* § 824o(e). And Section 215 carefully preserves state authority over "the construction of additional generation" and in-state resource adequacy, establishing regional advisory boards to ensure appropriate state input on the administration of reliability standards. *Id.* § 824o(i)–(j).

Interpreting Section 202(c) to permit the Department to mandate generation based on its own unfettered assessment of bulk-system reliability needs would effectively allow the Department to bypass Section 215's procedural safeguards, constraints on federal authority, and protection of state power. Such a bypass would impermissibly "contradict Congress' clear intent as expressed in its more recent," reliability-specific legislation, enacted "with the clear understanding" that the Department had "no authority" to address long-term reliability through Section 202(c). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142 & 149 (2000); s*ee also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401–02 (D.C. Cir. 2004) ("Congress's specific and limited enumeration of [agency] power" over a particular matter in one Section of the Federal Power Act "is strong evidence that [a separate Section] confers no such authority on [agency]."). Congress has, in Section 215, directly established the mechanisms (and limitations) by which the federal government may compel action to ensure the reliability of bulk-power electric system. In so doing, it has confirmed that the Department may not, through Section 202(c) "emergency" orders, use those reliability concerns to mandate the generation it views as required to address broad "resource adequacy problems," Ex. 1 at 2 (December Schahfer Order); Ex. 2 at 2 (December Culley Order); its emergency authority is confined to specific and imminent supply shortfalls requiring immediate response.

52

*iii. The Department's Regulations Similarly Establish that Section 202(c) Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response.*

The Department's regulations demonstrate its own long-standing understanding that Section 202(c)'s emergency authority is confined to imminent, certain, and otherwise unavoidable resource shortages, and does not provide a mechanism to address broad, long-term concerns as to the reliability of the bulk-power system. The regulations recognize that an emergency under Section 202(c) requires, first, "a *specific* inadequate power supply situation." 10 C.F.R. § 205.371 (emphasis added). The Department's non-specific dissatisfaction with regional power planning does not, consequently, empower the Department to override that planning by emergency order. The need for both specificity and certainty is repeated in the Department's regulations defining an inadequate energy supply: "A system may be considered to have" inadequate supply when "the projected energy deficiency . . . *will* cause the applicant [for a 202(c) Order] to be unable to meet its normal peak load requirements based upon use of all of its otherwise available resources so that it *is* unable to supply adequate electric service to its customers." 10 C.F.R. § 205.375 (emphasis added). The same provision suggests that an emergency will generally exist only when "the projected energy deficiency . . . without emergency action by the [Department], will equal or exceed 10 percent of the applicant's then normal daily net energy for load." *Id.*

The regulations further recognize that Section 202(c) does not provide a means of planning against months-off expectations or risks. They define an emergency as "an *unexpected* inadequate supply of electric energy which may result from the *unexpected* outage or breakdown" of generating, transmission, or distribution facilities—not a tool to ensure future energy abundance, or override state and private planning that the Department deems inadequate. 10 C.F.R. § 205.371 (emphasis added). Emergencies are characterized by shortages produced by "weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected 'entity' to prevent." *Id.* Where the culprit is increased demand, it must be "a *sudden* increase in customer demand," *id.* (emphasis added), rather than demand projections producing non-immediate reliability concerns.

And while the regulations suggest that "inadequate planning or the failure to construct necessary facilities can result in an emergency," they recognize that the Department may not utilize a "continuing emergency order" to mandate long-term system planning. *Id.* The regulations also recognize that "where a shortage of electricity is projected due solely to the failure of parties to agree to terms, conditions, or other economic factors" there is no emergency "unless the inability to supply electric service is *imminent.*" *Id.* (emphasis added). An emergency may exist

53

where past planning failures produce an immediate, present-tense shortfall (that is where, a shortfall *results* from insufficient planning); the Department has no authority to commandeer bulk-system reliability planning merely because it deems current plans inadequate. *See* 10 C.F.R. § 205.375 (requiring present inability to meet demand to demonstrate inadequate energy supply). As the Department stated when it promulgated those regulations, the statute allows the Department to provide "assistance [to a utility] during a period of unexpected inadequate supply of electricity," but does not empower it to "solve long-term problems." *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39,984, 39,985–86 (Aug. 6, 1981).

### iv. Courts Have Uniformly Held that Section 202(c) Can Be Invoked Only in Immediate Crises.

Caselaw applying Section 202(c) further supports the narrow circumstances under which it permits the Department to seize command of the power system. *Richmond Power and Light* arose out of the 1973 oil embargo. The Federal Power Commission responded to the embargo by calling for voluntary transfer of electricity from non-oil power plants to areas of the country that relied heavily on oil, such as New England. 574 F.2d at 613. The New England Power Pool was not convinced that the voluntary program would work and petitioned the Commission for a 202(c) order. *Id.* Rather than issue such an order, the Commission facilitated an agreement between state commissions and supplying utilities, which satisfied the New England Power Pool, leading it to withdraw its petition. *Id.* A dissatisfied utility sought judicial review of the Commission's decision to allow the withdrawal of the Section 202(c) petition. *Id.* at 614.

The court easily upheld the Commission's decision not to invoke Section 202(c). *Id.* Though the oil embargo had ended, the utility argued that the "high cost and uncertain supply of imported oil" justified an emergency order. *Id.* The Commission countered that the voluntary program had worked, the New England Power Pool never interrupted service, and there was no need for a Section 202(c) order. *Id.* at 615. The D.C. Circuit agreed. *Id.* The utility alternatively argued that "dependence on imported oil leaves this country with a *continuing* emergency." *Id.* (emphasis added). The court observed that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances." *Id.* Interpreting this statutory language, the court upheld the Commission's view that Section 202(c) cannot be used when "supply is adequate but a means of fueling its production is in disfavor." *Id.*

*Richmond Power & Light* thus teaches that Section 202(c) is not an appropriate means to implement long-term national policy to switch fuels. The provision allows only a temporary fix for a temporary problem.

54

The Eighth Circuit has similarly held that Section 202(c) can only be used to respond to immediate crises. In *Otter Tail Power*, a utility insisted that the only way for the Federal Power Commission to properly order the utility to connect to a municipal power provider was to issue a Section 202(c) order. 429 F.2d at 234. Demand for electricity in the city had increased, and the peak load of the municipal power provider was getting to be so high that both of its two generators would likely need to be used simultaneously in the near future, "causing a possible loss of service should one malfunction during a peak period." *Id*. at 233–34. To avoid this possible loss of service, the Federal Power Commission issued a Section 202(b) order, requiring the utility to connect to the municipal power provider. *Id*. The utility argued that the Federal Power Commission used the wrong provision and should have used Section 202(c) instead. *See id*.

The court explained that Section 202(c) "enables the Commission to react to a war or national disaster" by ordering "immediate" interconnection during an "emergency." *Id*. at 234. For non-emergency situations, "[o]n the other hand, Section 202(b) applies," including when there is a "crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the Commission." *Id*. The court upheld the Commission's use of Section 202(b) instead of Section 202(c) because there was no immediate emergency. *See id*. The case law uniformly supports the interpretation that Section 202(c) can only be used in acute, short-term, urgent emergencies.

### v. The Department's Prior Orders Recognize that Section 202(c) Does Not Confer Plenary Authority Over Bulk-System Resource Adequacy.

The Department's consistent application of Section 202(c) prior to 2025 further corroborates the urgency of the emergency conditions that are the necessary predicate for any Department intervention under Section 202(c). *See Fed. Trade Comm'n v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it is equally significant in determining whether such power was actually conferred."). Since obtaining authority under Section 202(c) in the 1970s and prior to 2025, the Department has consistently used Section 202(c) to address specific, imminent, and unexpected shortages—not to address longer-term reliability concerns or demand forecasts. *See, e.g.*, Ex. 9 at 1 (DOE Order No. 202-22-4) (responding to ongoing severe winter storm producing immediate and "unusually high peak load" between Christmas Eve and Boxing Day); Ex. 17 at 1–2 (DOE Order No. 202-20-2) (responding to shortages produced by ongoing extreme heat and wildfires); Ex. 105 at 1 (DOE Order No. 202-08-1) (ordering temporary connection of facilities in response to "massive devastation caused by Hurricane

55

Ike," leaving "large portions" of Texas "without electricity"); *see also* Rolsma, 57 Conn. L. Rev. at 803–04 (describing "sparing[]" use of Section 202(c) outside of war-time shortages during the twentieth century).[11] Public Interest Organizations are not aware of any instance in which, before 2025, the Department utilized Section 202(c) to mandate generation the Department viewed as necessary to ensure long-term resource sufficiency, or in response to generalized regional risks that had not produced any particular, defined generation shortfall, and for good reason: Any such use would exceed the Department's statutory authority.

2. *The Orders' Primary Focus is Long-Term Bulk-System Reliability, Which Is Not a Basis to Mandate Generation Under Section 202(c).*

The Orders primarily rely upon assertions of long-term bulk-system reliability concerns. *See* Ex. 1 at 1–4 (December Schahfer Order); Ex. 2 at 1–4 (December Culley Order). Those concerns—even if fully substantiated—would not be a basis to mandate Culley's and Schahfer's continued operation. And they are not substantiated. MISO, the Indiana Commission, NIPSCO and CenterPoint Indiana have taken and are continuing to take steps to address longer-term concerns to ensure no resource shortfall arises.

i. *Even Assuming* Arguendo *Evidentiary Support, the Department's 2027-Onwards Concerns Are Not an "Emergency" Within the Meaning of 202(c).*

The Orders claim "a potential longer term resource adequacy emergency in MISO," acknowledging a "capacity surplus for the summer of 2026," but citing projections of possible "insufficient capacity to meet the peak demand for electricity in each of the following four summers"—that is, arising no earlier than the Summer of 2027. Ex. 1 at 3 (December Schahfer Order); Ex. 2 at 3 (December Culley Order) (also noting "surplus of generation capacity" in the Winter of 2026, "followed by increasing deficits the following four years."). Even if the Orders' claimed emergency conditions were established (they are not), reliability concerns arising

---

[11] The Department has also narrowly tailored the remedies in Section 202(c) orders to ensure that the orders only address the stated emergency, to limit the order to the minimum period necessary, and to mitigate violations of environmental requirements and impacts to the environment. *See, e.g.,* Ex. 9 at 4–7 (DOE Order No. 202-22-4) (limiting order to the 3 days of peak load, directing PJM to exhaust all available resources beforehand, requiring detailed environmental reporting, notice to affected communities, and calculation of net revenue associated with actions violating environmental laws); Ex. 17 at 3–4 (DOE Order No. 202-20-2) (limiting order to the 7 days of peak load, directing CAISO to exhaust all available resources beforehand, requiring detailed environmental reporting).

beyond "the near term . . . in subsequent years," Ex. 1 at 4 (December Schahfer Order); Ex. 2 at 5 (December Culley Order), do not qualify as an emergency under Section 202(c). Such concerns are neither imminent nor unexpected. The Department's stated concerns cannot plausibly be characterized as a "*sudden* increase in the demand for electric energy" or a "shortage" in electric energy, generation, or transmission" constituting an emergency. 16 U.S.C. § 824a(c)(1).

At most the Orders describe long-term trends that may affect the reliability of the bulk power system in the future if left unaddressed. The Orders' longer-term concerns are based on projections of demand increases, changes in the mix of power supply resources, challenges in resource development, and the Administration's view of foreign actors. *See* Ex. 1 at 1–4 (December Schahfer Order); Ex. 2 at 1–4 (December Culley Order).

While many of the Orders' stated concerns are the province of state, regional, and private entities, Congress has provided certain mechanisms for the federal government to address the reliability concerns raised in the Orders. The emergency provision in Section 202(c), along with the Department's claimed power to seize command-and-control authority over generating resources like Schahfer and Culley 2, are not among those mechanisms.

The congressionally provided mechanisms to the federal government include Section 202(a), which allows the federal government to pursue "an abundant supply of electric energy" but only by facilitating "*voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" 16 U.S.C. § 824a(a) (emphasis added). Additionally, under certain circumstances, Section 202(b) allows the federal government to require utilities to sell or exchange energy with other facilities, but only upon application and with "no authority to compel the enlargement of generating facilities for such purposes." *Id.* § 824a(b).

Another mechanism, Section 215, provides for mandatory, nationwide reliability standards developed and enforced by a federally certified but independent entity. 16 U.S.C. § 824o(d), (e). "These standards," the Department explains, "ensure that all owners, operators, and users of the bulk-power system have an obligation to maintain system security and reliability." Ex. 52 at 7 (Department Export Authorization EA-365-C (Oct. 21, 2025)). The standards cannot be enforced by ordering generation facilities to operate, and Section 215 specifically disallows requiring the "construction of additional generation" or "enforc[ing] compliance" with "adequacy" standards. 16 U.S.C. § 824o(e), (i)(2).

The Orders purport to mandate generation based upon the Department's assessment of the bulk-power system's long-term reliability needs, a power

57

Congress chose not to provide *any* federal agency. *See* 16 U.S.C. § 824o(e) (specifying enforcement mechanisms for federal reliability standards). And what authority Congress has authorized to implement mandatory reliability standards, it provided to FERC—not the Department. *Alcoa,* 564 F.3d at 1344. Reliability concerns in future years simply do not constitute an emergency within the meaning of Section 202(c).

Section 202(c) provides an explicitly "temporary" authority, 16 U.S.C. § 824(a)(c), preventing any interpretation of its terms that might encompass a potential longer term resource adequacy emergency. The expansive interpretation of Section 202(c) implicit in the Order, stretching the meaning of "emergency" to cover resource planning concerns over "years" subsequent to the near term, is further precluded by the Federal Power Act's express background principles of permitting "Federal regulation" only of "matters which are not subject to regulation by the States," and disavowing "jurisdiction, except as specifically provided" over "facilities used for the generation of electric energy." 16 U.S.C. § 824(a), (b)(1); *see Duke Power Co. v. Fed. Power Com.,* 401 F.2d 930, 938 (D.C. Cir. 1968) (explaining that the Federal Power Act's policy declarations are "relevant and entitled to respect as a guide in resolving any ambiguity or indefiniteness in the specific provisions which purport to carry out its intent"). The Department knows that "resource adequacy planning and capacity requirements . . . have traditionally been the domain of state regulatory commissions, NERC-certified Regional Entities, and RTOs/ISOs," *i.e.*, not the Department. Ex. 52 at 5 n.4 (Department Export Authorization EA-365-C (Oct. 21, 2025)).

Through the Order, the Department expressly seeks to override the decisions of state, regional, and utility planners pursuant to the procedures established by Congress to ensure abundant electricity supplies and the reliability of the bulk-electric system. 16 U.S.C. §§ 824a(a)–(b), 824o. Section 202(c) does not permit that effort to transform the statutory scheme from one driven primarily by market- and state-based decision-making to one consolidating centralized federal command-and-control in the Department. And it especially does not permit that transformation in service of the Department's desire to dictate "how much coal-based generation there should be over the coming decades"—a power that the Supreme Court has found Congress "highly unlikely" to have left to agency discretion. *West Virginia v. EPA*, 597 U.S. 697, 729 (2022).

> ## ii. *The Order Does Not Demonstrate Any Long-Term Resource Adequacy Concerns that Are Not Already Being Addressed Through the Appropriate Processes Under the Federal-State Balance of Responsibilities.*

In addition to being an invalid basis for Department action under Section 202(c), the Orders' discussion of long-term concerns is unreasoned and without substantial evidence, including because the Orders both overestimate the potential of a shortfall and underestimate the ability of existing processes to address any projected shortfall. The following sections examine the several bases for the Department's claim of a long-term emergency; as they explain, none of those bases provide any actual evidence that Department intervention is necessary.

### a. <u>The Department Misinterprets the OMS-MISO Survey</u>.

One of the Department's principal citations for its claim that MISO faces a long-term shortfall is the OMS-MISO Survey. Ex. 1 at 3 (December Schahfer Order); Ex. 2 at 3 (December Culley Order) (discussing Ex. 89 at 2, 7, 9 (2025 OMS-MISO Survey)). The Department's description of the OMS-MISO Survey is fundamentally flawed.

Broadly speaking, the purpose of the OMS-MISO Survey is to explore a wide range of potential outcomes based on current trends, to ensure that MISO is aware of the full spectrum of possibilities (including remote ones) for which it may need to secure adequate resources to ensure grid reliability. See *supra* section IV.B.3 (discussing the OMS-MISO Survey). In keeping with that purpose, the Survey applies assumptions to the bottom end of its forecasts that are extremely unlikely to reflect reality. This worst-case scenario contains extremely conservative assumptions about how much of the new generation that utilities have actively planned for is able to become operational. See Ex. 89 at 5–6 (2025 OMS-MISO Survey).

In attempting to create the illusion of a long-term emergency, the Department cites only to this bottom edge, studiously ignoring the rest of the range of outcomes that were considered. In short, the Department cherry-picks the data in the Survey that confirm the Department's own biases.

No example of the Department's selective interpretation of the evidence is more obvious than the Department glossing over the fact that the OMS-MISO Survey projects a near-certain surplus of resources through at least May 2027. *See* Ex. 1 at 3 (December Schahfer Order); Ex. 2 at 2–3 (December Culley Order). In other words, the Department's own citation provides no basis to think that Schahfer or Culley are needed for almost one and a half years. The Department attempts to undermine this projection by calling it "potential" and suggesting that "at least 3.1

59

GW of additional generation capacity" would need to be added." *Id*. But this phrasing is not consistent with the study, whose most conservative estimate concludes there will be a surplus in 2026; and the phrasing ignores the reality that new resources are built in MISO every year. 3.1 GW is fewer resources than came online per year over the past three years, and that was before utilities began accelerating new resource development in response to increasing load projections. *See* Ex. 89 at 6 (2025 OMS-MISO Survey). The Department's claim that MISO needs at least 3.1 GW of new generation is also factually incorrect because it ignores 1.4 GW of existing resources that are not currently committed to retire, but which were excluded from the Survey's projections because they were identified as having a "low certainty" of continued operation in 2026—if even one of those resources doesn't end up retiring, it would reduce the need for new resources below 3.1 GW. Ex. 89 at 5, 7 (2025 OMS-MISO Survey).

The Department's discussion of later-year projections is even more misleading. *See* Ex. 1 at 3 (December Schahfer Order); Ex. 2 at 3 (December Culley Order). The OMS-MISO Survey examines MISO's resource adequacy projections using two alternate assumptions for how quickly new resources can be built. The first assumption relies on a "historical" projection. The historical projection predicts 3.5 GW of new resources per year based on a three-year historical average, plus 1.2 GW of replacement resources per year based on historical levels. The Survey's "historical" projection also assumes that only half of utilities' planned upgrades to existing facilities will actually take place. *Id*.

The second assumption relies on an "emerging" projection "based on member submittals to the OMS-MISO Survey" (*i.e.*, what utilities have told OMS-MISO they are actually planning to build). The emerging projection predicts 6.2 GW of new resources per year and 2.4 GW of replacements per year. Ex. 89 at 5–6 (2025 OMS-MISO Survey).

The Department cites exclusively to the "historical" projection, ignoring the "emerging" projection entirely—but this paints an excessively pessimistic picture of the future. The Survey's estimated 1.4 to 8.2 GW deficits from 2027/28 to 2030/31 in the historical projection are more than matched by its forecast 6.4 to 11.4 GW surpluses over the same period in its emerging projection. *Id*. at 7. And again, both of these projections ignore entirely the possibility that any of the 1.4 to 3.8 GW of "potentially unavailable resources" turns out to in fact still be available. The Department's decision to ignore the half of the OMS-MISO Survey that is inconsistent with its emergency declaration has no basis in the structure of the Survey: the two projections are explicitly presented as "bookend capacity forecasts." *Id*. at 6.

60

In ignoring the emerging projection, the Department unreasonably fails to take into account several key factors that support that projection. First, the historical 2022 to 2024 new capacity build rate is not likely to be reflective of future build because the scope of the need for new generation only became clear in the past year or two: indeed, MISO added almost 5 GW of new resources in 2024, which was about 50 percent more than the MISO region had ever built before. *Id.* Second, the historical projection underestimates future contributions of storage, because MISO currently only has roughly 164 MW of operational storage,6 meaning that the historical trend still does not account for the coming influx of battery storage resources. And third, the historical projection's assumption that only half of utilities' "replacement" and "surplus" projects will actually occur has no actual historical basis, because these are new categories of projects that MISO therefore has no historical data on. *Id.* at 5 (indicating that replacement and surplus projects were not considered for the 2024 Survey).

The Department has also ignored other information in the OMS-MISO Survey that indicates the possibility of even more new generation coming online than either of the two projections in the Survey anticipate. For instance, the survey indicates that 54 GW of projects have a signed generator interconnection agreement but are waiting to interconnect. *Id.* at 6. A review of historic trends is instructive here: ninety percent of projects with signed generator interconnection agreements ultimately get built. See Ex. 120 at 6 n.* (2024 OMS-MISO Survey). Assuming that trend continues—and the circumstances of increasing demand provide good reason to think it will—48 GW of the total 54 GW projects currently with signed generator interconnection agreements will come online.

Additionally, there are about 291 GW of projects currently in MISO's interconnection queue. Ex. 121 at 7:15–17 (Witmeier 2025 ERAS Testimony). MISO's historic interconnection queue completion rate is twenty-one percent, see Ex. 112 at 21:2–5 (Witmeier 2024 Queue Cap Testimony), which would equate to another 61 GW (291 GW × 21% = 61.1 GW) of new projects interconnecting from the current queue. Together, those two groups represent more than 109 GW of new resource additions that MISO could reasonably expect to come online in the next several years.

      b.  <u>Neither the Energy Emergency Executive Order nor the Grid Reliability Executive Order provides a valid basis to declare an emergency under Section 202(c)</u>.

The Department also cites to the Energy Emergency EO and the Grid EO claiming that there is an energy emergency and that the grid is being stressed by unprecedented demand. Ex. 1 at 3-4 (December Schahfer Order); Ex. 2 at 3

(December Culley Order). Neither of these executive orders is valid evidence of an actual energy emergency.

If the Orders' reference to a national energy emergency is meant to serve as evidence of an emergency as defined under Section 202(c), it is insufficient. Claims recited in an Executive Order are not substantial evidence supporting agency action. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Chritton v. Nat'l Transp. Safety Bd.,* 888 F.2d 854, 856 (1989) (internal quotation marks omitted). And an emergency under Section 202(c) must be a specific inadequate power supply situation. See *supra* sec. V.A.1; *e.g.*, 10 C.F.R. § 205.371 (emphasis added). In the quoted passages from the Energy Emergency EO, the President offered his perspective on issues relating to the nexus between energy usage and "our Nation's economy, national security, and foreign policy." But these themes are simply not relevant to assessing whether an "emergency" exists under Section 202(c)(1) and the Department's regulations under 10 C.F.R. § 205.371. Thus, the Orders provide no specific evidence of inadequate generation nationwide, let alone in Indiana or even in MISO specifically. An emergency under Section 202(c) also must be imminent. See *supra* sec. V.A.1. But even the Department's other cited evidence demonstrates clearly that there is nothing imminent about even the most tenuous projected shortfalls. Nothing in the Orders refers to a shortage in the Winter 2025–2026 or Spring 2026 seasons, the actual time period covered by those Orders.

Even if the declared national energy emergency were legitimate, a presidential declaration of an emergency does not unlock unlimited agency powers. *See Biden v. Nebraska*, 600 U.S. 477, 500-01 (2023) (presidential declaration of national emergency does not change the limitations on agency's emergency authority as written into statute). President Trump issued the Energy Emergency EO pursuant to authority from the National Emergencies Act.[12] Congress explained that the National Emergencies Act "is not intended to enlarge or add to Executive power. Rather, the statute is an effort by Congress to establish clear procedures and

---

[12] Under the National Emergencies Act, no emergency powers unlocked by a Presidential declaration of a national emergency "shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631 (emphasis added). The Energy Emergency EO does not adhere to this requirement. Ex. 92, 90 Fed. Reg. at 8,434 (Energy Emergency EO) (generically directing agencies to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the . . . generation of domestic energy resources.").

safeguards for the exercise by the President of emergency powers conferred on him by other statutes." S. Rep. No. 94-1168, 3 (1976), (emphasis added). But Section 202(c)'s authority is not triggered by a Presidential emergency declaration; the statute requires that "the Commission determine[] that an emergency exists." 16 U.S.C. § 824a (emphasis added).[13] Thus, the burden is on the Department to demonstrate that there is an emergency pursuant to the narrow language of Section 202(c); simply pointing to the Energy Emergency EO or the Grid Reliability EO without providing actual evidence that an emergency exists results in an arbitrary and capricious order.

c. <u>The Department's July Resource Adequacy Report does not substantiate its claim of a long-term resource adequacy shortfall.</u>

The Order also briefly cites to the Department's July Resource Adequacy Report as evidence of a potential emergency years down the road. Ex. 1 at 4 (December Schahfer Order); Ex. 2 at 4 (December Culley Order) (citing Ex. 96 (July Resource Adequacy Report)). But that Report does not credibly project conditions in 2030 because of its many inaccurate assumptions and methodological errors.[14] Moreover, that Report offers no actual evidence of any near-term shortfall.

Most glaringly, the Report overestimates demand growth and expected facility retirements while underestimating the likelihood of new entry. This biases the entire report in the direction of over-identifying resource adequacy concerns. Ex. 113 at 21–25 (Inst. Pol'y Integrity Report); see also Ex. 68 at 7 (Grid Strategies Sept. Report) (explaining that the July Resource Adequacy Report relies on load growth and capacity retirement assumptions that are "drastically higher" than those provided by the U.S. Energy Information Administration, the arm of the Department tasked with "independent statistics and analysis"); Ex. 122 at 2–3 (GridLab Report) (noting that the July Resource Adequacy Report fails to account for the potential flexibility of data center load additions; that the Report assumes double the retirements and only a quarter of the firm resource additions assumed by the Energy Information Administration; and that the report ignores "fast-track" interconnection processes recently approved by FERC for multiple RTOs); Ex. 99 at 34-35 (PIOs' RFR of July Resource Adequacy Report) (citing multiple expert reports

---

[13] The Department has exercised certain powers under Section 202(c) since the DOE Organization Act of 1977. 42 U.S.C. § 7151(b).

[14] A group of organizations including several of the PIOs here have raised several concerns with this Report in a separate rehearing request. See generally Ex. 99 (RFR of July Resource Adequacy Report).

and initiatives demonstrating the potential for flexibility of large data center loads, including Ex. 123 (Duke University Rethinking Load Growth Study)).

The Report also "departs from best [modeling] practices by using a deterministic modeling rather than a probabilistic approach," and thereby fails to account for necessary uncertainties. Ex. 113 at 19 (Inst. Pol'y Integrity Report). And in many places the Department simply does not explain its own methodology. The report states that its model is derived from NERC's Interregional Transfer Capability Study, which is focused on the ability of the transmission system to transfer power between regions. Ex. 96 at 2 (July Resource Adequacy Report). However, the report inexplicably excludes new transmission projects from its analysis, ignoring that transmission improvements can be the most cost-effective way to improve grid reliability. The Department's report also appears to misunderstand certain principles of statistical reasoning, calling out PJM for failing loss-of-load criteria under one realization of a possible weather year that would include Winter Storm Elliott, without considering that a system's LOLE is averaged across all simulated weather years. Ex. 113 at 19 (Inst. Pol'y Integrity Report); Ex. 96 at 7, 9, 27 (July Resource Adequacy Report). The Department also added more "perfect capacity" (in megawatts) within its modeling than actually needed to bring regions to its targeted Normalized Unserved Energy level. Ex. 113 at 26 (Inst. Pol'y Integrity Report); Ex. 96 at 19, 27, 30, 32, 40. These analytical failings in and of themselves disqualify the report as a viable source of evidence for an emergency finding.

The lack of evidence for a long-term emergency is underscored by the fact that the Department's own analysis premises a resource adequacy shortfall on a type of demand increase (large load buildout), Ex. 96 at 2–3, 15–17 (July Resource Adequacy Report), that the report goes on to admit would likely never actually be allowed to destabilize the grid. Specifically, the report notes that its analysis "is not an indication that reliability coordinators would allow this level of load growth to jeopardize the reliability of the system." *Id*. at 14. In other words, even taking the report at face value, it does not identify a shortfall of a type and nature that could ever justify invocation of the Department's Section 202(c) emergency authority. At best, the report highlights that data centers cannot be built at projected rates unless new generation is built, which is far from the type of emergency situation that could ever provide the basis for a Section 202(c) order.

Finally, on its opening page, the report acknowledges that its analysis is general in nature, looking at the country as a whole, and that the various "entities responsible for the maintenance and operation of the grid" have information "that could further enhance the robustness of reliability decisions" in the sections of the grid they administer. *Id*. at i. This type of generalized analysis based on incomplete

64

information is simply insufficient to justify a Section 202(c) emergency finding for MISO or any other specific region.

> d. MISO has designed its ERAS proposals to address claimed shortfalls and has not suggested that any further generation/capacity is needed.

There is one place where MISO has projected a distant resource adequacy need: in the course of requesting FERC approval for its proposed Expedited Resource Addition Study, which FERC approved in July 2025. Ex. 90 at 6, 13–17 (MISO ERAS Transmittal Letter); Ex. 91 (MISO ERAS Decision). But as explained above, *supra* sec. IV.B.3, that projected need spurred MISO to initiate a process that will add at least 26.5 GW (and likely more) of new capacity to MISO's system over the next several years.

The Department minimizes the import of this approval by suggesting that the projects won't reach commercial operation for at least three years and could be further delayed by supply chain constraints. Ex. 1 at 3 (December Schahfer Order); Ex. 2 at 3 (December Culley Order). But the Department's first statement is factually incorrect—projects that are selected for ERAS could begin operation sooner than three years from the application date; they just have up to six years of leeway—and its second statement is far too conjectural to provide a basis for an emergency declaration. Ex. 91 at P 84 (MISO ERAS Decision). The Department cannot defensibly declare an emergency justifying use of its 202(c) authority based on a concern that the expedited interconnection process MISO has established specifically to meet projected resource adequacy needs won't work—absent substantial and specific evidence of that fact, it is pure conjecture.

3. *The Orders Do Not, and Could Not, Provide any Valid Evidence or Reasoned Decision-Making to Support Their Stated Near-Term Resource Adequacy Concerns.*

i. *The Described Concerns Are Insufficiently Specific and Certain to Meet the Statutory Definition of an Emergency.*

The Orders gesture at the possibility of electricity shortfalls in the "near" term, but offer no plausible evidence of such shortfalls. See *infra* sec. V.A.3.ii.

That failure to adduce plausible evidence to one side, the generalized, speculative risks described by the Orders are neither specific nor certain enough to qualify as an "emergency" within the meaning of Section 202(c). 16 U.S.C. § 824a(c). A notional suggestion of some possible shortfall, which might (or might not) require generation from Schahfer or Culley 2, is not a "specific inadequate power supply

65

situation" enabling the use of the Department's Section 202(c) authority. 10 C.F.R. § 205.371.

The Department does not find that there will be a single supply shortfall during the entirety of the 90-day term of the two Orders. Ex. 1 at *passim* (December Schahfer Order); Ex. 2 at *passim* (December Culley Order). Nor does the Department point to any specific circumstances even giving rise to a risk of such a shortfall. Ex. 1 at *passim* (December Schahfer Order); Ex. 2 at *passim* (December Culley Order). For the duration of the two Orders—from December 23, 2025 through March 23, 2026—the Department's near-term justification amounts to the simple assertion that "MISO's year-round resource adequacy concerns are well documented." *See* Ex. 1 at 1 (December Schahfer Order); Ex. 2 at 1 (December Culley Order). At most, this conclusory statement asserts the possibility that some resource inadequacy might (or might not) emerge somewhere in MISO—but that does not, and cannot, demonstrate that "an emergency exists by reason of a sudden increase in the demand for electric energy" or an identified "shortage of electric energy" or of "facilities for the generation or transmission of electric energy." 16 U.S.C. § 824a(c)(1); *see also Louisville & N.R. Co. v. Sullivan*, 617 F.2d 793, 795 (D.C. Cir 1980) (explaining that where statute permits emergency orders based on determination that a "facility or piece of equipment [is] in unsafe condition, the agency may not issue order based on "a generalized poor safety record" without showing of "particular" safety hazard). The Orders do not describe or provide support for—even taken on their own terms—any imminent, specific, or certain electricity shortfall. The Orders therefore fail to describe an "emergency" within the meaning of Section 202(c).

ii. *The Claimed Shortfall Is Unreasoned and Not Supported by Substantial Evidence.*

a. None of the MISO Proceedings and Reports Cited by the Order Support Its Claim that the Midwest Faces a Near-Term Resource Adequacy Emergency.

The Orders fail to employ reasoned decision-making and fail to offer substantial evidence of an emergency in the Winter 2025–2026 season (which is most of the period it covers). Instead, the Orders review and recite information from several MISO documents, misinterpreting and misrepresenting the materials to allege a resource adequacy crisis that simply does not exist.

The first example of this flawed reasoning is the Orders' statement that " 'new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources' in the northern and central zones, which include Indiana." Ex. 1 at 2 (December Schahfer Order)

66

(quoting Ex. 31 at 13 (MISO 2025–26 Auction Results)); Ex. 2 at 2 (December Culley Order) (quoting same). As in prior Section 202(c) orders last year, *e.g.*, Ex. 124 at 2 (November Campbell Order), the Department fails to note that this statement referred to *offers* rather than available supply, and particularly only to the netting of additions and subtractions causing total North/Central offers to decrease in absolute terms from Summer 2024 to Summer 2025. *See* Ex. 31 at 13 (MISO 2025–26 Auction Results). The Department also fails to acknowledge that overall resource offerings in MISO North/Central were sufficient relative to the Reserve Margin Requirement, which also decreased from 2024 to 2025. *Compare* Ex. 84 at 16 (MISO 2024–25 Auction Results) (showing a Summer 2024 Reserve Margin Requirement of 100,710 MW in Zones 1–7), *with* Ex. 31 at 18 (MISO 2025–26 Auction Results) (showing a Summer 2025 Reserve Margin Requirement of 99,770.5 MW in Zones 1–7).

This result also tracks MISO's Planning Auction results which, as explained above, *supra* secs. IV.A.2.ii, IV.B, resulted in MISO securing more resources for Winter 2025 than it determined were necessary to ensure resource adequacy. In short, it was clear in April 2025, when MISO released its 2025–2026 Planning Auction results, that the MISO system had no resource adequacy crisis this Winter and upcoming Spring even after accounting for announced plant retirements, including the Schahfer and Culley retirements. The Orders fail to acknowledge these critical facts undercutting the Orders' emergency determination.

The Orders also gesture to various recent reports in which MISO has forecasted an increasing resource adequacy risk in non-Summer seasons. See Ex. 1 at 1–2 (December Schahfer Order); Ex. 2 at 1–2 (December Culley Order). However, the Department does not appear to have carefully examined what MISO was actually saying in any of these materials.

First, the Department quotes from MISO's 2021 capacity accreditation filing, in which MISO described a shift of reliability risks "from 'Summer only' to a year-round concern," apparently for the proposition that the Winter season also experiences meaningful systemic risks. Ex. 1 at 1 (December Schahfer Order) (quoting Ex. 77 at 3 (MISO 2021 Transmittal Letter)); Ex. 2 at 1 (December Culley Order) (quoting same). The relevant graph in the 2021 Transmittal Letter shows an incidence of MaxGen events across all four seasons from 2014 through 2022 but says nothing about how serious these events were. *See* Ex. 77 at 3 (MISO 2021 Transmittal Letter). A simple review of MISO's actual MaxGen events would have revealed that none of the Winter events exceeding the "MaxGen Warning" level ascended to the level (MaxGen Event Step 5) that entails manual shedding of load. Ex. 32 at *passim* (MISO Emergency Declarations); see *supra* sec. IV.A.3, IV.B.1. In other words, recent winter storms have presented a challenge for MISO—but even

67

the most severe episodes in recent years have failed to cause actual load shedding. And as explained above, MISO's own assessment is that the Winter does not yet have anything close to the grid vulnerability of Summer.

Next, the Orders cite MISO's 2023 Attributes Roadmap, which (according to the Orders) established that "by the summer of 2027, there will be an equal loss of load risk in both the summer and fall seasons" and "the risk of loss of load in the winter and spring seasons, although not as high as in the summer or fall, will nevertheless increase over time." Ex. 1 at 2 (December Schahfer Order) (citing Ex. 85 at 11 (MISO Attributes Roadmap)); Ex. 2 at 1–2 (December Culley Order) (citing same). But again, the Orders fail to discuss the magnitude of risk at issue. The implicated graph on page 11 of the MISO Attributes Roadmap identifies loss of load risks that peak around hour 20 with around 150 hours of expected lost load, Ex. 85 at 11 (MISO Attributes Roadmap), but those 150 hours (from 3,750 runs of the model)[15] correspond to a lower risk than the industry-standard acceptable risk target. Specifically, the LOLE risk is .05 days/year, or 50% of the industry-standard target of 0.1 days per year. Ex. 86 at 7, 19 (MISO Attributes Roadmap Technical Appendix); *see generally* Ex. 10 at 2–3 (Grid Strategies June Report) (discussing LOLE risk targets). The Department thus fails to make a reasoned determination and fails to account for record evidence detracting from its determination, because its discussion of "equal" risk fails to mention that the absolute risk in both seasons remains extremely low.

Furthermore, the graph the Order cites in the MISO Attributes Roadmap doesn't even refer to the present Winter season. *See* Ex. 85 at 11 (MISO Attributes Roadmap). Instead, it refers to projected risk in Winter 2027–28 and makes clear that there was minimal such risk in Winter 2023–24; but it is entirely silent as to the risk profile in Winter 2025–26, which is the only Fall season that is relevant to the Orders' claim of a near-term emergency. *See id.* And the resource mix for Winter 2025–26 looks much more similar to that in Winter 2023–24 (when risk was not concentrated in the Winter season) than to MISO's projected Winter 2027–28 mix— so the 2023 chart is a more useful predictor of likely risk allocation in Winter 2025–26. *See* Ex. 68 at 1–2 (Grid Strategies Sept. Report). As further discussed below, the Orders may not use the possibility of risks in future Winter seasons as evidence that actual risks exist in the current Winter season—particularly where, as here, there is concrete evidence demonstrating that no such risk exists.

---

[15] For a given season, 15 weather years and 250 random outage samples per weather year are modeled. Ex. 86 at 7 (MISO Attributes Roadmap Technical Appendix). $15 \times 250 = 3,750$.

Finally, the Orders gesture to MISO's 2024 Reliability Imperative Report, which mentions "risks in non-summer months that rarely posed challenges in the past." Ex. 1 at 2 (December Schahfer Order) (quoting Ex. 87 at 12 (MISO's Response to the Reliability Imperative); Ex. 2 at 2 (December Culley Order) (quoting same). But the "Response to the Reliability Imperative" offers no specific information about Winter season risks other than its qualitative discussion of recent winter storms. *See generally* Ex. 87 at *passim* (MISO's Response to the Reliability Imperative).

Notably, while the Orders attempt without justification to sow doubt about resource adequacy in non-summer seasons generally, they provide no evidence indicating any actual risk of inadequate supply in the Winter 2025–26 season. Indeed, the word "Winter" is mentioned only twice in each of the two Orders, and there is no substantive discussion of circumstances of the 2025–2026 Winter. In one passage that is common to both Orders, the Department cites the 2025 OMS-MISO Survey results for evidence of a capacity surplus in the Winter 2026–2027 season. Ex. 1 at 3 (December Schahfer Order): Ex. 2 at 3 (December Culley Order); Ex. 89 at 9 (2025 OMS-MISO Survey). This is a staggering abdication of the Department's obligation to provide sound evidentiary backing for its emergency declarations and further confirms that there is no remotely sound reason to be concerned about resource adequacy shortfalls in Winter 2025–2026.

      b.  <u>The Orders Ignore Evidence Undercutting any Claimed Emergency in MISO</u>.

MISO staff indicated less than three months ago that the system will have "sufficient capacity to cover both Coincident and Non-Coincident peak forecast load(s)" this Winter, with available resources generally exceeding the forecasted peaks by around 30 percent in each of December, January, and February. Ex. 141 at 20 (MISO 2025–26 Winter Readiness Presentation); *see also* Ex. 138 at 7 (MISO Fall 2025 Operations Report) ("The MISO Seasonal Resource Adequacy Construct cleared sufficient resources to cover demand this winter[.]"). MISO also confirmed that its system will have adequate transmission capability to move power across the region (or into the region) as needed. *See* Ex. 141 at 23–32 (MISO 2025–26 Winter Readiness Presentation).

NERC's 2025–2026 Winter Reliability Assessment, which was published prior to the Orders, did not include MISO among the regions it identified with "risks of electricity supply shortfalls during periods of more extreme conditions." Ex. 143 at 5–6 (NERC 2025–2026 Winter Reliability Assessment). The report identified MISO as facing "limited risk" in Winter 2025–2026, as "MISO was able to procure 6.1% more resources through the [Planning Auction] than required by its minimum resource adequacy target," and "[a] further 3.3 GW of resources were available but

69

not chosen to be committed for the winter season." *Id.* at 17; *see also* Ex. 144 at 34–35 (FERC Staff Winter Reliability Assessment) (recognizing that MISO is "anticipated to have sufficient available generation resources and net transfers to meet [its] expected loads under normal winter conditions" and omitting MISO from a list of regions that "[i]n extreme scenarios . . . face a higher likelihood of challenges").

Furthermore, after MISO's Winter 2025–2026 season began on December 1, 2025, there is no evidence that MISO has needed to implement any emergency procedures beyond a pair of non-actionable Capacity Advisories, which are essentially communications to stakeholders, and which applied only to the MISO South subregion, not to the North/Central subregion that includes Indiana. MISO's monthly Operations Report for December 2025 indicates three weather alerts, two geomagnetic disturbance alerts or warnings, and one System Status Level 1 event, but no Max Gen alerts, warnings, or events. Ex. 111 at 2 (MISO December Operations Report); Ex. 33 at 9–12 (MISO Market Capacity Emergency) (discussing capacity advisories). Notably, Schahfer 18 was— as discussed above—in forced outage status throughout December due to broken equipment, and there is no reason to believe any of the Plants were needed by  MISO to serve load throughout the month without incident.

Despite this clear guidance from NERC about the winter season, the Orders regarding Schahfer and Culley 2 failed to acknowledge NERC's winter assessment or the actual experience of MISO's early Winter season.  At the time it issued the Orders, the Department had the information about NERC's Winter Reliability Assessment squarely before it because the PIOs had raised the NERC report in a rehearing and stay request in December 2025 (over a week before the Orders) related to the Department's most recent Section 202(c) order on the J.H. Campbell Generating Plant, and the Department cited the same report one week earlier in another section 202(c) order, *see* Order No. 202-25-11 at 1, so ignoring it here is especially striking.

The Orders are also unreasoned and without substantial evidence in failing to consider MISO's available mechanisms during grid-straining events. MISO's declaration of various levels of "Max Gen" events at times when system margins grew relatively smaller is a feature, not a bug, of MISO's resource adequacy management. *See* Ex. 68 at 3–4 (Grid Strategies Sept. Report). And this past Summer, MISO's Max Gen event declarations only rose to the first "Max Gen" level out of five, indicating that the system was not close to a blackout. *See id.*; *supra* secs. IV.A.3, IV.B.1. MISO's protocols allow it to call on several tranches of resources, including Load Modifying Resources, Voluntary Load Reduction, resources currently on outage, and emergency headroom, as needed. Ex. 70 at

70

¶¶ 10–23 (Konidena Decl.). In short, MISO effectively stewarded all the resources at its disposal this past Summer to avoid a true grid emergency, exactly as the RTO (and intervenors) predicted it would.

## B. The Orders Are Not Based on Reasoned Decision-Making and Substantial Evidence in Imposing Requirements to Best Meet the Claimed Emergency and Serve the Public Interest.

The Orders determine that additional dispatch of Schahfer and Culley 2 are necessary to best meet the purported emergency and serve the public interest. But the Orders provide no rational basis for that determination. The Orders do not address the limitations of either the Schahfer or Culley 2 plant, or explain how, in light of those limitations the Plants could even meet the claimed emergency. In fact, both Plants are unlikely to be able to do so. The Orders do not examine the expense of running any of the units or the associated environmental damage, factors which cause additional dispatch of the plant to harm, rather than serve, the public interest. And the Orders do not address readily available and obvious alternatives which, in point of fact, would better meet the claimed emergency. The Orders also fail to consider how they are causing economic damage by, *inter alia*, crowding out otherwise competitive resources, disrupting planning, and creating policy-driven uncertainty. See Ex. 137 at PDF pp. 2–3 (R Street Institute Commentary: *DOE "Zombies" Are Eating Competitive Power Markets*). Consequently, and for the reasons further discussed in the following subsections, the Order is without support in the record, unreasoned, and unlawful. *Allentown Mack*, 522 U.S. at 374; *State Farm*, 463 U.S. at 42–43, 51; *Burlington Truck Lines*, 371 U.S. at 168; *Butte Cnty.*, 613 F.3d at 194.

### 1. Legal Framework: Section 202(c)(1) Authorizes the Department to Require Only Generation that Best Meets the Emergency and Serves the Public Interest.

Section 202(c)(1) authorizes the Department to impose only those requirements that (i) "best" (ii) "meet the emergency and" (iii) "serve the public interest." 16 U.S.C. § 824a(c)(1).

The term "best" demands a comparative judgment that there are no better alternatives. The word "best" is inherently a comparative term and means "that which is 'most advantageous.'" *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (*quoting* Webster's New International Dictionary 258 (2d ed.1953)); *cf. Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980, 983–84 (D.C. Cir. 2004) (explaining that statutory "best available control technology" requirement demands sources in a category clean up emissions to the level that peers have shown can be achieved). Consequently, the Department must, at minimum, consider alternatives and

71

evaluate whether and to what extent a given alternative addresses the emergency and serves the public interest, including deficiencies associated with the alternative.[16]

The Department's obligation to exercise reasoned decision-making further requires consideration of alternatives. The Department need not consider every conceivable alternative, but it must consider alternatives within the ambit of the regulatory context as well as alternatives which are significant and viable or obvious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020); *Motor Vehicle Manufs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). Intervenors and the public may also introduce information that requires the Department to evaluate alternatives and reconsider its decision to impose or maintain a requirement. *See, e.g.*, *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133, 144 (D.C. Cir. 2005) (evaluating agency failure to consider alternative raised by dissenting Commissioners and introduced by commenters); *cf.* 10 C.F.R. § 205.370 (stating ability to cancel, modify, or otherwise change an order).

The Department's regulations and practice identify relevant alternatives for its consideration. The regulations specify information the Department shall consider in deciding to issue an order under Section 202(c), and require an applicant for a 202(c) order to provide the information. 10 C.F.R. § 205.373. The specified information includes "conservation or load reduction actions," "efforts . . . to obtain additional power through voluntary means," and "available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions." *Id*. § 205.373(g)–(h); Ex. 9 at 4 (DOE Order No. 202-22-4).

The Department may then choose only the best alternative. The best alternative is the one which is most advantageous for meeting the stated emergency and serving the public interest.

The statutory command to take only measures that serve the public interest, including with respect to environmental considerations, further constrains the Department's authority. The public interest element demands that the Department advance, or at least consider, the various policies of the Federal Power Act. *Cf.*

---

[16] To be sure, the nature and extent to which the Department must consider alternatives depends on the emergency. An emergency that truly requires the Department to act within hours, for instance, permits a more abbreviated consideration than an emergency for which the Department has days to decide.

*Wabash Valley Power Ass'n*, 268 F.3d at 1115 (interpreting the "consistent with the public interest" standard in Section 203 of the Federal Power Act); *see Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 759 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482, 484–86, 488 (1962). Primary policies of the Federal Power Act include protecting consumers against excessive prices; maintaining competition to the maximum extent possible consistent with the public interest; and encouraging the orderly development of plentiful supplies of electricity at reasonable prices. *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 (1976) (orderly development); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973) (maintaining competition); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 418 (1952) (excessive prices). And because Section 202(c) expressly protects environmental considerations, these are part of the public interest element too. *See NAACP*, 425 U.S. at 669 ("[T]he words 'public interest' . . . . take meaning from the purposes of the regulatory legislation.").

### 2. The Orders do not address the generators' unreliability or explain how, in light of that unreliability, the generators could meet the claimed emergency.

The Orders are unreasoned and not based on substantial evidence in requiring the Plants' availability and operation while failing to address the Plants' unreliability.

Schahfer is old and creaky, with significant reliability issues, as discussed above in section IV.C.3.i. In anticipation of its retirement, NIPSCO has deferred maintenance on Units 17 and 18, further exacerbating the reliability of the plant. These reliability issues raise significant doubt that Schahfer is capable of reliable operation such that it could meet the claimed emergency. In fact, forcing the unreliable Schahfer to continue operating actually threatens grid reliability.

Both Schahfer Unit 17 and Unit 18 have seen repeated and significant unforced outages in recent months, reflecting the units' deteriorating state. In 2024, NIPSCO's equivalent forced outage rate ("EFOR"), which represents the percentage of time (in hours) a unit was unable to generate power for reasons other than planned maintenance, was 18.8% and 13.2% for Schahfer Units 17 and 18 respectively. Ex. 4 at 5 (Powers January Declaration). These rates are substantially worse than the national average for coal-fired units of 12 percent. *Id.*; *see* Ex. 40 at 59 (NERC 2024 Reliability Report). This is driven in part by the fact that the units are so uneconomical. As NIPSCO explains,

> "NIPSCO's coal EFOR has been significantly affected by changing power markets, which has changed the economical dispatch for coal. Infrequent operation for years, which imposes high thermal stresses on

> a unit, leading to an increase in forced and maintenance outage hours, followed by an increase in the demand for operating hours later in the year, exacerbates the issues."

Ex. 13 at 21 (NIPSCO Performance Metric Collaborative Update).

NIPSCO's coal units are both dilapidated and expensive enough that their net capacity factor—that is, the percentage of a unit's nameplate capacity that it actually produces considering both outages and how often it is scheduled to dispatch—was at 25% for 2024. *Id.* at 22.

The units' outage rate in 2025 has been similarly dismal. Unit 18 has spent more than 5,000 hours, over 212 days, in unforced outages during the first three quarters of 2025. *See* Ex. 4 at 6 (Powers January Declaration) (citing Ex. 14 at attachment 4-A (Saffran Q1 2025 Outage Testimony); Ex. 15 at attachment 4-A (Saffran Q2 2025 Outage Testimony); Ex. 16 at attachment 4-A, p. 2 (Saffran Q3 2025 Outage Testimony)). Unit 18's L-1 turbine blade separated from the root and fell into the condenser in February, causing an unforced outage that left the unit offline until late June. *See* Ex. 15 at attachment 4-A, p. 2 (Saffran Q2 2025 Outage Testimony). In early July, the unit experienced another outage when one of the L-0 blades on the governor end fell off one third of the way down from the tip. Ex. 16 at attachment 4-A (Saffran Q3 2025 Outage Testimony). The same November 20, 2025 filing from a NIPSCO official reports "significant damage to the upper portion of the condenser tubes on the governor end." *Id.* Unit 18 is quite literally falling apart, and treating the unit as a critical energy asset needed to maintain reliability is facially absurd. Unit 17, while perhaps a bit less dramatically enfeebled, is also falling apart. Unit 17 spent 1,044 hours in unforced outages in 2025. *See* Ex. 4 at 6 (Powers January Declaration) (citing Ex. 14 at attachment 4-A (Saffran Q1 2025 Outage Testimony); Ex. 15 at attachment 4-A (Saffran Q2 2025 Outage Testimony); Ex. 16 at attachment 4-A, p. 2 (Saffran Q3 2025 Outage Testimony)). On September 6, the unit experienced a 201 hour unforced outage to "replace bad tubes and repair previously installed dutchmen." Ex. 16 at attachment 4-A, p. 2 (Saffran Q3 2025 Outage Testimony).

Repair of Unit 18 to get it to a working state looks impossible within the timeframe of the December Schahfer Order. As NIPSCO's president explained recently before the Indiana Commission:

> "Unit 18 is in a forced outage; that one will take more time and effort to ultimately get it to where it needs to be, and at some point, if we do get a 202(c) [order], and it continues, we'll likely have to do some work on [Unit] 17 as well. . . . We've taken some steps to be prepared—long

74

lead time equipment, in particular, that ultimately would have to be ordered for us to come in. Frankly, that unit needs to be rebuilt. . . . We're taking some steps to be able to do that, but it will take time; it can take six months or longer for us to ultimately be able to get that unit back to where it would need to be to operate for an extended period of time. It's just the reality of that unit being close to retirement. We're not completely unprepared, but it will take time to get that long lead time items in to be able to make the repairs necessary.

Ex. 53 at 51:35 timestamp (IURC 2025 Winter Reliability Forum (December 2, 2025)); Ex. 53A (video recording available at https://www.youtube.com/watch?v=bCzALF4V45M). VP Bryan McCaul explained that, in anticipation of a 202(c) order from the Department, NIPSCO has "had a lot of negotiations with the [original equipment manufacturer], and trying to pull in future possible deliveries on those [replacement turbine] blades, and also looking at the [high pressure and intermediate pressure] turbines. . . . There's a lot of contract stuff happening trying to make sure we are positioned to not have what was originally an 18 month lead time on those blades, maybe be more like March or May." *Id.* at 58:44. Even in NIPSCO's most optimistic case, Schahfer Unit 18 will not be able to operate through most of the 90-day order period.

At a minimum, the Orders are inconsistent with the long-term and orderly planning processes that utilities undertake to shore up reliable operations; at worst, they set MISO up to rely on generators that will fail unexpectedly.

Even if Schahfer were not falling apart, there is significant reason to think that Units 17 and 18 could not act as reliability resources during the pendency of the December Schahfer Order. NIPSCO has depleted Schahfer's coal stocks as it prepared for retirement. *See* Ex. 18 at 23 & 23 n.14 (Wagner Testimony) (stating that Schahfer had 16 days coal inventory supply at the end of September 2025, whereas the target is a supply for 40 days with a plus or minus 10 day window of variability). And it seems unlikely that NIPSCO would be able to easily return to having reasonable coal stockpiles. As NIPSCO' fuel manager explained to the Indiana Commission, "NIPSCO's [rail] fleet size at the end of [September 2025] can provide 76% of NIPSCO's maximum coal unit demand and at average railroad cycle times." *Id.* at 22. NIPSCO is hampered in its ability to supply Schahfer with coal, and it has limited coal reserves on-site that it can draw from. Nor could NIPSCO easily obtain more train capacity to provide Schahfer additional coal. The same NIPSCO expert explained:

> [T]he availability of coal gondolas is extremely limited and relying on that market to obtain railcars for short-term needs can adversely impact coal supply reliability and is not prudent. In addition, the timing of lease terms can preclude fleet size changes as leasing decisions are made on a forward-looking basis. . . . [I]t can take several months to bring cars into the fleet, and it is an even longer process when returning cars. In addition, moving rail cars in and out of service is a costly process. Therefore, the forward-looking nature of lease agreements and the time and costs required to place cars in and out of service make it difficult to make short-term changes to the size of the fleet and it is not prudent, practical, nor economic to dynamically change the fleet size when coal demand deviates from the forecast.

*Id.* at 20–21 (footnote omitted).

Moreover, even if it had the train cars to get the coal to the plant, NIPSCO sees risk in its ability to source the coal. As NIPSCO explained:

> [V]ariable coal demand impacts supply chain efficiency and can lead to unpredictable coal supplier and railroad performance. . . . Given the uncertainty in the energy markets due to delayed coal generation retirements, projected increases in electricity demand due to the emergence of data centers, crypto mining, and other load growth drivers, there could be volatility in all energy commodity prices that could impact supply. . . . [I]f coal demand increases, utilities may struggle to schedule deliveries as railroads and coal producers have rationalized assets, labor, and production, and it may take time for production and shipments to rise to meet any rapid increase in demand.

*Id.* at 15–17, 23.

These limitations severely undercut any reliability role Schahfer could reasonably play and are entirely ignored in the Department's December Schahfer Order.

Culley 2 is likewise an unreliable and creaky generator. Culley 2 had an EFOR in 2024 of 32.4% and a net capacity factor of 31.8%. Ex. 22 at 24 (CenterPoint 2024 Performance Report); Ex. 4 at 8 (Powers January Declaration). Like the Schahfer units, the Culley EFOR rates are substantially worse than the national average for coal-fired units of 12 percent. Ex. 4 at 8 (Powers January Declaration); *see also* Ex. 40 at 59 (NERC 2024 Reliability Report). Culley 2 has been experiencing boiler tube leaks that have been causing outages and forcing the unit offline. Ex. 22 at 24

(CenterPoint 2024 Performance Report). And the maintenance issues are likely to get worse, not better. CenterPoint Indiana has anticipated the retirement of Culley 2 and therefore not invested in major maintenance needed to keep the plant operating smoothly, as CenterPoint Indiana's vice president of power operations relayed to the Indiana Commission. "In 2025, the plant will be years past due for a turbine and generator overhaul and will require major boiler work and other capital investments to maintain safe and reliable operation." Ex. 23 at 6 (Wayne Games 2021 Testimony). CenterPoint Indiana reported that its "Culley 2 maintenance expenditure declined about 20% from 2022 to 2023 in [FERC Uniform System of A]ccount[s] 512 (Maintenance of Boiler Plant)." Ex. 4 at 9 (Powers January Declaration) (citing Ex. 152 at PDF pp. 8, 20 (CenterPoint Rate Case Discovery Responses)). "Increased maintenance spending is necessary to minimize the effect of equipment degradation with age and changing operating regimes. Plants such as F.B. Culley that have likely underspent on capital investment and O&M are at greater risk of future forced outages." Ex. 4 at 9 (Powers January Decl.). It is unlikely that the plant can stay online and operational to address the purported emergency identified by the December Culley Order.

The Orders fail to come to grips with the dangers to grid reliability that they create. Unreliable coal plants like Culley 2 and Schahfer are particularly likely to cause grid disturbances. .

> "Cold snaps, heat waves, and storms have all exposed coal's fragility during grid stress events. Reliability is not just about being dispatchable, it's about delivering performance under stress. Coal plants struggle to do that consistently. For coal plants to truly meet the constant demands of data centers, they would need to run at high capacity factors and avoid major outages, all of which fly in the face of current performance trends. If a large coal plant trips offline while supporting a cluster of data centers, the sudden loss of supply could lead to cascading failures across the grid. This is because generation must equal load at all times, datacenter or no datacenter. As a result, relying on coal plants to support these high-density digital loads doesn't enhance reliability, it endangers it. And it's not a matter of *if* the coal plant will fail, but *when.*"

Ex. 118 at PDF pp. 2–3 (RMI Analysis of Coal Plants' Threats to Reliability).

The Department avers that it is concerned with reliability, *see* Ex. 1 at 4 (December Schahfer Order); Ex. 2 at 5 (December Culley Order), yet puts forward no analysis to address the likelihood that its Orders might actually create the (otherwise unproven) problem they are supposedly trying to address. The

77

Department mandates generation from old plants which, in anticipation of their retirements, deferred significant maintenance needs, while stylizing the generators as needed for reliability, risking sudden break-downs and grid stability concerns. This ostrich-like approach to record evidence and public information is not reasoned decision-making. *Butte Cnty.*, 613 F.3d at 194; *cf. Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 177 (D.C. Cir. 2022) (rejecting "ostrich-like approach" to agency decision-making).

### 3. The Orders Do Not Address the Plants' Continued Demonstration of Their Technical Inability to Meet the Claimed Emergency.

Separately, the Orders provide no reasoned basis to conclude that Schahfer and Culley 2, even if fully maintained and operational, could meet the claimed emergency, let alone that these Plants are the best way to do so, given the technical specifications and operational limits of the Plants.

Schahfer and Culley 2 are not designed to turn on quickly in response to extreme demand, nor are they capable of ramping their output up and down quickly. The Orders point to projections of demand growth, including from "data centers driving artificial intelligence (AI) innovation." Ex. 1 at 4 (December Schahfer Order) (internal quotation marks omitted); Ex. 2 at 4 (December Culley Order) (same). Even assuming *arguendo* the Department has authority under Section 202(c) to address that claimed circumstance (it does not), coal plants' "always-on nature" and "rigidity" are "a poor match for the dynamic and often unpredictable nature of data center demand." Ex. 118 at PDF p. 3 (RMI Analysis of Coal Plants' Threats to Reliability); *see also* Ex. 129 at 3 (Energy Innovation Report) (explaining that data center loads "are not 24/7 blocks. Instead, they are choppy, with swings of hundreds of megawatts over short intervals, undermining assumptions of steady baseload behavior and potentially affecting the stability of the grid if safeguards are not put in place."). "[L]arge, voltage-sensitive loads like data centers require flexible, responsive grid solutions, not slow-ramping generators that can take 12 or more hours to come online." Ex. 118 at PDF p. 3 (RMI Analysis of Coal Plants' Threats to Reliability) (relying on NERC). Fast-ramping generators are also needed to respond to extreme emergency demand increases in cases when an emergency is declared only a few hours before the demand must be met. Ex. 4 at 10 (Powers January Declaration).

Schahfer has slow ramp and startup times, as noted above in section IV.C.3.i.b. The two coal generating units have start-up targets of 22 hours after a 1-hour notice and ramp rates of 3 MWs per minute. Ex. 19 at 6 (NIPSCO CPCN Discovery Responses). NIPSCO has recognized that its coal units at Schahfer are ill suited to meet its customers' needs because of their slow ramp and start times. NIPSCO

78

sought and received permission to decommission and reuse the interconnection rights associated with Units 17 and 18 for gas fired generators that would not face these problems. *See* Ex. 20 at 18 (IURC Schahfer Gas Plant Order) (describing NIPSCO's finding that it needed generation with faster ramp rates and start up times); *id.* at 14, 17 (discussing how the proposed CTs would use the interconnection rights associated with retiring units 17 and 18); *id.* at 42 (the Indiana Commission approving NIPSCO's plan to build the CTs in question). The new CT units, in contrast to Units 17 and 18, can start up in as few as 11 minutes and have a ramp rate of 140 MWs per minute, making them significantly more responsive than Units 17 and 18 to swinging demand. Ex. 19 at 6 (NIPSCO CPCN Discovery Responses). The Department's order forcing Schahfer to stay online risks delaying the in service date for these new responsive units, because the new CT units were designed to come online using the interconnection rights of the retiring units 17 and 18. If the new CT units have delayed in-service dates, the December Schahfer Order risks degraded reliability for NIPSCO and MISO customers.

CenterPoint Indiana has reached similar conclusions with regard to Culley 2. CenterPoint Indiana created two proposed generation portfolios for its 2025 integrated resource plan: a "preferred portfolio" which offered among the lowest cost and most flexible operating futures for CenterPoint Indiana in a range of possible future scenarios, and an "alternate preferred portfolio," which offers lowest cost generation solutions assuming significant large load growth. Ex. 21 at 10–11, 165–68, 185–86 (CenterPoint Indiana 2025 IRP). CenterPoint Indiana's analysis found that in the high data center load growth scenario, Culley 2 should be retired and have its interconnection rights used for a battery storage installation at the site to support system capacity and provide additional ramping capability. *See id.* at 10, 185–186; *see also* Ex. 2 at 4 (December Culley Order) (asserting emergency conditions because of data center demand). Even without the large load assumption, use of the Culley 2 interconnection for a battery storage installation is in the preferred portfolio. Ex. 71 at 139, 165–166 (CenterPoint Indiana 2025 IRP).

The Plants are ill-suited to meet the highly variable and rapidly changing load of data centers, even compared to other coal units. The average coal plant takes 12 hours to reach maximum capacity from a cold start. Ex. 55 at 26 (IEA Flexibility Report); Ex. 118 at PDF p. 3 (RMI Analysis of Coal Plants' Threats to Reliability). By comparison, utility-scale battery storage can dispatch from a cold start to full power in a matter of seconds. Ex. 4 at 10 (Powers January Decl.). Schahfer and Culley 2, with their long startup times, are ill-suited to serve as peaking plants that respond to extreme peak demand on short notice. Ex. 4 at 10–12 (Powers January Decl.).

In short, the Orders fail to examine the inherent mismatch between the problem they diagnose and the mandates they impose. Schahfer and Culley 2 are both

falling apart, and unsuited to meet the rapid ramping needs associated with the data center load growth the Orders identify as driving the purported emergency.

*4. The Orders Do Not Address or Reflect Consideration of Alternatives.*

Other alternatives are available to the Department that better meet the claimed emergency and serve the public interest. MISO has access to robust transmission connectivity between itself and neighboring regions to support the stability of its grid. *See, e.g.*, Ex. 35 at 2 (Patton MISO Comments) ("[I]t is important to recognize that, unlike some other RTOs, MISO has tremendous import capability that is routinely utilized during tight conditions to supplement its internal resources."). During the entire period of the Orders, MISO Zone 6 can import more than 7.5 GW. Ex. 3 at 8 (EFG Report); Ex. 37 at 12 (MISO 2025–2026 CIL/CEL Final Results); *see generally* Ex. 65 at 52–53 (DOE Transmission Planning Study) (documenting interregional variability in electricity demand); Ex. 66 at 22–35 (NERC 2024 Interregional Transfer Capability Study, Part 1) (describing transfer capabilities between MISO and other regions). The Department has long recognized that power pools and utility coordination "are a basic element in resolving electric energy shortages." *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power*, 46 Fed. Reg. 39,984, 39,985–86 (Aug. 6, 1981). And recent history bears out the important role of transmission connectivity along with imports and exports. *See, e.g.*, Ex. 43 at 64 (Winter Storm Elliott System Operations Inquiry) ("Despite tightening conditions on the MISO system as the morning progressed, MISO maintained steadily increasing exports to TVA throughout the day."); Ex. 44 at 43, 83–84 (PJM Elliott Report) (describing PJM exports of between 8 and 11 GW to TVA, and exports to MISO and other regions); Ex. 36 at 6 (MISO Elliott Max. Gen. Event Overview) ("MISO consistently exported power to southern neighbors with a maximum value of nearly 5 GW[.]"); *see also* Ex. 7 at 1 (DOE Order No. 202-02-1) (providing for usage of interregional transmission).

The Order fails to consider the alternative of imports and transmission connectivity to meet the claimed emergency. The Order includes no reasonable basis to question the availability of resources from neighboring regions, nor why the two Orders provide a better means of ensuring resource sufficiency than addressing those barriers directly through its power to require "interchange" and "transmission" of electric energy from those neighboring regions. 16 U.S.C. § 824a(c)(1); *see* 10 C.F.R. §§ 205.373(f) & 205.375 (providing for consideration of available resources, including power transfers). The Order's failure to consider

imports and interregional transmission connectivity is unreasoned, and the Order is not based on substantial evidence.[17]

*C.  The Orders Exceed Other Limits on the Department's Statutory Jurisdiction.*

*1.  The Department Lacks Jurisdiction to Impose the Availability Requirements.*

In directing MISO, NIPSCO, and CenterPoint Indiana to take "all measures" to ensure that Schahfer and Culley 2 are "available to operate," Ex. 1 at 5 (December Schahfer Order); Ex. 2 at 5 (December Culley Order), the Department exceeds its authority under Section 202(c) of the Federal Power Act and impermissibly intrudes on the authority over generating facilities that Section 201(b) of the statute reserves to the states, 16 U.S.C. §§ 824(b)(1), 824a(c)(1). The sweeping language in the Department's Orders would encompass physical   and all other changes necessary to revive a decrepit generating plant undergoing closure pursuant to a state-approved retirement process. The Federal Power Act's language, structure, legislative history, and interpretation by the courts all confirm that the Department's Orders are unlawful.

The structure and language of the Federal Power Act reflect Congress's deliberate choices to preserve the states' traditional authority over generating facilities and to circumscribe the Department's emergency authority in light of the states' role. The first sentence of the Federal Power Act declares that federal regulation extends "only to those matters which are not subject to regulation by the States." *Id.* § 824(a). Section 201(b)(1) states that, except as otherwise "specifically" provided, federal jurisdiction does not attach to "facilities used for the generation of electric energy." *Id.* § 824(b)(1). The courts have held that Section 201(b)(1) reserves to the states authority over electric generating facilities, *see, e.g., Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016), including the authority to order their closure, *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) (explaining that under Section 201(b), states retain the right "to require the retirement of existing generators" or to take any other action in their "role as

---

[17] The Department must also incorporate demand response and other alternatives in determining whether an emergency exists, and as a condition precedent to calling for generation by a polluting resource like Schahfer or Culley 2, a requirement consistent with Departmental practice. See 16 U.S.C. §§ 824a(c)(1)–(2); 10 C.F.R. § 205.375; e.g., Ex. 39 at 4–5 (DOE Order No. 202-22-2); Ex. 45 at 2–3 (DOE Order No. 202-21-1); Ex. 17 at 3 (DOE Order No. 202-20-2). MISO has access to demand response and authority over generator outages. See Ex. 70 at ¶¶ 20–23 (Konedina Decl.)

regulators of generation facilities"). Congress also recognized the states' exclusive authority over generating facilities in Section 202(b), which provides that FERC's interconnection authority does not include the power to "compel the enlargement of generating facilities for such purposes." 16 U.S.C. § 824a(b).

There is a clear distinction between authority to regulate generation facilities and the Department's authority under Section 202(c) to require generation of electric energy. Electric energy is an electromagnetic wave, and its "generation, delivery, interchange, and transmission" is the creation and propagation of that wave. *See* Brief *Amicus Curiae* of Electrical Engineers, Energy Economists and Physicists in Support of Respondents at 2, *New York v. FERC*, 535 U.S. 1 (2002); *see also* Edison Electric Institute Glossary of Electric Utility Terms (1991 ed.) (defining electric generation as "the act or process of transforming other forms of energy into electric energy"). Section 202(c)(1), like the rest of the Federal Power Act, is written "in the technical language of the electric art" and federal jurisdiction generally "follow[s] the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental test." *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515, 529 (1945); *see also Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 454, 467 (1972).

The scope of the Department's emergency power under Section 202(c) is bounded both by the provision's specific language and Congress's clear intention and repeated direction in the Federal Power Act to respect the states' authority over generating facilities. When an actual emergency exists, Section 202(c)(1) authorizes the Department to order only two specific things: (1) "temporary connections of facilities" and (2) "generation, delivery, interchange, or transmission of electric energy." *Id.* § 824a(c)(1). The only reference to "facilities" in the authorizing provision of Section 202(c)(1) appears in the clause relating to temporary connections, not in the clause pertaining to "generation" of electric energy. And that clause only authorizes connections "of" facilities; it does not provide authority to regulate the facilities. The differences in Congress's word choice in these clauses— referencing "facilities" in one authorizing provision but not the other—must be given effect. *See, e.g., Gallardo v. Marstiller*, 596 U.S. 420, 430 (2022); *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008).

Given Congress's use of the term "generating facilities" elsewhere in the statute, if it had intended to give the Department authority over generating facilities in Section 202(c)(1), it would have done so explicitly. Instead, the provision conspicuously excludes authority to manage the physical characteristics of power plants. Congress purposely limited and particularized the Department's emergency powers, carefully avoiding intrusion on the states' authority over generating facilities recognized in Section 201(b)(1). *See* S. Rep. No. 74-621, at 19 (explaining

that the emergency powers in Section 202(c)(1) "which were indefinite in the original bill have been spelled out with particularity"); *compare* S. 1725, Cong. Tit. II § 203(a) (providing in original, unenacted bill that control of the production and transmission of electric energy "except in time of war or other emergency declared to exist by proclamation of the President, shall, as far as practicable, be by voluntary coordination"), *with* 16 U.S.C. § 824a(c)(1) (providing particularized, specific authorities and circumstances in which the authorities may be exercised).

In certain circumstances, the Department may require generation of electric power and a utility may properly take steps at the facility to produce the power. It is commonplace in the electric sector for the federal regulator properly acting within its authority to cause effects in a state regulator's jurisdictional sphere, and vice versa. *See Elec. Power Supply Ass'n*, 577 U.S. at 281. But the federal regulator may neither directly regulate generation facilities nor impose requirements aimed at the facilities, even if nominally regulating within its sphere. *See id.* at 281–82; see also *Hughes*, 578 U.S. at 164–65. Such encroachment is impermissible, be it in a real emergency or in a wrongly claimed one. *See Conn. Light & Power*, 324 U.S. at 530 ("Congress is acutely aware of the existence and vitality of these state governments. It sometimes is moved to respect state rights and local institutions even when some degree of efficiency of a federal plan is thereby sacrificed."). Thus, the Department may not require generation that necessitates the utility taking steps under state authority, such as building a new generating unit or refurbishing a broken one.

The Federal Power Act does not give the Department sweeping authority to order "all measures" needed to make a generation facility "available to operate." Ex. 1 at 5 (December Schahfer Order); Ex. 2 at 5 (December Culley Order); *see* 16 U.S.C. § 824a(c). Nowhere does the statute empower the Department to order "all" steps that may be needed to resuscitate Culley 2 and Schahfer, which could include repairs or modifications to physical facilities and other measures going far beyond electric power generation. Because generating units at both Plants are at the end of their useful lives, with years of forgone maintenance and capital expenditures, rendering the units capable of meeting a short-term supply shortfall could essentially require rebuilding significant parts of the Plants. On their face, the Department's Orders are *ultra vires*. The Orders also contravene the Federal Power Act's repeated direction to respect the states' authority over generating facilities,

83

which includes the authority reserved to Indiana to ensure responsible closures of both generators. The Orders therefore are unlawful and should be withdrawn.[18]

### 2. The Department Lacks Jurisdiction to Disallow Treatment of Schahfer or Culley 2 as a Capacity Resource.

The Orders state that "[b]ecause this order is predicated on the shortage of facilities for generation of electric energy and other causes," Schahfer and Culley "shall not be considered capacity resources." Ex. 1 at 5 (December Schahfer Order); *see also* Ex. 2 at 6 (December Culley Order) (directing that Culley 2 shall not be considered a capacity resource). This provision serves only to increase costs to customers, who will be required to procure duplicative capacity as a result. It is also illegal. Section 202(c) authorizes the Commission to "require by order . . . temporary connections of facilities and . . . generation, delivery, interchange, or transmission of electric energy," and then shields facilities that operate pursuant to a Section 202(c) order from liability for unavoidable violations of federal, state, or local environmental laws or regulations. 16 U.S.C. §§ 824a(c)(1), (3). Nowhere does the Federal Power Act suggest that the Department may predetermine or override the reasoned decisions of FERC in its determination of whether just and reasonable wholesale rates require an operating resource to be considered a capacity resource.

The explanation the Orders offer for this override, essentially that Schahfer and Culley 2 cannot be capacity resources because the orders do not deem them capacity resources, is clearly circular. As a result, the true reasoning behind this provision remains unclear—but its clear effect is to prevent MISO from considering the continued existence of Schahfer or Culley 2 as it works to ensure resource adequacy across its footprint. MISO's tariff defines a "capacity resource" as any of several types of resources "that are available to meet demand," and its definition of "Planning Resource" makes clear that generators like Schahfer and Culley 2 must be a Capacity Resource in order to satisfy a region's Reserve Margin Requirement. MISO Tariff Sec. 1.C, 1.P (Definitions). The Tariff also establishes clear procedures for calculating capacity contribution from all resources. *Id*. at Sec. 69A.4–69A.4.5; Schedule 53, Seasonal Accredited Capacity Calculation; Schedule 53A, Extended Seasonal Accredited Capacity Calculation. Thus, the Orders' elimination of capacity treatment for Schahfer and Culley 2 prevents MISO from following its own tariff in the wake of Schahfer and Culley's 2 continued operation and what will presumably

---

[18] A utility that takes steps subject to state authority cannot point to a Section 202(c) order as the basis for a right to recover associated costs. *See* 16 U.S.C. § 824a(c)(1) (providing for compensation or reimbursement to be paid based on just and reasonable terms for carrying out an authorized order).

be indefinitely renewed 202(c) orders to force Schahfer and Culley 2 to remain operational.[19] *See* Exhibit 124, U.S. Department of Energy's November 18, 2025 Emergency Order No. 202-25-9 (issuing a third 90-day 202(c) order forcing the J.H. Campbell Power Plant to remain online); Exhibit 131, U.S. Department of Energy's November 25, 2025 Emergency Order No. 202-25-10 (issuing a third 90-day 202(c) order forcing the Eddystone Generating Station to remain online).

The Orders also represent a significant and improper intrusion into FERC's authority to ensure that RTOs like MISO justly and reasonably ensure resource adequacy in their footprint. In particular, the Orders undermine years of FERC's regulatory oversight of MISO's resource adequacy construct, as codified in MISO's FERC-approved tariff. It is within FERC's purview under Section 205 of the Federal Power Act to provide that oversight, 16 U.S.C. Sec. 824d; and it is within MISO's purview to apply its own tariff in the first instance and decide whether generators, including Schahfer and Culley 2, should qualify as a "Capacity Resource" within MISO's FERC-approved resource adequacy construct. 18 C.F.R. § 35.1(e) ("No public utility shall . . . impose any classification, practice, rule, [or] regulation . . . which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for *good cause shown*." (emphasis added)).

The Department's intrusion into the oversight relationship between FERC and the RTOs also runs afoul of the filed rate doctrine, which holds that "no change shall be made [in] any [approved] . . . rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public" in another filing with FERC. 16 U.S.C. § 824d(d); *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021). Interference in MISO's capacity accreditation procedures effectuates a *de facto* change to its tariff, without the legally required notice. And more generally, "Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships. . . . governed in the first instance by business judgment and not regulatory coercion." *Otter Tail Power*, 410 U.S. at 374.

---

[19] PIOs recognize that the MISO tariff would likely allow Schahfer Unit 18 to not be considered a capacity resource given the extensive repairs needed to return the unit to operation. *See infra* section V.B.2 (discussing the extensive repairs needed to return Schahfer Unit 18 to service); MISO Tariff Sec. 64.1.1.xi (describing how units expected to be on outage for more than 31 days in a planning season can decline to participate in the Planning Auction). Regardless, however, the capacity eligibility of Schahfer and Culley 2 should be determined pursuant to the MISO tariff.

The Department's interference here in the core operational procedures of MISO's resource adequacy construct improperly upends that relationship.

More broadly, the result of the Orders not allowing MISO to include Schahfer or Culley 2 in its resource adequacy planning will be MISO securing resources it determines will adequately maintain grid security without Schahfer and Culley 2, pursuant to its FERC-approved tariff. And there are only two plausible reasons for the Department to seek that outcome by including these provisions: either 1) the Department does not trust MISO's assessment of MISO's resource adequacy; or 2) the Department does not trust its own assessment of MISO's resource adequacy.

In either case, the Department's actions are improper. The Orders provide no evidence that MISO cannot be trusted to ensure resource adequacy, so a Department determination that MISO cannot be trusted would be arbitrary and capricious. It would also conflict with the Department's heavy reliance on MISO's statements and studies in support of its assertion that the region faces an emergency in the first place. Conversely, if the Department lacks the confidence that its own dire predictions that the system does not have enough resources will come true, then it is well short of the confidence necessary for an emergency declaration under Section 202(c).

If left unchecked, this provision could impose completely avoidable cost increases on Indiana and MISO ratepayers. During the pendency of these (unlawful) Orders, the principal effect of this provision will be to remove Schahfer and Culley 2's ability to provide replacement capacity in the event one of the resources that cleared the auction suffers a catastrophic outage or is otherwise suspended, retired, or shut down for more than 31 days in a season. Ex. 134 at 16 (MISO Manual on Resource Adequacy); *see* Ex. 119 (MISO, ZRC Replacement Guidance). Eliminating this compensation pathway will increase the financial cost of the Orders by removing a potential income stream that might have offset Schahfer and Culley 2's extremely high operational costs, and by forcing any other MISO zone that is impacted by an unexpected plant closure to look for potentially more expensive alternatives for replacement capacity.

Additionally, this provision will have an outsized impact in April 2026 if the Department continues renewing the Orders every 90 days; that is when MISO conducts its 2026-27 Planning Auction. Schahfer and Culley 2's exclusion from the list of facilities that might offer capacity would ensure that Indiana ratepayers and MISO ratepayers writ large likely would be forced to pay for Schahfer and Culley 2's continued operation without any countervailing benefits: they would miss out on a major revenue stream that would have reduced Schahfer and Culley 2's operating losses, and, by operation of MISO's sloped demand curve in the Planning Auction

86

which pays more for capacity the scarcer it is, consumers will end up paying a higher premium for any capacity their utilities secure from the Planning Auction.

In short, including this provision is yet another way in which the Department has misapplied the statute: its inclusion only further ensures that Schahfer and Culley 2's principal impact will not be plugging a gap but rather sabotaging MISO's resource planning process and heightening cost burdens in a manner that does not serve the public interest.

D. *The Orders Fail to Provide the Conditions Required Under Section 202(c) to Lessen Conflicts with Environmental Standards and Minimize Environmental Harm.*

Where an order "may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation, Section 202(c) imposes several requirements. 16 U.S.C. § 824a(c). The Department must "ensure" that the order "requires generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest." Id. § 824a(c)(2). The Department must also "ensure," "to the maximum extent practicable," that the order "is consistent with any applicable Federal, State or local environmental law or regulation." *Id.* Additionally, the Department must ensure that the order minimizes any adverse environmental impacts, regardless of the facility's compliance (or non-compliance) with environmental standards. *See id.* The Orders violate these statutory obligations.

1. *Legal Framework: Section 202(c) Further Limits the Department's Authority and Mandates Affirmative Steps to Maximize Environmental Compliance and Minimize Environmental Harm Where the Order "May Result in a Conflict" with a Federal, State, or Local Environmental Law or Regulation.*

The Federal Power Act obligates the Department to include precautions in a Section 202(c) order where the order "may result in a conflict" with environmental laws or regulations. This is a forward-looking inquiry with a low threshold.[20]

The word "may" in this context denotes a mere possibility, not a certainty. This is especially apparent when matched against the term "shall" used in Section 202(c)(2) and the other provisions added to Section 202(c) at the same time. *See* Fixing America's Surface Transportation Act of 2015, Pub. L. No. 114-94, 129 Stat. 1312 § 61002 (codified at 16 U.S.C. § 824a). Congress' use of the two disparate terms must

---

[20] If actual noncompliance with environmental laws and regulations occurs to carry out the order, the statute provides a safe harbor. 16 U.S.C. § 824a(c)(3).

be given effect. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (discussing significance of the words "may" and "shall" in the same statutory provision).

Moreover, the consequences need not be "noncompliance" or "violation" of environmental law, both of which are terms Congress also used in 2015 adding other provisions to Section 202(c). A potential "conflict" suffices. *Cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (explaining that courts find "conflict" in the preemption context where, for instance, a law or order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). Taken together, anytime a Department order creates circumstances that might obstruct the accomplishment or execution of environmental laws or regulations, Section 202(c)(2) imposes duties on the Department to maximize compliance with the law and minimize adverse environmental effects.

Congress adopted the requirements of Section 202(c)(2) to address environmental issues arising in response to emergencies on the grid. Congress was well aware of environmental issues stemming from 202(c) orders when it imposed the requirements in Section 202(c)(2). *See, e.g.*, Rolsma, 57 Conn. L. Rev. at 807–09 (discussing prior incidents of tension between environmental requirements and responses to emergencies on the grid, and congressional hearings addressing the matter as part of the passage of Section 202(c)(2)). Congress struck a reasonable balance requiring that environmental concerns not be left by the wayside while the Department responds to actual emergencies. Rather than requiring the Department to engage in a probing review of environmental laws and permits at all levels of our federalist system before acting, Congress set a low threshold for imposition of the mandatory Section 202(c)(2) duties to minimize conflicts with environmental laws and environmental harms flowing from a Section 202(c) order.

### 2. The Orders May Result in a Conflict with a Federal, State, or Local Environmental Law or Regulation.

Here, the Department implicitly acknowledges the possible conflicts. The Orders are limited to a 90-day duration. Ex. 1 at 5 (December Schahfer Order); Ex. 2 at 5 (December Culley Order). That temporal limitation exists for a 202(c) order that may result in a conflict with environmental requirements. 16 U.S.C. § 824a(c)(4).

Moreover, the evidence shows that the Orders may result in conflicts with environmental requirements. The Schahfer generating plant is subject to the Best Technology Available for Minimizing Adverse Environmental Impact ("BTA") standards under the National Pollutant Discharge Elimination System ("NPDES"). Specifically, 40 C.F.R. § 125.94 requires that NIPSCO use best technology available to minimize impingement mortality associated with water cooling systems in the

Schahfer units. The Units each feature a closed-cycle cooling via a single multi-cell mechanical draft cooling tower. Ex. 24 at 55 (Schahfer 2020 NPDES Permit). The Indiana Department of Environmental Management ("IDEM") approved Schahfer's cooling systems as meeting the BTA standard, but stated that: "Primary in this entrainment BTA determination is that the facility will cease operations no later than December 31, 2022 and the permittee does have closed-cycle cooling via a single multi-cell mechanical draft cooling tower on each unit which has allowed the permittee to achieve substantial reductions in water usage." *Id.* at 55. In other words, IDEM approved Schahfer's NPDES permit on the flawed assumption that Units 17 and 18 would retire as of December 31, 2022. *Id.* at 1. The NPDES permit expired September 20, 2025. Ex. 24 at 1 (Schahfer 2020 NPDES Permit). As NIPSCO noted, in order to operate Schahfer Units 17 and 18 "for one day beyond 2025," the Schahfer NPDES permit would require NIPSCO "to install a wastewater treatment system and convert the [retired] Unit 14 and 15 bottom ash handling system" so that it could be used on Units 17 and 18. Ex. 132 at PDF p. 16 (NIPSCO Rate Case Discovery Responses).

The Order also may result in a conflict with the federal coal combustion residuals ("CCR") Rule. In 2015 and in subsequent rulemakings, the EPA promulgated rules pursuant to the Resource Conservation and Recovery Act ("RCRA") which created standards for legacy surface impoundments of CCR. EPA provided an alternative compliance mechanism that extended the deadline for owners and operators to complete closure of their unlined CCR surface impoundments larger than 40 acres until October 17, 2028 if the coal-fired boiler associated with the generator would permanently retire by that same date. 40 C.F.R. § 257.103(f)(2). In its latest compliance filings for the rule, NIPSCO explained that if it ceases combustion of coal at Schahfer by December 31, 2025 as expected, it would be able to close its CCR impoundment (the Waste Disposal Area) by September 17, 2028, a month ahead of EPA's deadline. Ex. 25 at 6 (Schahfer CCR Part A Demonstration Addendum). But the Department's December Schahfer Order prevents that closure, which, given the long timeline of closing the Waste Disposal Area, would cause Schahfer to breach the deadline of current federal law..

The December Culley Order also may result in a conflict with environmental laws and regulations. Culley 2 shares pollution control equipment with Culley 3, another generating unit at Culley which is not subject to an order from the Department. Culley 3 contains a flue gas desulfurization ("FGD") system which serves both units. Ex. 26 at 7 (Culley 2025 Air Permit Modification). Culley Units 3 and 2 also share equipment critical to meeting the units' NPDES permit requirements. Ex. 56 at 14 (Bradford Coal Inventory Testimony). The result of this setup is that Culley 3 outages can force Culley 2 offline for environmental compliance reasons. Culley 3 saw sustained outages in 2025 that, due to shared

pollution control systems, also forced Culley 2 offline. *See* Ex. 27 at 3 (CenterPoint Fuel Cost Order) (describing how "due to the environmental parameters associated with the Culley Unit 3 outage, Culley Unit 2's availability will be limited until Unit 3 comes back online"). As a result, even if Culley 2 is operational, any downtime needed to service Culley 3 may result in a conflict with environmental requirements.

Independently, running Culley 2 may result in clear conflict with the plant's NPDES permit. The permit mandates that "[b]eginning December 31, 2025, there shall be no discharge of bottom ash transport water from Unit 2." Ex. 28 at 6 (Culley 2024 NPDES Permit).

The Orders may result in additional conflicts with air pollution laws and regulations. For example, EPA has approved Indiana's regional haze state implementation plan revision. Ex. 57 (2026 EPA IN Haze SIP Approval). Indiana conducted its regional haze state implementation analysis under the assumption that owners of electric generating unit sources would "continue to shutdown units, convert to natural gas, and rely more on renewable energy." Ex. 69 at 2 (IN Haze SIP Responses to Public Comments); *see also* 90 Fed. Reg. 25,951 (finding Indiana's choice not to apply the four factor test to all of the state's EGUs reasonable because given "historical data showing relatively consistent or declining $NO_X$ and $SO_2$ annual emissions and emission rates, as well as 2028 projections, the overall emissions are not expected to increase in the future"). The Department's Orders prevent the retirement of Schahfer and Culley 2 and affect how the Plants are dispatched. *See* Ex. 1 at 5 (December Schahfer Order); Ex. 2 at 5 (December Culley Order). As such, the Orders may result in a conflict with environmental requirements.

   3.  The Orders Lack the Conditions Required by Section 202(c).

   i.  *The Orders' Terms Fail to Require Generation Only During Hours Necessary to Meet the Purported Emergency.*

The Orders directly contradict the Department's obligation to require generation "only during hours necessary to meet the emergency." 16 U.S.C. § 824a(c)(2). The Orders instead state: "For the duration of this Order, MISO is directed to take every step to employ *economic* dispatch" of the Schahfer and Culley 2 Plants "to *minimize cost* to ratepayers." Ex. 1 at 5 (December Schahfer Order) (emphasis added); Ex. 2 at 5 (December Culley Order) (emphasis added). The "emergency" nominally described by the Orders is the potential "loss of power to homes and businesses in the areas that may be affected by curtailments or power outages." Ex. 1 at 4 (December Schahfer Order); Ex. 2 at 5 (December Culley Order). Even if the

Department had substantiated that emergency (which it has not), the Federal Power Act would allow the Department to compel generation only when needed to prevent such involuntary curtailments or outages. 16 U.S.C. 824a(c)(2); *see, e.g.*, Ex. 6 at 9 (DOE Order No. 202-17-4 Summary of Findings) ("authorizing operation of" units subject to emergency order "only when called upon . . . for reliability purposes," according to "dispatch methodology" approved by the Department). "Economic dispatch," in sharp contrast, requires "the lowest-cost resources [to] run first," in pursuit of "the lowest-cost energy available." *City of New Orleans v. FERC,* 67 F.3d 947, 948–49 (D.C. Cir. 1995)*; see also Fla. Power & Light Co. v. FERC,* 88 F.3d 1239, 1241 (D.C. Cir. 1996) (noting distinction between economic dispatch and reserve capacity rules).

By instructing MISO to employ economic dispatch, the Orders' terms permit (indeed, direct) operation of Schahfer 17, Schahfer 18, and Culley 2 even when other—albeit potentially higher cost—resources are available that would prevent any "curtailments or power outages"—that is, the claimed emergency. Ex. 1 at 4 (December Schahfer Order); Ex. 2 at 5 (December Culley Order). The Orders' further instructions—limiting "dispatched units to the times and within the parameters as determined by MISO pursuant to paragraph A," *id.*—just repeats that initial instruction to "employ economic dispatch," without any further limitation that would "ensure" that generation occurs "only during hours necessary to meet the emergency" described by the Orders, *id.*; 16 U.S.C. § 824a(c)(2). Moreover, to the extent the Department directs that offering Schahfer and Culley 2 "on a must run basis may be necessary to ensure the units are available to operate," *see* Ex. 146 at P 49 (Campbell September Rehearing Order), that too violates the Department's obligation under Section 202(c)(2) to require generation only during hours needed to meet the claimed emergency and serve the public interest. As such, the Orders' terms fail to require operation "only during the hours necessary to meet the emergency" described by the two Orders and violate Section 202(c)(2). 16 U.S.C. § 824a(c)(2).[21]

> ii.  *The Orders Fail to Ensure Maximum Practicable Consistency with Environmental Rules and to Minimize Adverse Environmental Impacts.*

The Orders further fail to "ensure" that Schahfer and Culley 2 operate, "to the maximum extent practicable," in conformity with applicable environmental rules. *Id.* The Orders paraphrase the statutory text—that "operation of the [affected units] must comply with applicable environmental requirements . . . to the maximum

---

[21] That direction further fails to conform to the statute's command to compel only the generation that will "best meet the emergency." 16 U.S.C. § 824(c)(1).

extent feasible," but fail to specify *who* bears that responsibility or *what* such operation entails. Ex. 1 at 5 (December Schahfer Order); see also Ex. 2 at 5 (December Culley Order). The Orders impose no further substantive conditions beyond stating that they provide no relief from any obligation to "pay fees or purchase offsets or allowances for emissions." *Id.* The direction to "comply . . . to the maximum extent feasible" is, as a result, wholly unenforceable; the Orders provide no basis for the Department, or anyone else, to determine whether each plant is in fact complying or who might face the consequences of any failure to do so. *See* Ex. 9 at 5–7 (DOE Order No. 202-22-4) (requiring, *inter alia,* reporting of "number and actual hours each day" of operation "in excess of permit limits or conditions," and information describing how generators complied with environmental requirements to maximum extent feasible). Consequently, the Orders do not meet the Department's statutory obligation to "*ensure*" the maximum feasible consistency with applicable environmental standards—an obligation that requires the Department to offer some discrete guidance as to the Plants' operations, rather than merely parroting the statutory text. 16 U.S.C. § 824a(c)(2) (emphasis added).

In addition, the Orders fail to "minimize[] any adverse environmental impacts." 16 U.S.C. § 824a(c)(2). That mandate is textually and substantively distinct from the Department's (also unfulfilled) obligation to ensure maximum practicable compliance with environmental standards. *Id.* The Orders claim to minimize environmental impacts by "limit[ing] operation of dispatched units to the times and within the parameters as determined by MISO, pursuant" to the Orders' "paragraph A." Ex. 1 at 5 (December Schahfer Order); Ex. 2 at 5 (December Culley Order). But in both Orders, paragraph A contains only a command that MISO "take all measures necessary to ensure" that the Schahfer and Culley 2 Plants are "available to operate" and "employ economic dispatch . . . to minimize cost to ratepayers," and requires a directive that NIPSCO and CenterPoint Indiana comply with MISO's orders implementing the Orders' commands.[22] *Id.* An instruction minimizing ratepayer costs and demanding availability has no rational relationship to a requirement to minimize environmental impacts. The Orders contain no

---

[22] To the extent the Orders allow MISO to independently devise conditions limiting environmental impacts, that mere possibility, first, cannot satisfy the Department's own statutory obligation to "ensure" that its "order" minimizes environmental impacts (and limits hours to those necessary to meet the emergency, and mandates the maximum practicable compliance). 16 U.S.C. § 824a(c)(2). And even if it could, the Orders require MISO to employ "economic dispatch" and "ensure" that Schahfer and Culley are "available to operate"—directions that are flatly inconsistent with the statute's requirements related to Schahfer's and Culley 2's environmental impacts.

requirement similar to the requirements recommended by PIOs' expert engineer Mr. Powers: "DOE should require verification of the good working order of the Schahfer 17 and 18 air emission control systems before authorizing Schahfer 17 and 18 to operate under extreme demand conditions" or a similar recommendation for Culley 2. Ex. 4 at 19–20, 22 (Powers January Decl.).

Additionally, the Orders include no measures that would mitigate impacts when compliance with environmental standards proves impracticable—measures that have been routinely included in past orders. *See, e.g.*, Ex. 6 at 9 (DOE Order No. 202-17-4 Summary of Findings) (permitting non-compliant operation only during specified hours, and requiring exhaustion of "all reasonably and practically available resources," including demand response and identified behind-the-meter generation resources selected to minimize an increase in emissions); Ex. 9 at 7 (DOE Order No. 202-22-4) (requiring "reasonable measures to inform affected communities" of non-compliant operations). At a minimum the statute requires the Department to include sufficiently detailed reporting obligations to ascertain what impacts result from emergency operations; without such reporting, the Department has no ability to "ensure" that adverse impacts are minimized. *See, e.g.*, Ex. 110 at 5 (DOE Order No. 202-24-1) (requiring detailed data on emissions of pollutants). The Orders here instead only require "such additional information" as the Department, in the future, may (or may not) "request[] . . . from time to time." Ex. 1 at 5 (December Schahfer Order); Ex. 2 at 5 (December Culley Order). That possibility of future, unspecified inquiry cannot satisfy the statute's demand that the Department "ensure" that its Orders minimize environmental impacts. 16 U.S.C. § 824a(c)(2). As one example of mitigation measures, PIOs' expert engineer, Mr. Powers, suggested that if permit limits for PM, $NO_x$, or $SO_2$ are exceeded (as measured on the onsite monitors) during operation of Schahfer 17 and 18 or of Culley 2, the respective units should be shut down. Ex. 4 at 20, 22 (Powers January Decl.). Declining to include such a measure, particularly when there is no apparent risk of loss of power to homes and businesses in the area absent power from Schahfer and Culley 2, does not conform with the requirement of Section 202(c)(2) that the Department order generation only during hours needed to meet the claimed emergency and best serve the public interest.

93

VI. REQUEST FOR STAY

PIOs further move the Department for a stay of the Orders until the conclusion of judicial review. 18 C.F.R. § 385.212.[23] The Department has the authority to issue such a stay under the Administrative Procedure Act and should do so where "justice so requires." 5 U.S.C. § 705. In deciding whether to grant a request for stay, agencies consider (1) whether the party requesting the stay will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm other parties; and (3) whether a stay is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434, 436 (2010); *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see, e.g., Midcontinent Indep. Sys. Operator, Inc.,* 184 FERC ¶ 61,020, at P 41 (2023); *ISO Eng. Inc.*, 178 FERC ¶ 61,063, at P 13 (2022), *rev'd on other grounds sub nom. In re NTE Conn., LLC*, 26 F.4th 980, 987–88 (D.C. Cir. 2022).

Injuries under this standard must be actual, certain, imminent, and beyond remediation. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *ANR Pipeline Co.*, 91 FERC ¶ 61,252, at 61,887 (2000); *City of Tacoma*, 89 FERC ¶ 61,273, at 61,795 (1999) (recognizing that, absent a stay, options for "meaningful judicial review would be effectively foreclosed"). Financial injury is only irreparable where no "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Wis. Gas Co.*, 758 F.2d at 674 (*quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also In re NTE Conn., LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022). Environmental injury, however, "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Under those standards, a stay of the Orders is appropriate.

A. *Intervenors Will Suffer Irreparable Harm Without a Stay of the Orders.*

A stay is necessary to protect PIOs, their members, and the public from harm from continued coal-fired power operations caused by the Department's Orders.

---

[23] Pursuant to FPA Section 313(c) and Rule 713(e) of the applicable rules, the filing of a request for rehearing does not automatically stay a Department order. 16 U.S.C. § 825*l*(c); 18 C.F.R. § 385.713(e).

As noted extensively *supra* sec. IV.C.3.i.c and ii.c, Schahfer and Culley 2 emit health- and environment-harming air pollutants like nitrogen oxides, sulfur dioxide, particulate matter, and volatile organic compounds.

The health and environmental harms from this pollution flow directly from the Department's Orders and are actual, specific, and imminent, and can be deadly. They will affect the lives and well-being of PIOs and their members. The stark public health stakes of PIOs' request for stay require the Department to pause implementation of its Orders until a court reviews their validity.

Additionally, without a stay, the Orders create other injuries too. The Orders needlessly force NIPSCO and CenterPoint Indiana to continue to divert attention and investment dollars away from planned reuse of the Schahfer and Culley 2 interconnection rights for other generation projects. In doing so, the Department denies PIOs' members the benefits of Indiana's energy policies which are designed to benefit them and the public. In addition to forcing ratepayers to pay for the availability and dispatch of uneconomic, unreliable, and obsolete resources that the State, stakeholders, and owners want to close, *see supra* sec. IV.C, the Department's Orders jeopardize the diversification of generating resources the Department itself has said increases grid reliability. Ex. 142 (Dep't of Energy, *Energy Reliability and Resilience*). There is no clear recourse to remedy those injuries either.

### B. A Stay Would Not Result in Harm to Any Other Interested Parties.

No other interested parties would be harmed by a stay. The issuance of a stay would not harm end-use electricity consumers because the lack of an actual emergency means that a stay would not disrupt the provision of electricity. *See supra* secs. IV.B–.C, V.A. Furthermore, because MISO, the Indiana Commission, NIPSCO, and CenterPoint Indiana have already planned for Schahfer and Culley 2's closures and continue to plan for resource adequacy, a stay would only have the effect of relieving them of the administrative, compliance, and planning burdens imposed by the Orders. On the balancing of equities, there is therefore no meaningful countervailing harm that would follow from a stay.

### C. A Stay Is in the Public Interest Given the Significant Evidence Demonstrating There is No Factual or Legal Support for These Orders, and Given the Harm they Produce to the Broader Public.

There is no public interest served by the Orders, and a stay will only benefit the public. First, the Orders exceed the Department's authority; the Orders have provided no reasonable grounds to substantiate any near-term or imminent shortfall in electricity supply that would justify Schahfer and Culley 2's continued operation. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)

(noting "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Second, the Orders override Indiana's exercise of its "authority to choose [its] preferred mix of energy generation resources." *Citizens Action*, 125 F.4th at 239. By doing so, the Orders unlawfully intrude into states' reserved authority over in-state "facilities used for the generation of electric energy." 16 U.S.C. §824(b)(1); *see Pac. Gas & Elec.*, 461 U. S. at 205 ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States."); *see also Hughes*, 578 U.S. at 154 (cleaned up) ("Under the [Federal Power Act], FERC has exclusive authority to regulate the sale of electric energy at wholesale in interstate commerce. . . . But the law places beyond FERC's power, and leaves to the States alone, the regulation of any other sale—most notably, any retail sale—of electricity."). And third, a stay would protect the broader public—beyond PIOs and their members—from the onerous costs, and dangerous pollution, produced by unnecessary operation of the Schahfer and Culley 2 Plants.

## VII. CONCLUSION

For the reasons set forth above, the undersigned Public Interest Organizations respectfully request that the Department grant intervention with respect to each Order; grant rehearing and rescind the Orders (and any renewals of the Orders); and stay the Orders.

Filed on January 22, 2026.

Submitted by:

[Continued to next page for signatures.]

96

/s/ *Sameer H. Doshi*
Sameer H. Doshi
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, Illinois 60606
(312) 800-8332
sdoshi@earthjustice.org

Michael Lenoff
Jennifer Yun
Earthjustice
1400 L St NW, Lobby 2, Unit 34117
Washington, DC 20005
(202) 660-0519
mlenoff@earthjustice.org
jyun@earthjustice.org

*Counsel for Citizens Action Coalition of Indiana, Just Transition Northwest Indiana, Hoosier Environmental Council, and Public Citizen*

/s/ *Gregory E. Wannier*
Gregory E. Wannier
Tony Mendoza
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
tony.mendoza@sierraclub.org

Jonah Baskin
Sierra Club Environmental Law Program
50 F Street NW, Eighth Floor
Washington, DC 20001
(202) 556-3917
jonah.baskin@sierraclub.org

*Counsel for Sierra Club*

/s/ *Bradley Klein*
Bradley Klein
Nicholas Wallace
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
bklein@elpc.org
nwallace@elpc.org

*Counsel for Environmental Law & Policy Center*

Attachment: Index of Exhibits

**Index of Exhibits**

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1 | December Schahfer Order | U.S. Department of Energy's December 23, 2025 Emergency Order No. 202-25-12 | https://www.energy.gov/documents/order-number-202-25-12-schahfer |
| 2 | December Culley Order | U.S. Department of Energy's December 23, 2025 Emergency Order No. 202-25-13 | https://www.energy.gov/documents/order-number-202-25-13-culley |
| 3 | EFG Report | Carlos Peña and Anna Sommer of Energy Futures Group, Reliability and Capacity Assessment of F.B. Culley 2 and R.M. Schahfer 17 and 18, January 21, 2026 | |
| 4 | Powers January Declaration | Schahfer 17 & 18 and Culley 2 Declaration of Bill Powers, P.E., January 21, 2026 | |
| 5 | Synapse Report | Report of Lucy Metz and Devi Glick of Synapse Energy Economics on cost of continued operation of Culley Unit 2 and Schahfer Units 17–18 under Federal Power Act orders, January 21, 2026 | |
| 6 | DOE Order No. 202-17-4 Summary of Findings | Summary of Findings DOE Order No. 202-17-4 (Sep. 14, 2017) | https://www.energy.gov/sites/default/files/2017/09/f36/Order%20202-17-4%20Summary%20of%20Findings.pdf |
| 7 | DOE Order No. 202-02-1 | DOE, Order No. 202-02-1 (Aug. 16, 2002) | https://www.energy.gov/sites/default/files/202%28c%29%20order%20202-02-1%20August%2016%2C%202002%20-%20CSC.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 8 | Cooke Email to Alle-Murphy | Email from Lot Cooke, DOE to Linda Alle-Murphy Re: Rehearing procedures for DOE Order No. 202-05-3 | https://www.energy.gov/oe/articles/question-and-answer-procedural-questions-application-rehearing-order-no-202-05-02?nrg_redirect=397676 |
| 9 | DOE Order No. 202-22-4 | DOE, Order No. 202-22-4 (Dec. 24, 2022) | https://www.energy.gov/sites/default/files/2022-12/PJM%20202%28c%29%20Order.pdf |
| 10 | Grid Strategies June Report | Michael Goggin, *A Review of DOE's 202(c) Order for the Campbell Coal Plant* (June 18, 2025) | |
| 11 | NIPSCO 2025 Planning Reserve Margin Report | NIPSCO 2025 Annual Report in Compliance With Ind. Code § 8-1-8.5-13 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/1a22a22e-cc26-f011-8c4e-001dd8084fd9/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=46233_NIPSCO_Submission%20of%20Redacted%20Report_05012025.pdf |
| 12 | CenterPoint 2025 Planning Reserve Margin Report | CenterPoint Energy Indiana South 2025 HEA 1520 Report Pursuant to I.C. § 8-1-8.5-13 (May 23, 2025) | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/e865df14-0c38-f011-8c4e-001dd80846ac/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=46236_CEIS_Notice%20of%20Submission%20of%20HEA%201520%20Report_052325.pdf |
| 13 | -NIPSCO Performance Metric Collaborative Update | Northern Indiana Public Service Company LLC's Annual Performance Metric Collaborative Update, IURC Cause No. 44688, July 1, 2025 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/9847a67d-a756-f011-877b-001dd8084fd9/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=44688_NIPSCO_Compliance%20Filing%20-%20PMC%20Update_07012025.pdf |
| 14 | Saffran Q1 2025 Outage Testimony | Direct Testimony of David Saffran on behalf of Northern Indiana Public Service Company LLC, IURC Cause No. 38706 FAC 147, May 23, 2025 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/0f58f29b-f637-f011-8c4e-001dd80846ac/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=38706FAC147_NIPSCO_Petitioners%20Exhibit%204%20(Saffran)_05232025.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 15 | Saffran Q2 2025 Outage Testimony | Direct Testimony of David Saffran on behalf of Northern Indiana Public Service Company LLC, IURC Cause No. 38706 FAC 148, Aug. 18, 2025 | https://iurc.portal.in.gov/_entity/sharepoint documentlocation/635d1149-747c-f011-b4cc-001dd80846ac/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=38706FAC148_NIPSCO_Petitioners%20Exhibit%204%20(Saffran)_08182025.pdf |
| 16 | Saffran Q3 2025 Outage Testimony | Direct Testimony of David Saffran on behalf of Northern Indiana Public Service Company LLC, IURC Cause No. 38706 FAC 149, Nov. 20, 2025 | https://iurc.portal.in.gov/_entity/sharepoint documentlocation/e268e77b-52c6-f011-bbd3-001dd8084fd9/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=38706FAC149_NIPSCO_Petitioners%20Exhibit%204%20(Saffran)_11202025.pdf |
| 17 | DOE Order No. 202-20-2 | Department of Energy Order No. 202-20-2 (Sept. 6. 2020) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-caiso-september-2020?nrg_redirect=454296 |
| 18 | Wagner Testimony | Direct Testimony of John A. Wagner on behalf of Northern Indiana Public Service Company LLC, IURC Cause No. 38706 FAC 149, Nov. 20, 2025 | https://iurc.portal.in.gov/_entity/sharepoint documentlocation/08174aa0-52c6-f011-bbd3-001dd8084fd9/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=38706FAC149_NIPSCO_Petitioners%20Exhibit%203%20(Wagner)_11202025.pdf |
| 19 | NIPSCO CPCN Discovery Responses | IURC Cause No. 45947, NIPSCO-CAC Joint Exhibit 6 (NIPSCO's Public Responses to CAC Data Requests), July 11, 2024 | https://iurc.portal.in.gov/_entity/sharepoint documentlocation/98b5e199-824b-ef11-a316-001dd8073c71/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45947%20NIPSCO.CAC%20Joint%20Exhibit%20No.%206.pdf |
| 20 | IURC Schahfer Gas Plant Order | Indiana Utility Regulatory Commission Order in Cause No. 45947 dated October 16, 2024 | https://iurc.portal.in.gov/_entity/sharepoint documentlocation/8d902453-cd8b-ef11-ac21-001dd80bd98a/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=ord_45947_101624.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 21 | CenterPoint Indiana 2025 IRP | CenterPoint Energy Indiana South 2025 Integrated Resource Plan | https://www.in.gov/iurc/files/CEIS_2025_IRP_Volume_1_of_2.pdf |
| 22 | CenterPoint 2024 Performance Report | CenterPoint Energy Indiana South 2024 Electric Performance Report | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/ec855054-7c53-f011-877a-001dd80846ac/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45564_CEI%20South_Electric%20Performance%20Report_062725.pdf |
| 23 | Wayne Games 2021 Testimony | Rebuttal Testimony of Wayne D. Games To The Direct Testimony Of Intervening Parties On Need For Resources To Replace Existing Inefficient Units, Cause No. 45501 (May 24, 2021). | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/76eb9f24-6ebd-eb11-8236-001dd802dc58/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45501_CenterPoint%20Energy%20Indiana%20South_Games%20Rebuttal%20Testimony%20Petitioners%20Exhibit%20No%203-R%20(PUBLIC)_052421.pdf |
| 24 | Schahfer 2020 NPDES Permit | Indiana Dept. of Envtl. Mgmt. Approval of Schahfer Generating Station NPDES Permit Application (Sep. 24, 2020) | https://ecm.idem.in.gov/cs/idcplg?IdcService=GET_FILE&dID=83057089&dDocName=83057294&Rendition=web&allowInterrupt=1&noSaveAs=1 |
| 25 | Schahfer CCR Part A Demonstration Addendum | NIPSCO R.M. Schahfer Generating Station: Demonstration of Site-Specific Alternative Deadline to Initiate Closure of CCR Surface Impoundment Due to Permanent Cessation of Coal-fired Boilers by a Date Certain – Addendum 2. . . | https://www.nipsco.com/docs/librariesprovider11/rates-and-tariffs/ccr/r.m.-schahfer/r.m.-schahfer-generating-station-groundwater-moniitoring-and-corrective-action/rm-schahfer-generating-station-wda-part-a-addendum-2-summer-2022.pdf?sfvrsn=d2e31151_3 |
| 26 | Culley 2025 Air Permit Modification | Indiana Dept. of Envtl. Management, Minor Permit Modification to Part 70 Operating | https://ecm.idem.in.gov/cs/idcplg?IdcService=GET_FILE&dID=83826642&dDocName=83830685&Rendition=web&allowInterrupt=1&noSaveAs=1 |

iv

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| | | Permit No. T173-43264-00001, July 7, 2025 | |
| 27 | CenterPoint Fuel Cost Order | IURC Order, Cause No. 38708 FAC 146, April 30, 2025 | https://iurc.portal.in.gov/_entity/sharepoint documentlocation/08b0fe52-d625-f011-998a-001dd80b1717/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=ord_38708FAC146_043025.pdf |
| 28 | Culley 2024 NPDES Permit | Indiana Dept. of Envtl. Management, Modification to NPDES Permit No. IN0002259, May 3, 2024 | https://ecm.idem.in.gov/cs/idcplg?IdcService=GET_FILE&dID=83630044&dDocName=83634089&Rendition=web&allowInterrupt=1&noSaveAs=1 |
| 29 | Bradford 2025 CCR Testimony | Direct Testimony of F. Shane Bradford on behalf of CenterPoint Energy Indiana South, IURC Cause No. 45052 ECA 6, May 7, 2025 | https://iurc.portal.in.gov/_entity/sharepoint documentlocation/1f3f3a58-3b2c-f011-8c4e-001dd8084fd9/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45052%20ECA%206_CEI%20South_Pet.%27s%20Ex.%20No.%201_Bradford%20Direct%20Testimony%20and%20Attachment_050725%20(2).pdf |
| 30 | DOE Rehearing Procedures | U.S. Dep't of Energy, DOE 202(c) Order Rehearing Procedures (last visited June 17, 2025) | https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures |
| 31 | MISO 2025–26 Auction Results | MISO, Planning Resource Auction, Results for Planning Year 2025-2026 (Apr. 2025) | https://cdn.misoenergy.org/2025%20PRA%20Results%20Posting%2020250529_Corrections694160.pdf |
| 32 | MISO Emergency Declarations | MISO, Maximum Generation Emergency Declarations through June 2024 (Aug. 30, 2024) | https://www.oasis.oati.com/woa/docs/MISO/MISOdocs/Capacity_Emergency_Historical_Information.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 33 | MISO Market Capacity Emergency | MISO, Market Capacity Emergency, SO-P-EOP-11-002 Rev: 23 (Oct. 15, 2025) | https://cdn.misoenergy.org/SO-P-EOP-11-002%20Rev%2023%20MISO%20Market%20Capacity%20Emergency683501.pdf |
| 34 | Ramey MISO Comments | Comments of Todd Ramey on Behalf of Midcontinent ISO, Inc. (May 28, 2025), Docket No. AD24-11-000, Accession No. 20250528-4032 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250528-4032&optimized=false&sid=4f4f3475-8309-4416-8289-2aee6d84c1a8 |
| 35 | Patton MISO Comments | Technical Conference Comments of David B. Patton, Ph.D., MISO Independent Market Monitor (May 28, 2025), Docket No. AD25-7-000, Accession No. 20250528-4006 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250528-4006&optimized=false&sid=2c5ac909-a7f0-47eb-9bb3-c35f89976250 |
| 36 | MISO Elliott Max. Gen. Event Overview | MISO, Overview of Winter Storm Elliott December 23, Maximum Generation Event (Jan. 17, 2023) | https://cdn.misoenergy.org/20230117%20RSC%20Item%2005%20Winter%20Storm%20Elliott%20Preliminary%20Report627535.pdf |
| 37 | MISO 2025–2026 CIL/CEL Final Results | MISO, 2025-2026 PY Seasonal CIL/CEL Final Results (Oct. 24, 2024) | https://cdn.misoenergy.org/20241024%20LOLEWG%20Item%2004%20PY%202025-2026%20Final%20CIL_CEL%20Results654989.pdf |
| 38 | MISO LOLE Presentation | MISO, *LOLE 101: Probabilistic Analyses* | https://cdn.misoenergy.org/LOLE%20101%20Training624875.pdf |
| 39 | DOE Order No. 202-22-2 | Department of Energy Order No. 202-22-2 (Sept. 4, 2022) | https://www.energy.gov/ceser/federal-power-act-section-202c-banc-september-2022 |
| 40 | NERC 2024 Reliability Report | NERC, 2024 State of Reliability (June 2024) (excerpt) | https://www.nerc.com/pa/RAPA/PA/Performance%20Analysis%20DL/NERC_SOR_2024_Technical_Assessment.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 41 | NERC 2025 Summer Reliability Assessment | NERC, 2025 Summer Reliability Assessment (May 2025) | https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2025.pdf |
| 42 | 2019–24 NERC Summer Reliability Assessments | NERC, Summer Reliability Assessments for 2019-2024 (Compiled) | 2019 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2019.pdf<br><br>2020 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2020.pdf<br><br>2021 Reliability Assessment: https://nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC%20SRA%202021.pdf<br><br>2022 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2022.pdf<br>2023 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2023.pdf<br><br>2024 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2024.pdf |
| 43 | Winter Storm Elliott System Operations Inquiry | FERC, NERC, and Regional Entity Staff Report, Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott (Oct. 2023) | https://www.ferc.gov/media/winter-storm-elliott-report-inquiry-bulk-power-system-operations-during-december-2022# |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 44 | PJM Elliott Report | PJM, *Winter Storm Elliott: Event Analysis and Recommendation Report* (July 17, 2023) | https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/20230717-winter-storm-elliott-event-analysis-and-recommendation-report.pdf?ref=blog.gridstatus.io |
| 45 | DOE Order No. 202-21-1 | Department of Energy Order No. 202-21-1 (Feb. 14, 2021) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-ercot-february-2021?nrg_redirect=364318 |
| 46 | FERC Energy Primer | FERC, Energy Primer: A Handbook of Energy Market Basics (Dec. 2023) (excerpt) | https://www.ferc.gov/media/energy-primer-handbook-energy-market-basics |
| 47 | MISO Schedule 53 Class Averages | MISO, Planning Year 2026-2027 Preliminary Schedule 53 Class Averages | https://cdn.misoenergy.org/Initial%20Schedule%2053%20Class%20Average%20for%20PY26-27733034.pdf |
| 48 | Utility Dive, MISO begins reviewing 6.1 GW — 70% of it gas — in fast-track interconnection study (Dec. 2, 2025) | Ethan Howland, Utility Dive, MISO begins reviewing 6.1 GW — 70% of it gas — in fast-track interconnection study (Dec. 2, 2025) | https://www.utilitydive.com/news/miso-eras-fast-track-interconnection-study-gas/806747/ |
| 49 | 2025 Energy Innovation Dataset | Energy Innovation, dataset for Coal Power 28 Percent More Expensive In 2024 Than In 2021 (June 5, 2025) | https://energyinnovation.org/report/coal-power-28-percent-more-expensive-in-2024-than-in-2021/ |
| 50 | 2025 Energy Innovation Coal Cost Report | Energy Innovation, Coal Power 28 Percent More Expensive In 2024 Than In 2021 (June 5, 2025) | https://energyinnovation.org/wp-content/uploads/Coal-Cost-Update.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 51 | 2023 Energy Innovation Coal Cost Report | Energy Innovation, Coal Cost Crossover 3.0 (Jan. 2023) | https://energyinnovation.org/wp-content/uploads/Coal-Cost-Crossover-3.0-2.pdf |
| 52 | Department Export Authorization EA-365-C (Oct. 21, 2025) | Research Power Corp., Order No. EA365-C (Oct. 21, 2025) | https://www.energy.gov/gdo/ea-365-c-research-power-corporation |
| 53 | IURC 2025 Winter Reliability Forum (December 2, 2025) | Physical copy of video recording of IURC 2025 Winter Reliability Forum (December 2, 2025), delivered by courier to the United States Department of Energy | |
| 53A | IURC 2025 Winter Forum Internet Link | Internet link hosted on YouTube of video recording of IURC 2025 Winter Reliability Forum (December 2, 2025) | https://www.youtube.com/watch?v=bCzALF4V45M |
| 54 | NARUC Coal Report | National Association of Regulatory Utility Commissioners, Recent Changes to U.S. Coal Plant Operations and Current Compensation Practices (Jan. 2020) (excerpt) | https://www.osti.gov/servlets/purl/1869928 |
| 55 | IEA Flexibility Report | C. Henderson, International Energy Agency, Increasing the flexibility of coal-fired power plants (Sept. 2014) (excerpt) | https://usea.org/sites/default/files/092014_Increasing%20the%20flexibility%20of%20coal-fired%20power%20plants_ccc242.pdf |
| 56 | Bradford Coal Inventory Testimony | Direct Testimony of F. Shane Bradford on behalf of CenterPoint Energy Indiana South, IURC Cause No. 38708 FAC 149, Nov. 17, 2025 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/54dd55d5-bbc4-f011-bbd3-001dd8084346/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=38708FAC149_CEI%20South%20Electric_No%201%20Bradford%20 |

| No. | Exhibit Name | Document Name | URL |
|-----|-------------|---------------|-----|
| | | | Testimony%20and%20Attachments%20PUBLIC_111725.pdf |
| 57 | 2026 EPA IN Haze SIP Approval | Air Plan Approval; Indiana; Regional Haze Plan for the Second Implementation Period | (Pre-print not yet published in Federal Register.) |
| 58 | MISO Tariff Module E-1 | MISO Tariff Module E-1 – Resource Adequacy | https://docs.misoenergy.org/miso12-legalcontent/Module_E-1_-_Resource_Adequacy.pdf |
| 59 | NIPSCO 2025 Winter Reliability Presentation | NIPSCO 2025 Winter Reliability Forum Presentation (Dec. 2, 2025) | https://www.in.gov/iurc/files/3_25-WRF_NIPSCO_FINAL.pdf |
| 60 | MISO Tariff Section 38.2.7 | MISO Tariff Section 38.2.7 | https://docs.misoenergy.org/miso12-legalcontent/Module_C_-_Energy_and_Operating_Reserve_Markets.pdf |
| 61 | MISO Tariff Attachment Y | MISO Tariff Attachment Y | https://docs.misoenergy.org/miso12-legalcontent/Attachment_Y_-_Notification_of_Potential_Resource_-_SCU_Change_of_Status.pdf |
| 62 | FERC Technical Conference Notice | FERC, *Meeting the Challenge of Resource Adequacy in Regional Transmission Organization and Independent System Operator Regions* (June 2, 2025) | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250602-3068&optimized=false&sid=457eb824-f5ed-41fa-a043-a0cd8c55cb4b |
| 63 | Palgrave Handbook | M. Hafner & G. Luciana, Palgrave Handbook of International Economics (2022) (excerpt) | https://link.springer.com/book/10.1007/978-3-030-86884-0 |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 64 | IEA Report | International Energy Agency, The role of CCUS in low-carbon power systems (2020) (excerpt) | https://www.iea.org/reports/the-role-of-ccus-in-low-carbon-power-systems |
| 65 | DOE Transmission Planning Study | DOE, Nat'l Transmission Planning Study, Ch. 2: Long-Term U.S. Transmission Planning Scenarios (2024) | https://www.energy.gov/sites/default/files/2024-10/NationalTransmissionPlanningStudy-Chapter2.pdf |
| 66 | NERC 2024 Interregional Transfer Capability Study, Part 1 | NERC, Interregional Transfer Capability Study: (ITCS) Strengthening Reliability Through the Energy Transformation, Transfer Capability Analysis (Part 1) (Aug. 2024) | https://www.nerc.com/pa/RAPA/Documents/ITCS_Part_1_Results.pdf |
| 67 | CenterPoint Indiana 2025 Winter Reliability Presentation | CenterPoint Energy Indiana South 2025 Winter Reliability Forum Presentation (Dec. 2, 2025) | https://www.in.gov/iurc/files/4_25-WRF_CNP_FINAL.pdf |
| 68 | Grid Strategies Sept. Report | Michael Goggin, *A Review of DOE's Second 202(c) Order for the Campbell Coal Plant* (Sept. 2025) | |
| 69 | IN Haze SIP Responses to Public Comments | Appendix V, Regional Haze State Implementation Plan Responses to Public Comments (Dec. 29, 2021) | https://downloads.regulations.gov/EPA-R05-OAR-2021-0963-0002/attachment_22.pdf |
| 70 | Konidena Decl. | Declaration of Rao Konidena (Sept. 3, 2025) (including attachment) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 71 | NIPSCO 2018 IRP | Northern Indiana Public Company LLC 2018 Integrated Resource Plan, October 2018 | https://www.in.gov/iurc/files/2018-NIPSCO-IRP.pdf |
| 72 | NIPSCO 2021 IRP | Northern Indiana Public Company LLC 2021 Integrated Resource Plan, October 2021 | https://www.in.gov/iurc/files/NIPSCO_2021-Integrated-Resource-Plan-Document-1.pdf |
| 73 | NIPSCO May 2022 Investor Call | NiSource reports first quarter 2022 results | https://www.nisource.com/news/article/nisource-reports-first-quarter-2022-results-20220504 |
| 74 | DOE 202(c) Webpage as of Jan. 22, 2026 | U.S. Dep't of Energy, DOE's Use of Federal Power Act Emergency Authority (last visited Jan. 22, 2026), https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 75 | MISO Tariff Zonal Map | MISO, Attachment VV to FERC-Approved Tariff | https://etariff.ferc.gov/TariffBrowser.aspx?tid=1162 |
| 76 | Secretary Wright's West Virginia Remarks | Charles Young, West Virginia News, *Energy Secretary Chris Wright: Future of U.S. Coal is "long and bright"* (July 5, 2025) | https://www.wvnews.com/news/wvnews/energy-secretary-chris-wright-future-of-u-s-coal-is-long-and-bright/article_948eb88e-2509-42a3-b985-07c47f1ee151.html |
| 77 | MISO 2021 Transmittal Letter | Transmittal Letter, FERC Docket No. ER22-495-000 (Nov. 30, 2021), Accession No. 20211130-5166 | https://elibrary.ferc.gov/eLibrary/filelist?accession_Number=20211130-5166 |
| 78 | NiSource 2024 Annual Report | NiSource Inc. 2024 Annual Report (Form 10-K) | https://www.nisource.com/docs/librariesprovider2/sustainability-archives/2024/nisource-2024-annual-report.pdf?sfvrsn=2068f951_6 |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 79 | CenterPoint 2024 Annual Report | CenterPoint Energy, Inc. Form 10-K (2024 Annual Report) dated March 4, 2025 | https://investors.centerpointenergy.com/static-files/b4884cf5-749f-46ad-9f89-3507d71a725c |
| 80 | CenterPoint Indiana 2025 IRP Summary | Executive Summary, CenterPoint Energy Indiana South 2025 Integrated Resource Plan | https://www.in.gov/iurc/files/CEIS_2025_IRP-Non-Technical_Summary.pdf |
| 81 | Joundi Testimony | Testimony of Zakaria Joundi, FERC Docket No. ER24-1638 (Mar. 28, 2024), Accession No. 20240328-5329 (Tab E) | https://elibrary.ferc.gov/eLibrary/filelist?accession_Number=20240328-5329 |
| 82 | MISO 2024–25 LOLE Study Report | MISO, Planning Year 2024-2025 Loss of Load Expectation Study Report (April 2024) | https://cdn.misoenergy.org/LOLE%20Study%20Report%20PY%202024-2025631112.pdf |
| 83 | MISO 2025–26 LOLE Study Report | MISO, Planning Year 2025-2026 Loss of Load Expectation Study Report (April 2025) | https://cdn.misoenergy.org/PY%202025-2026%20LOLE%20Study%20Report685316.pdf?v=20250313114401 |
| 84 | MISO 2024–25 Auction Results | MISO, Planning Resource Auction Results for Planning Year 2024-25 (Corrected) (April 26, 2024) | https://cdn.misoenergy.org/2024%20PRA%20Results%20Posting%2020240425632665.pdf |
| 85 | MISO Attributes Roadmap | MISO Attributes Roadmap (Dec. 2023) | https://cdn.misoenergy.org/2023%20Attributes%20Roadmap631174.pdf |
| 86 | MISO Attributes Roadmap Technical Appendix | MISO, Technical Appendix: Attributes Roadmap (June 2024) | https://cdn.misoenergy.org/2023%20Attributes%20Technical%20Appendix631176.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 87 | MISO's Response to the Reliability Imperative | MISO's Response to the Reliability Imperative (Feb. 2024) | https://cdn.misoenergy.org/2024+Reliability+Imperative+report+Feb.+21+Final504018.pdf |
| 88 | Schahfer Waste Disposal Area Closure Plan | NIPSCO LLC R.M. Schahfer Generating Station Waste Disposal Area Closure Plan – Version #5 (October 2020) | https://www.nipsco.com/docs/librariesprovider11/rates-and-tariffs/ccr/r.m.-schahfer/r.m.-schahfer-generating-station-closure-and-post-closure-care/r-m-schahfer-generating-station---waste-disposal-area-closure-plan.pdf?sfvrsn=78977151_8 |
| 89 | 2025 OMS-MISO Survey | 2025 OMS-MISO Survey Results (June 6, 2025) | https://cdn.misoenergy.org/20250606%20OMS%20MISO%20Survey%20Results%20Workshop%20Presentation702311.pdf |
| 90 | MISO ERAS Transmittal Letter | Re: Midcontinent Independent System Operator, Inc. Revisions to the Open Access Transmission, Energy and Operating Reserve Tariff Expedited Resource Addition Study Filing, Docket No. ER25-2454-000 (June 6, 2025), Accession No. 20250606-5228 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250606-5228&optimized=false&sid=c2678d58-1762-48e9-bcca-059a2a848538 |
| 91 | MISO ERAS Decision | Order Accepting Tariff Revisions, Subject to Condition, 192 FERC 61,064 (July 21, 2025) | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250721-3077&optimized=false&sid=c2678d58-1762-48e9-bcca-059a2a848538 |
| 92 | Energy Emergency EO | Exec. Order No. 14,156, Declaring a National Energy Emergency | 90 Fed. Reg. 8433 (Jan. 29, 2025) |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 93 | Grid EO | Exec. Order No. 14,262, Strengthening the Reliability and Security of the U.S. Electric Grid | 90 Fed. Reg. 15,521 (Apr. 14, 2025) |
| 94 | NY Times Coal Article | Brad Plumer & Mira Rojanasakul, *Trump Signs Orders Aimed at Reviving a Struggling Coal Industry*, NY Times (Sept. 3, 2025). | https://www.nytimes.com/2025/04/08/climate/trump-order-coal-mining.html |
| 95 | EIA Table 8.4 | U.S. Energy Information Administration Electric Power Annual, Table 8.4: Average power plant operating expenses for major U.S. investor-owned electric utilities | https://www.eia.gov/electricity/annual/table.php?t=epa_08_04.html |
| 96 | July Resource Adequacy Report | DOE, Resource Adequacy Report: Evaluating the Reliability and Security of the United States Grid (July 2025) | https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf |
| 97 | DOE July 7 Press Release | *DOE, Department of Energy Releases Report on Evaluating U.S. Grid Reliability and Security* (July 7, 2025) | https://www.energy.gov/articles/department-energy-releases-report-evaluating-us-grid-reliability-and-security |
| 98 | Culley East Ash Pond Closure Plan | Southern Indiana Gas and Electric Company Written Closure Plan 257.102(b) and (d) for the East Ash Pond at the F.B. Culley Generating Station, Revision 1 (September 2021) | https://www.centerpointenergy.com/en-us/Documents/CCR-Reporting/Culley-Station-Closure/Culley-East-Closure-Plan-Rev-1.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 99 | RFR of July Resource Adequacy Report | Motion to Intervene and Request for Rehearing of Natural Resources Defense Council, the Ecology Center, Environmental Defense Fund, Environmental Law and Policy Center, Public Citizen, Sierra Club, and Vote Solar, DOE Resource Adequacy Report (Aug. 8, 2025). | https://sustainableferc.org/wp-content/uploads/2025/08/2025-08-06_NRDC-et-al-Request-for-Rehearing-DOE-Resource-Adequacy-Report.pdf |
| 100 | NIPSCO 2024 IRP | Northern Indiana Public Service Company LLC 2024 Integrated Resource Plan, Dec. 9, 2024 | https://www.in.gov/iurc/files/NIPSCO-2024-Integrated-Resource-Plan-Document.pdf |
| 101 | Schahfer Title V Permit Modification, Feb. 2025 | Northern Indiana Public Service Company LLC - R.M. Schahfer Generating Station, Significant Permit Modification No. 073-48085-00008, February 4, 2025 | https://ecm.idem.in.gov/cs/idcplg?IdcService=GET_FILE&dID=83755127&dDocName=83759170&Rendition=web&allowInterrupt=1&noSaveAs=1 |
| 102 | MISO Attachment Y Response to NIPSCO | NIPSCO Notice of Planned Participation under 40 C.F.R. 423.19(h), Oct. 29, 2025 (including letter from MISO dated Feb. 3, 2023) | https://www.nipsco.com/docs/librariesprovider11/rates-and-tariffs/elg/schahfer-notice-of-planned-participation---elg-rule-2034-subcategory.pdf?sfvrsn=58f9f251_1 |
| 103 | NIPSCO 2019 Rate Order | IURC Order, Cause No. 45159, Dec. 4, 2019 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/ac4c36e7-ae16-ea11-a997-001dd800b582/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45159%20ORDER%2020191204101716836.pdf |
| 104 | NIPSCO 2023 Rate Order | IURC Order, Cause No. 45772, Aug. 2, 2023 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/a4adc395-4031-ee11-bdf4-001dd80abde3/bb9c6bba-fd52-45ad- |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| | | | 8e64-a444aef13c39?file=ord_45772_080223.pdf |
| 105 | DOE Order No. 202-08-1 | DOE Order No. 202-08-1 (Sept. 14, 2008) | https://www.energy.gov/sites/prod/files/202%28c%29%20order%20202-08-1%20September%2014%2C%202008%20-%20CenterPoint%20Energy.pdf |
| 106 | NIPSCO 2025 Rate Order | IURC Order, Cause No. 46120, June 26, 2025 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/05bff4f4-a952-f011-877a-001dd80b1717/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=ord_46120_062625.pdf |
| 107 | Vectren 2014 IRP | Vectren Energy Delivery of Indiana, Inc. 2014 Integrated Resource Plan, November 2014 | https://www.in.gov/iurc/files/SIGECO-Vectren_2014_IRP_Report.pdf |
| 108 | Vectren 2016 IRP | Vectren Energy Delivery of Indiana, Inc. 2016 Integrated Resource Plan, December 2016 | https://www.in.gov/iurc/files/SIGECO-2016-IRP.pdf |
| 109 | Culley East Ash Pond Extension Demonstration | Southern Indiana Gas and Electric Company Request for Site-Specific Alternative Deadline to Initiate Closure of CCR Surface Impoundment (November 2020) | https://www.centerpointenergy.com/en-us/Documents/CCR-Reporting/Culley-Station-Closure/Culley-East-Site-Specific-Alternative-to-Initiate-Closure_FINAL.pdf |
| 110 | DOE Order No. 202-24-1 | DOE Order No. 202-24-1 (Oct. 9, 2024) | https://www.energy.gov/sites/default/files/2024-10/Duke%20202%28c%29%20Order_100924%20FINAL_JMG%20signed.pdf |
| 111 | MISO December Operations Report | MISO Monthly Operations Report, December 2025 | https://cdn.misoenergy.org/202512%20Market%20and%20Operations%20Report737032.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 112 | Witmeier 2024 Queue Cap Testimony | Errata to Att. X Queue Cap Proposal and Exemptions to Queue Cap, Tab A, Prepared Direct Testimony of Andrew Witmeier, at 21:4, Docket No. ER25-507-000 (Nov. 21, 2024) ("Witmeier 2024 Queue Cap Testimony"), Accession No. 20241213-5063. | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20241213-5063&optimized=false&sid=1e90ede4-da17-4482-8e6d-e346192d0609 |
| 113 | Inst. Pol'y Integrity Report | Inst. Pol'y Integrity, Enough Energy: A Review of DOE's Resource Adequacy Methodology (July 2025) | https://policyintegrity.org/files/publications/IPI_EnoughEnergy_FinalReport.pdf |
| 114 | IURC 2019 CCGT Order | IURC Order, Cause No. 45052, April 24, 2019 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/4dfb39e0-9f66-e911-8151-1458d04ef938/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45052_ord_20190424102046480.pdf |
| 115 | Vectren 2020 IRP | Vectren 2019/2020 Integrated Resource Plan, June 2020 | https://www.in.gov/iurc/files/2019-2020-Vectren-IRP-Volume-1-of-2.pdf |
| 116 | CenterPoint 2023 IRP | CenterPoint Energy Indiana South 2022/2023 Integrated Resource Plan, May 2023 | https://www.in.gov/iurc/files/2022-2023-CNP-IRP-Volume-1-of-2-Redacted.pdf |
| 117 | RTO Insider Article | John Cropley & Amanda Durish Cook, DOE Orders Mich. Coal Plant to Remain Available Another 90 Days, RTO Insider (Aug. 21, 2025). | https://www.rtoinsider.com/113044-doe-orders-mich-coal-plant-to-remain-available-another-90-days/ |

| No. | Exhibit Name | Document Name | URL |
|-----|--------------|---------------|-----|
| 118 | RMI Analysis of Coal Plants' Threats to Reliability | Gabriella Tosado, Ashtin Massie & Joe Daniel, *Reality Check: We Have What's Needed to Reliably Power the Data Center Boom, and It's Not Coal Plants*, RMI (Aug. 12, 2025) | https://rmi.org/reality-check-we-have-whats-needed-to-reliably-power-the-data-center-boom-and-its-not-coal-plants/ |
| 119 | MISO, ZRC Replacement Guidance | ZRC replacement and instructions in the MECT, Resource Adequacy Subcommittee (May 5, 2023 | https://cdn.misoenergy.org/20230524%20RASC%20Item%2004b%20ZRC%20Replacement628921.pdf |
| 120 | 2024 OMS-MISO Survey | 2024 OMS-MISO Survey Results (June 20, 2024) | https://cdn.misoenergy.org/20240620%20OMS%20MISO%20Survey%20Results%20Workshop%20Presentation635585.pdf |
| 121 | Witmeier 2025 ERAS Testimony | Prepared Direct Testimony of Andrew Witmeier, FERC Docket No. ER25-2454-000, (June 6, 2025), Accession No. 20250606-5228 | https://elibrary.ferc.gov/eLibrary/filelist?accession_Number=20250606-5228 |
| 122 | GridLab Report | GridLab Analysis: Department of Energy Resource Adequacy Report (July 11, 2025) | https://gridlab.org/gridlab-analysis-department-of-energy-resource-adequacy-report/ |
| 123 | Duke University Rethinking Load Growth Study | Tyler H. Norris et al., Rethinking Load Growth: Assessing the Potential for Integration of Large Flexible Loads in US Power Systems, Duke University Nicholas Institute for Energy, Environment & Sustainability (Feb. 2025) | https://nicholasinstitute.duke.edu/sites/default/files/publications/rethinking-load-growth.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 124 | November Campbell Order | DOE Order No. 202-25-9 (November 18, 2025) | https://www.energy.gov/sites/default/files/2025-11/Order%20No%20202-25-9.pdf |
| 125 | IURC AB Brown CT Order | IURC Order, Cause No. 45664, June 28, 2022 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/1b5e5448-13f7-ec11-bb3b-001dd80095d7/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=ord_45564_062822%20.pdf |
| 126 | IURC 2025 CenterPoint Rate Order | IURC Order, Cause No. 45990, Feb. 3, 2025 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/4355f179-6be2-ef11-8eea-001dd8067cf7/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=ord_45990_020325.pdf |
| 127 | Chrissy Behme Testimony | Direct Testimony of Chrissy M. Behme on behalf of CenterPoint Energy Indiana South, Cause No. 45990, Dec. 5, 2023 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/63d5d9a2-4594-ee11-8178-001dd8065be9/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45990_CEI%20South_Ex%202%20-%20Behme%20(PUBLIC)_120523.pdf |
| 128 | [Omitted.] | | |
| 129 | Energy Innovation Report | Eric G. Gimon, Senior Fellow, Energy Innovation, *Dodging the Firm Fixation for Data Centers and the Grid* (Nov. 2025) | https://energyinnovation.org/wp-content/uploads/Dodging-the-Firm-Fixation-for-Data-Centers-and-the-Grid.pdf |
| 130 | NERC Emergency Operations | N. Am. Elec. Reliab.Corp., EOP-011-4 Emergency Operations (last visited Jan. 8, 2026) | https://www.nerc.com/globalassets/standards/reliability-standards/eop/eop-011-4.pdf |
| 131 | Eddystone November Order | DOE Order No. 202-25-10 (Nov. 25, 2025) | https://www.energy.gov/sites/default/files/2025-11/Order%20No.%20202-25-10.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 132 | NIPSCO Rate Case Discovery Responses | NIPSCO Responses to Indiana Office of the Utility Consumer Counselor's Ninth Set of Data Requests in IURC Cause No. 46120, Nov. 4, 2024 | |
| 133 | Department Press Release on Centralia Order | U.S. Dep't of Energy, Energy Secretary Ensures Washington Coal Plant Remains Open to Ensure Affordable, Reliable and Secure Power Heading into Winter(Dec. 17, 2025) | https://www.energy.gov/articles/energy-secretary-ensures-washington-coal-plant-remains-open-ensure-affordable-reliable-and |
| 134 | MISO Manual on Resource Adequacy | MISO, BPM-011-r31, *Resource Adequacy Business Practices Manual* (Feb. 21, 2025) | https://www.misoenergy.org/legal/rules-manuals-and-agreements/business-practice-manuals/ |
| 135 | Holtec News Release | Holtec Int'l, *Holtec Receives Coveted "Tier 1 First Mover Award" from the USDOE to Accelerate Deployment of its Dual-Unit SMR-300 Plant at the Company's Palisades Energy Site* (Dec. 2, 2025) | https://holtecinternational.com/hh-40-24/ |
| 136 | Utility Dive Article on Palisades Plant | Meris Lutz, UtilityDive, *Palisades Becomes First Decommissioned US Nuclear Plant to Reach 'Operations' Status* (Aug. 28, 2025) | https://www.utilitydive.com/news/palisades-nuclear-plant-holtec-nrc-operations/758845/ |
| 137 | R Street Institute Commentary: *DOE "Zombies" Are Eating Competitive Power Markets* | Michael Giberson, Senior Fellow, R Street Institute, *Low-Energy Fridays: DOE "Zombies" Are Eating Competitive Power Markets* (Nov. 13, 2025) | https://www.rstreet.org/commentary/low-energy-fridays-doe-zombies-are-eating-competitive-power-markets/ |

| No. | Exhibit Name | Document Name | URL |
|-----|--------------|---------------|-----|
| 138 | MISO Fall 2025 Operations Report | Bd. of Directors Mkts. Committee, MISO, *Operations Report* (Dec. 9, 2025) | https://cdn.misoenergy.org/20251209%20Markets%20Committee%20of%20the%20BOD%20Item%2006%20MISO%20Operations%20Report730265.pdf |
| 139 | Report of the Nat'l Energy Pol'y Dev. Grp | *Reliable, Affordable, and Environmentally Sound Energy for America's Future*: Report of the National Energy Policy Development Group (May 2001) | https://www.nrc.gov/docs/ml0428/ml042800056.pdf |
| 140 | MISO ERAS December Release | MISO, *MISO Announces Second Cycle of ERAS Projects* (Dec. 1, 2025) | https://www.misoenergy.org/meet-miso/media-center/2025---news-releases/miso-announces-second-cycle-of-eras-projects/ |
| 141 | MISO 2025–26 Winter Readiness Presentation | MISO, *2025–26 Winter Readiness Workshop* (Oct. 29, 2025) | https://cdn.misoenergy.org/20251029%20Winter%20Readiness%20Workshop%20Presentation723831.pdf |
| 142 | Energy Reliability and Resilience | U.S. Dep't of Energy, Energy Reliability and Resilience(webpage as of Oct. 21, 2025) | https://web.archive.org/web/20251021071021/https:/www.energy.gov/eere/energy-reliability-and-resilience |
| 143 | NERC 2025–2026 Winter Reliability Assessment | NERC, *2025–2026 Summer Reliability Assessment* (Nov. 18 2025) | https://www.nerc.com/globalassets/our-work/assessments/nerc_wra_2025.pdf |
| 144 | FERC Staff Winter Reliability Assessment | Office of Technical Reporting & Office of Electric Reliability, FERC, *Winter Energy Market and Electric Reliability Assessment 2025–2026: A Staff Report to the Commission* (Nov. 20, 2025) | https://www.ferc.gov/news-events/news/2025-2026-winter-energy-market-and-reliability-assessment |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 145 | NERC Email | Email from NERC Communications Announcements to Rachel Sherrard et al. Re: Announcement \| NERC 2025-2026 Winter Reliability Assessment \| Rising Demand, Evolving Resources Continue to Challenge Winter Grid Reliability (Nov. 18, 2025 at 2:02:44 PM EST) | |
| 146 | Campbell September Rehearing Order | DOE Order No. 202-25-3B (Sept. 8, 2025) | https://www.energy.gov/sites/default/files/2025-09/Campbell%20Order%20Addressing%20Arguments%20Raised%20on%20Rehearing.pdf |
| 147 | Schahfer 2024 Groundwater Monitoring Report | Northern Indiana Public Service Company LLC, R.M. Schahfer Generating Station Waste Disposal Area 2024 Annual Groundwater Monitoring and Corrective Action Report | https://www.nipsco.com/docs/librariesprovider11/rates-and-tariffs/ccr/r.m.-schahfer/r.m.-schahfer-generating-station-groundwater-moniitoring-and-corrective-action/2025-rm-schahfer-generating-station-waste-disposal-area-annual-groundwater-monitoring-and-corrective-action-report.pdf?sfvrsn=1fc2fa51_3 |
| 148 | Culley 2024 Groundwater Monitoring Report | Southern Indiana Gas and Electric Company Annual Groundwater Monitoring and Corrective Action Report, East Ash Pond, F.B. Culley Generating Station, January 2025 | https://www.centerpointenergy.com/en-us/Documents/CCR-Reporting/Culley-Station-Groundwater-Monitoring/Culley_East_Ash_Pond_Annual_GroundWater_Report_2025.pdf |
| 149 | New York Times Article on Trump's Coal Plant Policy | Claire Brown and Brad Plumer, New York Times, *Trump Wants to Halt Almost All Coal Plant Shutdowns. It Could Get Messy* (Jan. 16, 2026) | https://www.nytimes.com/2026/01/16/climate/trump-coal-plants.html |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 150 | May Campbell Order | DOE Order No. 202-25-3 (May 23, 2025) | https://www.energy.gov/sites/default/files/2025-05/Midcontinent%20Independent%20System%20Operator%20%28MISO%29%20202%28c%29%20Order_1.pdf |
| 151 | August Campbell Order | DOE Order No. 202-25-7, August 20,, 2025 | https://www.energy.gov/sites/default/files/2025-08/MISO%20Order%20No.%20202-25-7.pdf |
| 152 | CenterPoint Rate Case Discovery Responses | IURC Cause No. 45990, CenterPoint Energy Indiana South Responses to the Indiana Office of the Utility Consumer Counselor's Twenty-Sixth Set of Data Requests | |
| 153 | Wayne Games 2018 Testimony | IURC Cause No. 45052, Public Rebuttal Testimony of Wayne D. Games on behalf of Southern Indiana Gas and Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc., Sep. 10, 2018 | https://iurc.portal.in.gov/_entity/sharepointdocumentlocation/e4ded2b4-c5b5-e811-8144-1458d04ef938/bb9c6bba-fd52-45ad-8e64-a444aef13c39?file=45052%20VectrenSouth%20PublicExhibit4RRebuttalTestimonyWayneGames%20091018.pdf |
| 154 | EPA COBRA Schahfer Retirement Analysis | U.S. Environmental Protection Agency, CO-Benefits Risk Assessment (COBRA) for nationwide benefit based on reduction of annual emissions from Schahfer 17 and 18 | |
| 155 | EPA COBRA Culley Retirement Analysis | U.S. Environmental Protection Agency, CO-Benefits Risk Assessment (COBRA) for nationwide benefit based | |

xxiv

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| | | on reduction of annual emissions from Culley 2 | |
| 156 | CenterPoint Cost Allocation Complaint | Southern Indiana Gas and Electric Company, Complaint Requesting Fast Track Processing, FERC Docket No. EL26-38-000, Jan. 5, 2026 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20260105-5189 |
| 157 | MISO Comments to FERC | Answer of the Midcontinent Independent System Operator, Inc., FERC Docket No. EL26-36-000, Jan. 20, 2026 | https://elibrary.ferc.gov/eLibrary/filelist?accession_Number=20260120-5226&optimized=false&sid=07e217b3-76d9-4e6a-9a2b-99ee7f2229d4 |